# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID CLARK, KEITH A. FEATHER, JORGE LOPEZ, THOMAS C. MEHEN, SUSIE PETTUS, AND ROBERT HEALY individually and as representatives of a class of participants and beneficiaries on behalf of the Duke Faculty and Staff Retirement Plan,

                    *Plaintiffs*,

v.

DUKE UNIVERSITY AND THE DUKE INVESTMENT ADVISORY COMMITTEE,

                    *Defendants*.

Civil Action No. 1:16-cv-1044

COMPLAINT—CLASS ACTION

JURY TRIAL DEMANDED

1.     Plaintiffs David Clark, Keith A. Feather, Jorge Lopez, Thomas C. Mehen, Susie Pettus, and Robert Healy individually and as representatives of a class of participants and beneficiaries in the Duke Faculty and Staff Retirement Plan (the "Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plan against Defendants Duke University and the Duke Investment Advisory Committee for breach of fiduciary duties under ERISA.[1]

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

2.     The duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent. The marketplace for retirement plan services is established and competitive. Billion dollar defined contribution plans, like the Plan, have tremendous bargaining power to demand low-cost administrative and investment management services. Defendants failed to use the Plan's bargaining power, causing the Plan to pay unreasonable and greatly excessive fees for recordkeeping, administrative, and investment services. Defendants also selected and retained investment options for the Plan that consistently and historically underperformed their benchmarks and charged excessive investment management fees.

3.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty. In addition,

Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the Plan is administered, where at least one of the alleged breaches took place, and where all Defendants reside.

## PARTIES

### The Duke Faculty and Staff Retirement Plan

6.     The Duke Faculty and Staff Retirement Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

7.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

8.     Faculty and staff members of Duke University are eligible to participate in the Plan, which provides the only source of retirement income for many employees of Duke University. Plan participants' retirement income depends upon deferrals of employee compensation, employer matching

3

contributions, and performance of investment options net of fees and expenses.

9.      As of December 31, 2014, the Plan held $4.7 billion in assets and had 37,939 participants with account balances. As such, it is one of the largest defined contribution plans in the United States, ranking in the top 1% of all defined contribution plans that filed a Form 5500 with the Department of Labor based on total plan assets. Plans of such great size are commonly referred to as "jumbo plans".

## Plaintiffs

10.      David Clark resides in Durham, North Carolina, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

11.      Keith A. Feather resides in Hillsborough, North Carolina, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

12.      Jorge Lopez resides in Apex, North Carolina, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

4

13. Thomas C. Mehen resides in Irvine, California, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

14. Susie Pettus resides in Creekmoor, North Carolina, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

15. Robert Healy resides in Durham, North Carolina, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan

## Defendants

16. Duke University ("Duke") is a non-profit corporation organized under North Carolina law with its principal place of business in Durham, North Carolina. Duke is the fiduciary responsible for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Upon information and belief, Duke has exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable Duke to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan, and the selection, monitoring, and removal of the investment options made available

5

to participants for the investment of their contributions and provision of their retirement income.

17. Duke is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

18. Duke formed an Investment Advisory Committee to assist with the administration of the Plan. The named fiduciary and Plan Administrator under 29 U.S.C. §1002(16)(A)(i), however, remains Duke University. The Plan Administrator is responsible for all matters relating to the Plan, including, but not limited to: resolving questions about eligibility to participate in the Plan, making decisions about claims for benefits, and resolving questions that arise regarding the Plan's administration and operation. The Plan Administrator may delegate responsibility for any aspect of the Plan's administration to other individuals or entities.

19. Upon information and belief, the Investment Advisory Committee is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets,

6

and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

20.     Because the Investment Advisory Committee and its delegates have acted as alleged herein as the agents of Duke University, all of them are collectively referred to as Defendants.

## FACTS APPLICABLE TO ALL COUNTS

### I.     Plan investments

21.     Under the terms of the Plan, Plan participants are eligible to contribute a discretionary amount of their annual compensation to the Plan, and Duke makes a matching contribution.

22.     Defendants exercise exclusive and discretionary authority and control over the investment options that are included in the Plan.

23.     Defendants included as Plan investment options mutual funds and insurance company variable annuity products offered by the Plan's *four* recordkeepers: the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), the Vanguard Group, Inc. ("Vanguard"), Fidelity Investments Institutional Operations Company ("Fidelity"), and the Variable Life Insurance Company ("VALIC"). Defendants select investment options into which participants' investments are directed, and decide which investment options to remove from the Plan.

7

24.     As of December 31, 2014, Defendants provided over 400 investment options to Plan participants. Among the available investments, 40 were TIAA-CREF options, almost 100 were Vanguard options, over 200 were Fidelity options, and almost 100 were VALIC options. These investments included retail and institutional share class mutual funds, insurance separate accounts, variable annuity options, and fixed annuity options. The retail share class mutual funds are designed for small individual investors, not jumbo retirement plans such as the Plan, and are identical in every respect to institutional share class funds, except for much higher fees.

25.     These investments are designated by Defendants as available investment alternatives offered under the Plan.

26.     The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent upon the claims-paying ability of Teachers Insurance and Annuity Association of America.

27.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, some participants who invest in the TIAA Traditional

8

Annuity must pay a 2.5% surrender charge to withdraw their investment in a single lump sum within 120 days of termination of employment. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is over a *ten-year period,* unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years.

28.    The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

29.    The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

    a.  "administrative expense" charge (24 bps);[2]

    b.  "distribution expense" charge (9.5 bps);

    c.  "mortality and expense risk" charge (0.5 bps); and

---

[2] One basis point is equity to 1/100th of one percent (or 0.01%). Expenses as of May 1, 2014.

d. "investment advisory expense" charge (ranging from 4 to 12.5 bps).

30.     The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2013, these charges consisted of the following:

a. "administrative expense" charge (26.5 bps);

b. "distribution expense" charge (8 bps);

c. "mortality and expense risk" charge (0.5 bps);

d. "liquidity guarantee" (18 bps); and

e. "investment management expense" charge (36.5 bps).

31.     The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

10

32.     The Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

33.     The Fidelity investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

34.     Mutual funds have shareholders who are not participants in the Plan, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in the mutual funds, including participants in the Plan, pay the expenses set forth in ¶¶31–32.

35.     The VALIC investment options offered to Plan participants include fixed and variable annuity account options. These options charge varying amounts for investment management in addition to distribution, marketing, and other expenses. The value of each participant's investment in these variable accounts will change over time based on investment experience and the expenses of the account. The variable accounts include insurance company pooled separate accounts that invest in underlying mutual funds advised by VALIC or other mutual fund companies, such as Vanguard. For

these options, VALIC charges fees *in addition to* the expense ratio of the underlying mutual funds, which can reach *multiples* of the total fees charged by the mutual funds. For instance, VALIC charged 118 bps for the VALIC Vanguard Lifestrategy Conservative Growth Fund when the underlying Vanguard Lifestrategy Conservative Growth Fund (VSCGX) charged 13 bps, an increase of *over 807%.* See infra ¶60.

36.    The VALIC fixed accounts invest in the general account of VALIC and depend upon the claims-paying ability of VALIC. These options offer a fixed rate of return to participants.

37.    As of December 31, 2014, of the Plan's $4.7 billion in net assets, TIAA-CREF funds accounted for $1.3 billion, Vanguard funds accounted for $887 million, Fidelity funds accounted for $1.6 billion, and VALIC funds accounted for $903 million.

## II.    Defendants' actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.

38.    Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These recordkeepers primarily differentiate

12

themselves based on price and vigorously compete for business by offering the best price.

39.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

40.     The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $75,000 account balance is the same for a participant with $7,500 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

41.     Jumbo defined contribution plans, like the Plan, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee

13

charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants.

42.     Some investments engage in a practice known as revenue sharing. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to use their higher-cost mutual funds as plan investment options.  Prudent fiduciaries, if they use asset-based charges to pay for recordkeeping, must monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary must ensure that, if asset based revenue sharing is used to pay recordkeeping costs, the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable recordkeeping fee.

43.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and

custodians or trustees. This leverages plan assets to ensure that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services.

44.     According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[3]

45.     It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

> **1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.
> **2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009).[4]

---

[3] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

[4] Available at https://www.standard.com/pensions/publications/14883_1109.pdf (emphasis in original).

46.     The benefits of using a single recordkeeper are clear.

By selecting a single recordkeeper, plan sponsors can enhance
their purchasing power and negotiate lower, transparent
investment fees for participants. Participants will benefit from a
more manageable number of institutional-quality investment
options to choose from. Participants will also benefit from
customized and consistent enrollment, education and ongoing
communication materials.[5]

47.     In a study titled "How 403(b) Plans Are Wasting Nearly $10

Billion Annually, and What Can Be Done to Fix It", AonHewitt, an

independent investment consultant, similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne
costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an "open
architecture" investment menu, and packaging the options within
a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce
compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate
competitive pricing.[6]

48.     Another independent investment consultant, Towers Watson,

also recognized that using multiple recordkeepers has caused:

---

[5] *Id.*

[6] AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually,
and What Can Be Done to Fix  It* (Jan. 2016), available at
https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-
4bc0-aac1-
1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annuall
y_Whitepaper_FINAL.pdf.aspx.

16

high investment and administrative costs, and complex choices
for plan participants in terms of the number of vendors and the
array of investment options. Additionally, this complexity has
made it difficult for employers to monitor available choices and
provide ongoing oversight…Such designs typically are expensive
and fail to leverage plan size. They can also be confusing to the
average plan participant, who is likely to fall short of achieving
retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New
Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2
(2012).[7]

49.     Other industry literature makes the same points. See, e.g.,
Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,*
PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single
provider was an overall drop in administrative fees and expenses.
Recordkeeping basis points returned to the plan sponsors rather than to the
vendor. All plan money aggregated into a single platform, and participants
were able to save on fee structure. This also eliminated the complications and
confusion of having three different recordkeepers.");[8] Paul B. Lasiter, *Single
Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying,
among other things, the key disadvantages of maintaining a multi-provider

---

[7] Available at
https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-
14E3-4C52-BB78-8930F598FD26%7D.

[8] Available at http://www.plansponsor.com/paring-down-providers-a-403b-
sponsors-experience/?fullstory=true.

17

platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[9]

50. Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plan. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[10]

51. Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continued to contract with *four* separate recordkeepers for the Plan: TIAA-CREF, Vanguard, Fidelity, and VALIC. This inefficient and costly structure has caused Plan participants to

---

[9] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[10] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

18

pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services.

52.     The Plan's recordkeepers receive compensation for providing such services through per-participant fees and/or revenue sharing payments from the Plan's investments.

53.     Upon information and belief and industry experts, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plan's TIAA-CREF investments are set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

54.     Upon information and belief, Vanguard's recordkeeping division is compensated for recordkeeping services based on internal revenue sharing it receives from using higher-cost share classes of Vanguard mutual funds, as opposed to institutional classes readily available to a jumbo plan such as the Plan.

55. Upon information and belief, Fidelity's recordkeeping division is compensated based on internal and external revenue sharing it receives from the mutual funds on Fidelity's platform.

56. Upon information and belief, VALIC's recordkeeping division is compensated based on internal and external revenue sharing it receives from the annuities and mutual funds on VALIC's platform.

57. In addition, TIAA-CREF, Vanguard, Fidelity and VALIC also receive additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

58. Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level (roughly 30,000), and the recordkeeping market, a reasonable recordkeeping fee for the Plan would have been a fixed amount between $700,000 and $1.1 million (approximately $30 per participant with an account balance).

59. Based on the direct and indirect compensation levels shown on the Plan's Form 5500s filed with the Department of Labor and upon information and belief regarding the internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the

20

Plan paid at least $6.4 to $10.4 million (or approximately $280 per participant with an account balance) per year from 2010 to 2014, over 830% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

60.    This is a *very* conservative total because this amount excludes asset-based revenue sharing payments VALIC received for recordkeeping and administrative services on over $900 million invested in VALIC variable and fixed accounts. This information was not disclosed to Plan participants. These asset-based payments are substantial. For instance, on each of the variable accounts, VALIC charged fees *47% to 807%* higher than the fees actually charged by the underlying mutual funds, and received additional compensation through revenue sharing payments from proprietary mutual funds and other third-party mutual funds. Based on information presently available to Plaintiffs, the amounts currently charged by VALIC on its variable annuity products and the expenses of the underlying mutual funds are set forth below.

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC American Beacon Holland Large Cap Growth Fund | 196 bps | American Beacon Holland Large Cap Growth Fund (Inv) (LHGFX) | 116 bps | 68.97% |
| VALIC Ariel Appreciation Fund | 192 bps | Ariel Appreciation Fund (Inv) (CAAPX) | 112 bps | 71.43% |
| VALIC Ariel Fund | 182 bps | Ariel Fund (Inv) (ARGFX) | 102 bps | 78.43% |
| VALIC Asset Allocation Fund | 150 bps | VALIC Company I Asset Allocation Fund (VCAAX) | 70 bps | 114.29% |
| VALIC Blue Chip Growth Fund | 163 bps | VALIC Company I Blue Chip Growth Fund (VCBCX) | 83 bps | 96.39% |
| VALIC Broad Cap Value Income Fund | 165 bps | VALIC Company I Broad Cap Value Income Fund (VBCVX) | 85 bps | 94.12% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Capital Conservation Fund | 143 bps | VALIC Company I Capital Conservation Fund (VCCCX) | 63 bps | 126.98% |
| VALIC Core Equity Fund | 160 bps | VALIC Company I Core Equity Fund (VCCEX) | 80 bps | 100.00% |
| VALIC Dividend Value Fund | 162 bps | VALIC Company I Dividend Value Fund (VCIGX) | 82 bps | 97.56% |
| VALIC Emerging Economies Fund | 174 bps | VALIC Company I Emerging Economies Fund (VCGEX) | 94 bps | 85.11% |
| VALIC Foreign Value Fund | 159 bps | VALIC Company I Foreign Value Fund (VCFVX) | 79 bps | 101.27% |
| VALIC Global Social Awareness Fund | 142 bps | VALIC Company I Global Social Awareness Fund (VCSOX) | 62 bps | 129.03% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Global Strategy Fund | 144 bps | VALIC Company I Global Strategy Fund (VGLSX) | 64 bps | 125.00% |
| VALIC Government Securities Fund | 144 bps | VALIC Company I Government Securities Fund (VCGSX) | 64 bps | 125.00% |
| VALIC Growth Fund | 160 bps | VALIC Company I Growth Fund (VCULX) | 80 bps | 100.00% |
| VALIC Growth & Income Fund | 165 bps | VALIC Company I Growth & Income Fund (VCGAX) | 85 bps | 94.12% |
| VALIC Health Sciences Fund | 185 bps | VALIC Company I Health Sciences Fund (VCHSX) | 105 bps | 76.19% |
| VALIC International Equities Index Fund | 124 bps | VALIC Company I International Equities Index Fund (VCIEX) | 44 bps | 181.82% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC International Government Bond Fund | 145 bps | VALIC Company I International Government Bond Fund (VCIFX) | 65 bps | 123.08% |
| VALIC International Growth Fund | 181 bps | VALIC Company I International Growth Fund (VCINX) | 101 bps | 79.21% |
| VALIC Large Cap Core Fund | 163 bps | VALIC Company I Large Cap Core Fund (VLCCX) | 83 bps | 96.39% |
| VALIC Large Capital Growth Fund | 155 bps | VALIC Company I Large Capital Growth Fund (VLCGX) | 75 bps | 106.67% |
| VALIC Mid Cap Index Fund | 116 bps | VALIC Company I Mid Cap Index Fund (VMIDX) | 36 bps | 222.22% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Mid Cap Strategic Growth Fund | 161 bps | VALIC Company I Mid Cap Strategic Growth Fund (VMSGX) | 81 bps | 98.77% |
| VALIC Money Market I Fund | 131 bps | VALIC Company I Money Market I Fund (VCIXX) | 51 bps | 156.86% |
| VALIC NASDAQ-100 Index Fund | 133 bps | VALIC Company I NASDAQ-100 Index Fund (VCNIX) | 53 bps | 150.94% |
| VALIC Science & Technology Fund | 178 bps | VALIC Company I Science & Technology Fund (VCSTX) | 98 bps | 81.63% |
| VALIC Small Cap Fund | 173 bps | VALIC Company I Small Cap Fund (VCSMX) | 93 bps | 86.02% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Small Cap Aggressive Growth Fund | 179 bps | VALIC Company I Small Cap Aggressive Growth Fund (VSAGX) | 99 bps | 80.81% |
| VALIC Small Cap Index Fund | 120 bps | VALIC Company I Small Cap Index Fund (VCSLX) | 40 bps | 200.00% |
| VALIC Small Cap Special Value Fund | 167 bps | VALIC Company I Small Cap Special Values Fund (VSSVX) | 87 bps | 91.95% |
| VALIC Small-Mid Growth Fund | 180 bps | VALIC Company I Small-Mid Growth Fund (VSSGX) | 100 bps | 80.00% |
| VALIC Stock Index Fund | 114 bps | VALIC Company I Stock Index Fund (VSTIX) | 34 bps | 235.29% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Value Fund | 165 bps | VALIC Company I Value Fund (VAVAX) | 85 bps | 94.12% |
| VALIC Aggressive Growth Lifestyle Fund | 140 bps | VALIC Company II Aggressive Growth Lifestyle Fund (VAGLX) | 85 bps | 64.71% |
| VALIC Capital Appreciation Fund | 140 bps | VALIC Company II Capital Appreciation Fund (VCCAX) | 85 bps | 64.71% |
| VALIC Conservative Growth Lifestyle Fund | 142 bps | VALIC Company II Conservative Growth Lifestyle Fund (VCGLX) | 87 bps | 63.22% |
| VALIC Core Bond Fund | 132 bps | VALIC Company II Core Bond Fund (VCCBX) | 77 bps | 71.43% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC High Yield Bond Fund | 151 bps | VALIC Company II High Yield Bond Fund (VCHYX) | 96 bps | 57.29% |
| VALIC International Opportunities Fund | 155 bps | VALIC Company II International Opportunities Fund (VISEX) | 100 bps | 55.00% |
| VALIC Large Cap Value Fund | 136 bps | VALIC Company II Large Cap Value Fund (VACVX) | 81 bps | 67.90% |
| VALIC Mid Cap Growth Fund | 140 bps | VALIC Company II Mid Cap Growth Fund (VAMGX) | 85 bps | 64.71% |
| VALIC Mid Cap Value Fund | 160 bps | VALIC Company II Mid Cap Value Fund (VMCVX) | 105 bps | 52.38% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Moderate Growth Lifestyle Fund | 140 bps | VALIC Company II Moderate Growth Lifestyle Fund (VMGLX) | 85 bps | 64.71% |
| VALIC Money Market II Fund | 110 bps | VALIC Company II Money Market II Fund (VIIXX) | 55 bps | 100.00% |
| VALIC Small Cap Growth Fund | 171 bps | VALIC Company II Small Cap Growth Fund (VASMX) | 116 bps | 47.41% |
| VALIC Small Cap Value Fund | 150 bps | VALIC Company II Small Cap Value Fund (VCSVX) | 95 bps | 57.89% |
| VALIC Socially Responsible Fund | 111 bps | VALIC Company II Socially Responsible Fund (VCSRX) | 56 bps | 98.21% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Strategic Bond Fund | 142 bps | VALIC Company II Strategic Bond Fund (VCSBX) | 87 bps | 63.22% |
| VALIC Vanguard LifeStrategy Conservative Growth Fund | 118 bps | Vanguard LifeStrategy Conservative Growth Fund (Inv) (VSCGX) | 13 bps | 807.69% |
| VALIC Vanguard LifeStrategy Growth Fund | 120 bps | Vanguard LifeStrategy Growth Fund (Inv) (VASGX) | 15 bps | 700.00% |
| VALIC Vanguard LifeStrategy Moderate Growth Fund | 119 bps | Vanguard LifeStrategy Moderate Growth Fund (Inv) (VSMGX) | 14 bps | 750.00% |
| VALIC Vanguard Long-Term Investment-Grade Fund | 102 bps | Vanguard Long-Term Investment-Grade Fund (Inv) (VWESX) | 22 bps | 363.64% |
| VALIC Vanguard Long-Term Treasury Fund | 100 bps | Vanguard Long-Term Treasury Fund (Inv) (VUSTX) | 20 bps | 400.00% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Vanguard Wellington Fund | 131 bps | Vanguard Wellington Fund (Inv) (VWELX) | 26 bps | 403.85% |
| VALIC Vanguard Windsor II Fund | 139 bps | Vanguard Windsor II Fund (Inv) (VWNFX) | 34 bps | 308.82% |

61.     The impact of excessive fees on employees' and retirees'
retirement assets is dramatic. The U.S. Department of Labor has noted that
a 1% higher level of fees over a 35-year period makes a 28% difference in
retirement assets at the end of a participant's career. U.S. Dep't of Labor, *A
Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[11]

62.     Upon information and belief, Defendants also failed to conduct a
competitive bidding process for the Plan's recordkeeping services. A
competitive bidding process for the Plan's recordkeeping services would have
produced a reasonable recordkeeping fee for the Plan. This competitive
bidding process would have enabled Defendants to select a recordkeeper

---

[11] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

charging reasonable fees, negotiate a reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

63.     Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers, and therefore, caused the Plan to pay unreasonable expenses for administration. Had Defendants monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $45 million of their retirement savings in the last six years alone through unreasonable recordkeeping fees.[12]

## III.     Defendants failed to prudently consider or offer dramatically lower-cost investments that were available to the Plan, including identical mutual funds in lower-cost share classes.

64.     Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs."

---

[12] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS

J. 7, 8 (Jan./Feb. 1991);[13] Eugene F. Fama & Kenneth R. French, *Luck Versus*

*Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915

(2010)("After costs…in terms of net returns to investors, active investment

must be a negative sum game.").

65.     To the extent managers show any sustainable ability to beat the

market, the outperformance is nearly always dwarfed by mutual fund

expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual*

*Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund*

*Performance: An Empirical Decomposition into Stock-Picking Talent, Style,*

*Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-

return level, the funds underperform broad market indexes by one percent

per year").

66.     If an individual high-cost mutual fund exhibits market-beating

performance over a short period of time, studies demonstrate that

outperformance during a particular period is not predictive of whether a

mutual fund will perform well in the future. Laurent Barras et al., *False*

*Discoveries in Mutual Fund Performance: Measuring Luck in Estimated*

*Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in*

---

[13] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

*Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart*, On Persistence in Mutual Fund Performance,* at 57.

67.    Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

68.    Moreover, jumbo retirement plans have enormous bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[14]

69.     Apart from the fact that a prudent fiduciary will carefully weigh whether an actively managed fund is likely to outperform an index over time, net of fees, academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

70.     Lower-cost institutional share classes of mutual funds compared to retail shares are available to institutional investors, and far lower-cost

---

[14] Available at
http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

share classes are available to jumbo investors like the Plan. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments to defined contribution plans.

71.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. Therefore, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plan's size, if requested, the investment provider would make available lower-cost share classes for the Plan, if there were any fund that did not individually reach the threshold.

72.     Despite these far lower-cost options, Defendants selected and continue to retain Plan investment options with far higher costs than were and are available for the Plan based on its size. Moreover, for the *exact same mutual fund option*, Defendants selected and continue to offer far higher-cost share classes of identical mutual funds than were easily available to the Plan. The following table lists the significantly lower-cost share classes *identical* to the Plan's mutual funds that were available since 2010, but were not used:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Funds Washington Mutual-R5 (RWMFX) | 42 bps | American Funds Washington Mutual-R6 (RWMGX) | 37 bps | 13.51% |
| Deutsche Core Equity-S (SCDGX) | 66 bps | Deutsche Core Equity-Inst (SUWIX) | 50 bps | 32.00% |
| Deutsche Core Plus Income-S (SCSBX) | 72 bps | Deutsche Core Plus Income-Inst (SZIIX) | 66 bps | 9.09% |
| Deutsche CROCI Equity Dividend-S (KDHSX) | 102 bps | Deutsche CROCI Equity Dividend-Inst (KDHIX) | 82 bps | 24.39% |
| Deutsche CROCI International-S (SCINX) | 94 bps | Deutsche CROCI International-Inst (SUIIX) | 81 bps | 16.05% |
| Deutsche Emerging Markets Equity-S (SEMGX) | 155 bps | Deutsche Emerging Markets Equity-Inst (SEKIX) | 132 bps | 17.42% |
| Deutsche Enhanced Emerging Markets Fixed Income-S (SCEMX) | 99 bps | Deutsche Enhanced Emerging Markets Fixed Income-Inst (SZEIX) | 81 bps | 22.22% |
| Deutsche Global Equity-S (DBIVX) | 139 bps | Deutsche Global Equity-Inst (MGINX) | 113 bps | 23.01% |
| Deutsche Global Growth-S (SCOBX) | 123 bps | Deutsche Global Growth-Inst (SGQIX) | 120 bps | 2.50% |
| Deutsche Global High Income-S (SGHSX) | 89 bps | Deutsche Global High Income-Inst (MGHYX) | 73 bps | 21.92% |
| Deutsche Global Income Builder-S (KTRSX) | 77 bps | Deutsche Global Income Builder-Inst (KTRIX) | 60 bps | 28.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Deutsche Global Small Cap-S (SGSCX) | 130 bps | Deutsche Global Small Cap-Inst (KGDIX) | 113 bps | 15.04% |
| Deutsche GNMA-S (SGINX) | 54 bps | Deutsche GNMA-Inst (GIGGX) | 45 bps | 20.00% |
| Deutsche Gold & Precious Metals-S (SCGDX) | 115 bps | Deutsche Gold & Precious Metals-Inst (SGDIX) | 100 bps | 15.00% |
| Deutsche Health and Wellness-S (SCHLX) | 131 bps | Deutsche Health and Wellness-Inst (SUHIX) | 106 bps | 23.58% |
| Deutsche Large Cap Focus Growth-S (SCQGX) | 111 bps | Deutsche Large Cap Focus Growth-Inst (SGGIX) | 87 bps | 27.59% |
| Deutsche Mid Cap Growth-S (SMCSX) | 109 bps | Deutsche Mid Cap Growth-Inst (BTEAX) | 30 bps | 263.33% |
| Deutsche Mid Cap Value-S (MIDTX) | 110 bps | Deutsche Mid Cap Value-Inst (MIDIX) | 102 bps | 7.84% |
| Deutsche Science and Technology-S (KTCSX) | 106 bps | Deutsche Science and Technology-Inst (KTCIX) | 67 bps | 58.21% |
| Deutsche Short Duration-S (DBPIX) | 63 bps | Deutsche Short Duration-R6 (PPILX) | 50 bps | 26.00% |
| Deutsche Small Cap Growth-S (SSDSX) | 104 bps | Deutsche Small Cap Growth-Inst (SSDIX) | 98 bps | 6.12% |
| Deutsche Small Cap Value-S (KDSSX) | 105 bps | Deutsche Small Cap Value-Inst (KDSIX) | 80 bps | 31.25% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Deutsche Strategic Government Securities-S (KUSMX) | 62 bps | Deutsche Strategic Government Securities-Inst (KUSIX) | 51 bps | 21.57% |
| Deutsche World Dividend-S (SCGEX) | 115 bps | Deutsche World Dividend-R6 (SERNX) | 95 bps | 21.05% |
| Fidelity China Region (FHKCX) | 98 bps | Fidelity Advisor China Region-I (FHKIX) | 93 bps | 5.38% |
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond-Inst (FCNVX) | 30 bps | 33.33% |
| Fidelity Dividend Growth (FDGFX) | 92 bps | Fidelity Dividend Growth-K (FDGKX) | 71 bps | 29.58% |
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX) | 125 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA)-I (FIEMX) | 119 bps | 5.04% |
| Fidelity Global Commodity Stock (FFGCX) | 109 bps | Fidelity Advisor Global Commodity Stock-I (FFGIX) | 107 bps | 1.87% |
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth-Z (FZAJX) | 88 bps | 18.18% |
| Fidelity International Real Estate (FIREX) | 114 bps | Fidelity International Real Estate-Inst (FIRIX) | 109 bps | 4.59% |
| Fidelity International Small Cap (FISMX) | 142 bps | Fidelity International Small Cap-Inst (FIXIX) | 131 bps | 8.40% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity International Small Cap Opportunities (FSCOX) | 89 bps | Fidelity International Small Cap Opportunities-Inst (FOPIX) | 88 bps | 1.14% |
| Fidelity Japan (FJPNX) | 80 bps | Fidelity Advisor Japan-I (FJPIX) | 75 bps | 6.67% |
| Fidelity Large Cap Growth (FSLGX) | 86 bps | Fidelity Advisor Large Cap Growth-Inst (FLNOX) | 74 bps | 16.22% |
| Fidelity Latin America (FLATX) | 103 bps | Fidelity Latin America-Inst (FLFIX) | 101 bps | 1.98% |
| Fidelity Low-Priced Stock (FLPSX) | 99 bps | Fidelity Low-Priced Stock-K (FLPKX) | 85 bps | 16.47% |
| Fidelity Mega Cap Stock (FGRTX) | 68 bps | Fidelity Mega Cap Stock-Z (FZALX) | 54 bps | 25.93% |
| Fidelity Mid Cap Growth (FSMGX) | 70 bps | Fidelity Advisor Mid Cap Growth-Inst (FGCOX) | 59 bps | 18.64% |
| Fidelity Real Estate Income (FRIFX) | 92 bps | Fidelity Advisor Real Estate Income-I (FRIRX) | 89 bps | 3.37% |
| Fidelity Select Gold (FSAGX) | 94 bps | Fidelity Advisor Gold-I (FGDIX) | 91 bps | 3.30% |
| Fidelity Select Materials (FSDPX) | 94 bps | Fidelity Advisor Materials-I (FMFEX) | 93 bps | 1.08% |
| Fidelity Spartan 500 Index-Inst (FXSIX) | 5 bps | Fidelity Spartan 500 Index-Adv Inst (FXAIX) | 3 bps | 66.67% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan Extended Market Index-Adv (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index-Adv Inst (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Inflation-Protected Index-Adv (FSIYX) | 10 bps | Fidelity Spartan Inflation-Protected Index-Adv Inst (FIPDX) | 5 bps | 100.00% |
| Fidelity Spartan International Index-Adv (FSIVX) | 12 bps | Fidelity Spartan International Index-Adv Inst (FSPSX) | 6 bps | 100.00% |
| Fidelity Spartan International Index-Inv (FSIIX) | 10 bps | Fidelity Spartan International Index-Adv (FSIVX) | 7 bps | 42.86% |
| Fidelity Spartan International Index-Inv (FSIIX) | 11 bps | Fidelity Spartan International Index-Adv Inst (FSPSX) | 6 bps | 83.33% |
| Fidelity Spartan Long Term Treasury Bond Index-Inv (FLBIX) | 20 bps | Fidelity Spartan Long Term Treasury Bond Index-Adv (FLBAX) | 10 bps | 100.00% |
| Fidelity Spartan Short Term Treasury Index-Inv (FSBIX) | 20 bps | Fidelity Spartan Short Term Treasury Index-Adv (FSBAX) | 10 bps | 100.00% |
| Fidelity Spartan Total Market Index (Ins) (FSKTX) | 6 bps | Fidelity Spartan Total Market Index-Adv Inst (FSKAX) | 5 bps | 20.00% |
| Fidelity Spartan US Bond Index-Inst (FXSTX) | 7 bps | Fidelity Spartan US Bond Index-Adv Inst (FXNAX) | 5 bps | 40.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Stock Selector Small Cap (FDSCX) | 72 bps | Fidelity Advisor Stock Selector Small Cap-I (FCDIX) | 62 bps | 16.13% |
| ICT Treasury Portfolio Deutsche US Treasury Money-S (IUSXX) | 23 bps | ICT Treasury Portfolio Deutsche US Treasury Money-Inst (ICTXX) | 21 bps | 9.52% |
| MFS Value-R4 (MEIJX) | 67 bps | MFS Value-R5 (MEIKX) | 56 bps | 19.64% |
| Oppenheimer Developing Markets-Y (ODVYX) | 103 bps | Oppenheimer Developing Markets-I (ODVIX) | 88 bps | 17.05% |
| PIMCO Total Return-Adm (PTRAX) | 71 bps | PIMCO Total Return-Inst (PTTRX) | 46 bps | 54.35% |
| Prudential Jennison Mid Cap Growth-Z (PEGZX) | 76 bps | Prudential Jennison Mid Cap Growth (Q) (PJGQX) | 60 bps | 26.67% |
| Strategic Advisers International Multi-Manager (FMJDX) | 116 bps | Strategic Advisers International Multi-Manager-F (FMBKX) | 107 bps | 8.41% |
| Strategic Advisers Small Mid Cap Multi- Manager (FNAPX) | 116 bps | Strategic Advisers Small Mid Cap Multi- Manager-F (FARMX) | 106 bps | 9.43% |
| TIAA-CREF Equity Index-Ret (TIQRX) | 33 bps | TIAA-CREF Equity Index-Inst (TIEIX) | 9 bps | 266.67% |
| TIAA-CREF Growth & Income-Ret (TRGIX) | 73 bps | TIAA-CREF Growth & Income-Inst (TIGRX) | 52 bps | 40.38% |

43

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF International Equity-Ret (TRERX) | 78 bps | TIAA-CREF International Equity-Inst (TIIEX) | 57 bps | 36.84% |
| TIAA-CREF International Equity Index-Ret (TRIEX) | 35 bps | TIAA-CREF International Equity Index-Inst (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF Large-Cap Growth Index-Ret (TRIRX) | 34 bps | TIAA-CREF Large-Cap Growth Index-Inst (TILIX) | 9 bps | 277.78% |
| TIAA-CREF Large-Cap Value-Ret (TRLCX) | 74 bps | TIAA-CREF Large-Cap Value-Inst (TRLIX) | 49 bps | 51.02% |
| TIAA-CREF Large-Cap Value Index-Ret (TRCVX) | 34 bps | TIAA-CREF Large-Cap Value Index-Inst (TILVX) | 9 bps | 277.78% |
| TIAA-CREF Lifecycle 2010-Ret (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010-Inst (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015-Ret (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015-Inst (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020-Ret (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020-Inst (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025-Ret (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025-Inst (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030-Ret (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030-Inst (TCRIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2035-Ret (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035-Inst (TCIIX) | 47 bps | 53.19% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2040-Ret (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040-Inst (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045-Ret (TTFRX) | 72 bps | TIAA-CREF Lifecycle 2045-Inst (TTFIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2050-Ret (TLFRX) | 71 bps | TIAA-CREF Lifecycle 2050-Inst (TFTIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle Retirement Income-Ret (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income-Inst (TLRIX) | 40 bps | 62.50% |
| TIAA-CREF Mid-Cap Growth-Ret (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth-Inst (TRPWX) | 52 bps | 48.08% |
| TIAA-CREF Mid-Cap Value-Ret (TRVRX) | 74 bps | TIAA-CREF Mid-Cap Value-Inst (TIMVX) | 49 bps | 51.02% |
| TIAA-CREF Real Estate Securities-Ret (TRRSX) | 81 bps | TIAA-CREF Real Estate Securities-Inst (TIREX) | 56 bps | 44.64% |
| TIAA-CREF S&P 500 Index-Ret (TRSPX) | 33 bps | TIAA-CREF S&P 500 Index-Inst (TISPX) | 8 bps | 312.50% |
| TIAA-CREF Small-Cap Blend Index-Ret (TRBIX) | 34 bps | TIAA-CREF Small-Cap Blend Index-Inst (TISBX) | 9 bps | 277.78% |
| TIAA-CREF Small-Cap Equity-Ret (TRSEX) | 80 bps | TIAA-CREF Small-Cap Equity-Inst (TISEX) | 55 bps | 45.45% |
| TIAA-CREF Social Choice Equity-Ret (TRSCX) | 45 bps | TIAA-CREF Social Choice Equity-Inst (TISCX) | 22 bps | 104.55% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Valic American Century Mid Cap Value-Inst | 81 bps | American Century Mid Cap Value-R6 (AMDVX) | 65 bps | 24.62% |
| Valic American Funds AMCAP-R4 | 74 bps | American Funds AMCAP-R6 (RAFGX) | 39 bps | 89.74% |
| Valic American Funds EuroPacific Growth-R4 | 85 bps | American Funds EuroPacific Growth-R6 (RERGX) | 50 bps | 70.00% |
| Vanguard 500 Index-Inv (VFINX) | 17 bps | Vanguard Institutional Index-Inst Plus (VIIIX) | 2 bps | 750.00% |
| Vanguard Asset Allocation-Inv (VAAPX) | 27 bps | Vanguard Asset Allocation-Adm (VAARX) | 19 bps | 42.11% |
| Vanguard Balanced Index-Inv (VBINX) | 26 bps | Vanguard Balanced Index-Inst (VBAIX) | 8 bps | 225.00% |
| Vanguard Capital Opportunity-Inv (VHCOX) | 48 bps | Vanguard Capital Opportunity-Adm (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index-Inv (VDMIX) | 20 bps | Vanguard Developed Markets Index-Inst Plus (VDMPX) | 6 bps | 233.33% |
| Vanguard Developed Markets Index-Inv (VDVIX) | 20 bps | Vanguard Developed Markets Index-Inst Plus (VTMNX) | 7 bps | 185.71% |
| Vanguard Dividend Appreciation Index-Inv (VDAIX) | 20 bps | Vanguard Dividend Appreciation Index-Adm (VDADX) | 10 bps | 100.00% |
| Vanguard Emerging Markets Stock Index-Inv (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index-Inst (VEMIX) | 15 bps | 133.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Emerging Markets Stock Index-Inv (VEIEX) | 33 bps | Vanguard Emerging Markets Stock Index-Inst Plus (VEMRX) | 10 bps | 230.00% |
| Vanguard Energy-Inv (VGENX) | 38 bps | Vanguard Energy-Adm (VGELX) | 31 bps | 22.58% |
| Vanguard Equity-Income-Inv (VEIPX) | 31 bps | Vanguard Equity-Income-Adm (VEIRX) | 22 bps | 40.91% |
| Vanguard European Stock Index-Inv (VEURX) | 26 bps | Vanguard European Stock Index-Inst (VESIX) | 10 bps | 160.00% |
| Vanguard Explorer-Inv (VEXPX) | 49 bps | Vanguard Explorer-Adm (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index-Inv (VEXMX) | 26 bps | Vanguard Extended Market Index-Inst Plus (VEMPX) | 8 bps | 225.00% |
| Vanguard FTSE All-World ex-US Index-Inv (VFWIX) | 35 bps | Vanguard FTSE All-World ex-US Index-Inst (VFWSX) | 15 bps | 133.33% |
| Vanguard FTSE All-World ex-US Index-Inv (VFWIX) | 35 bps | Vanguard FTSE All-World ex-US Index-Inst Plus (VFWPX) | 10 bps | 250.00% |
| Vanguard FTSE All-World ex-US Small-Cap Index-Inv (VFSVX) | 78 bps | Vanguard FTSE All-World ex-US Small-Cap Index-Inst (VFSNX) | 30 bps | 160.00% |
| Vanguard FTSE Social Index-Inv (VFTSX) | 29 bps | Vanguard FTSE Social Index-Inst (VFTNX) | 16 bps | 81.25% |
| Vanguard GNMA-Inv (VFIIX) | 23 bps | Vanguard GNMA-Adm (VFIJX) | 13 bps | 76.92% |

47

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Growth & Income-Inv (VQNPX) | 32 bps | Vanguard Growth & Income-Adm (VGIAX) | 21 bps | 52.38% |
| Vanguard Growth Index-Inv (VIGRX) | 26 bps | Vanguard Growth Index-Inst (VIGIX) | 8 bps | 225.00% |
| Vanguard Health Care-Inv (VGHCX) | 36 bps | Vanguard Health Care-Adm (VGHAX) | 29 bps | 24.14% |
| Vanguard High-Yield Corporate-Inv (VWEHX) | 28 bps | Vanguard High-Yield Corporate-Adm (VWEAX) | 15 bps | 86.67% |
| Vanguard Inflation-Protected Securities-Inv (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities-Inst (VIPIX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index-Inv (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index-Inst (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index-Inv (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index-Inst Plus (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Investment-Grade-Inv (VFICX) | 24 bps | Vanguard Intermediate-Term Investment-Grade-Adm (VFIDX) | 11 bps | 118.18% |
| Vanguard Intermediate-Term Treasury-Inv (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury-Adm (VFIUX) | 12 bps | 108.33% |
| Vanguard International Growth-Inv (VWIGX) | 49 bps | Vanguard International Growth-Adm (VWILX) | 33 bps | 48.48% |

48

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Large-Cap Index-Inv (VLACX) | 26 bps | Vanguard Large-Cap Index-Inst (VLISX) | 8 bps | 225.00% |
| Vanguard Long-Term Bond Index-Inv (VBLTX) | 22 bps | Vanguard Long-Term Bond Index-Inst (VBLLX) | 7 bps | 214.29% |
| Vanguard Long-Term Bond Index-Inv (VBLTX) | 22 bps | Vanguard Long-Term Bond Index-Inst Plus (VBLIX) | 5 bps | 340.00% |
| Vanguard Long-Term Investment-Grade-Inv (VWESX) | 26 bps | Vanguard Long-Term Investment-Grade-Adm (VWETX) | 13 bps | 100.00% |
| Vanguard Long-Term Treasury-Inv (VUSTX) | 25 bps | Vanguard Long-Term Treasury-Adm (VUSUX) | 12 bps | 108.33% |
| Vanguard Mid Cap Index-Adm (VIMAX) | 9 bps | Vanguard Mid Cap Index-Inst Plus (VMCPX) | 6 bps | 50.00% |
| Vanguard Mid Cap Index-Inv (VIMSX) | 26 bps | Vanguard Mid Cap Index-Inst (VMCIX) | 8 bps | 225.00% |
| Vanguard Mid Cap Index-Inv (VIMSX) | 24 bps | Vanguard Mid Cap Index-Inst Plus (VMCPX) | 6 bps | 300.00% |
| Vanguard Mid-Cap Growth Index-Inv (VMGIX) | 26 bps | Vanguard Mid-Cap Growth Index-Adm (VMGMX) | 10 bps | 160.00% |
| Vanguard Mid-Cap Value Index-Inv (VMVIX) | 24 bps | Vanguard Mid-Cap Value Index-Adm (VMVAX) | 10 bps | 140.00% |
| Vanguard Morgan Growth-Inv (VMRGX) | 43 bps | Vanguard Morgan Growth-Adm (VMRAX) | 29 bps | 48.28% |

49

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Pacific Stock Index-Inv (VPACX) | 26 bps | Vanguard Pacific Stock Index-Inst (VPKIX) | 10 bps | 160.00% |
| Vanguard Prime Money Market-Inv (VMMXX) | 23 bps | Vanguard Prime Money Market-Adm (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP-Inv (VPMCX) | 45 bps | Vanguard PRIMECAP-Adm (VPMAX) | 36 bps | 25.00% |
| Vanguard REIT Index-Inv (VGSIX) | 26 bps | Vanguard REIT Index-Inst (VGSNX) | 9 bps | 188.89% |
| Vanguard Short-Term Bond Index-Inv (VBISX) | 22 bps | Vanguard Short-Term Bond Index-Adm (VBIRX) | 11 bps | 100.00% |
| Vanguard Short-Term Bond Index-Inv (VBISX) | 22 bps | Vanguard Short-Term Bond Index-Inst Plus (VBIPX) | 5 bps | 340.00% |
| Vanguard Short-Term Federal-Inv (VSGBX) | 22 bps | Vanguard Short-Term Federal-Adm (VSGDX) | 12 bps | 83.33% |
| Vanguard Short-Term Investment-Grade-Inv (VFSTX) | 24 bps | Vanguard Short-Term Investment-Grade-Inst (VFSIX) | 9 bps | 166.67% |
| Vanguard Short-Term Treasury-Inv (VFISX) | 22 bps | Vanguard Short-Term Treasury-Adm (VFIRX) | 12 bps | 83.33% |
| Vanguard Small Cap Index-Inv (NAESX) | 26 bps | Vanguard Small Cap Index-Inst Plus (VSCPX) | 6 bps | 333.33% |
| Vanguard Small Cap Value Index-Inv (VISVX) | 26 bps | Vanguard Small Cap Value Index-Inst (VSIIX) | 8 bps | 225.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Small-Cap Growth Index-Inv (VISGX) | 26 bps | Vanguard Small-Cap Growth Index-Inst (VSGIX) | 8 bps | 225.00% |
| Vanguard Total Bond Market Index-Inv (VBMFX) | 22 bps | Vanguard Total Bond Market Index-Inst Plus (VBMPX) | 5 bps | 340.00% |
| Vanguard Total International Stock Index-Inv (VGTSX) | 22 bps | Vanguard Total International Stock Index-Inst Plus (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index-Inv (VTSMX) | 17 bps | Vanguard Institutional Total Stock Market Index-Inst Plus (VITPX) | 2 bps | 750.00% |
| Vanguard Total World Stock Index-Inv (VTWSX) | 45 bps | Vanguard Total World Stock Index-Inst (VTWIX) | 23 bps | 95.65% |
| Vanguard U.S. Growth-Inv (VWUSX) | 45 bps | Vanguard U.S. Growth-Adm (VWUAX) | 29 bps | 55.17% |
| Vanguard Value Index-Inv (VIVAX) | 26 bps | Vanguard Value Index-Inst (VIVIX) | 8 bps | 225.00% |
| Vanguard Wellesley Income-Inv (VWINX) | 28 bps | Vanguard Wellesley Income-Adm (VWIAX) | 21 bps | 33.33% |
| Vanguard Wellington-Inv (VWELX) | 30 bps | Vanguard Wellington-Adm (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor II-Inv (VWNFX) | 35 bps | Vanguard Windsor II-Adm (VWNAX) | 27 bps | 29.63% |
| Vanguard Windsor-Inv (VWNDX) | 33 bps | Vanguard Windsor-Adm (VWNEX) | 22 bps | 50.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Western Asset Core Plus Bond-I (WACPX) | 45 bps | Western Asset Core Plus Bond-IS (WAPSX) | 43 bps | 4.65% |

73.     These lower-cost share classes of the identical mutual funds for the Plan have been available for years, some dating back to the early 2000s or before.

74.     The failure to select lower-cost share classes for the Plan's mutual fund options that are *identical in all respects* (portfolio manager, underlying investments, and asset allocation) *except for cost* demonstrates that Defendants failed to consider the size and purchasing power of the Plan when selecting share classes and failed to engage in a  prudent process for the selection, monitoring, and retention of those mutual fund options.

75.     Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share class mutual fund options, the Plan participants would not have lost millions of dollars of their retirement savings.

## IV. Defendants selected and retained a large number of duplicative investment options, diluting the Plan's ability to pay lower fees and confusing participants.

76. Defendants provided a dizzying array of duplicative funds in the same investment style, thereby depriving the Plan of its bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and leading to "decision paralysis" for participants. *Over 400* investment options were included in the Plan for the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and stable value.

77. In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[15] This provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding confusion.

78. A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of

---

[15] Available at https://www.callan.com/research/files/990.pdf.

53

the same investment style into a single investment option, the Plan would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

79.     Prudent fiduciaries of large defined contribution plans must engage in a detailed due diligence process to select and retain investments for a plan based on the risk, investment return, and expenses of available investment alternatives. Overall, the investment lineup should provide participants with the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

80.     Within each asset class and investment style deemed appropriate for the participant-directed retirement plan, prudent fiduciaries make a reasoned determination and select a prudent investment option. Unlike Defendants, prudent fiduciaries do not select and retain numerous investment options for a single asset class and investment style. When many investment options in a single investment style are plan options, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

81.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. See, e.g., The Standard, *Fixing Your 403(b) Plan:*

*Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[16]

82.     Moreover, having numerous actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return, while paying much higher fees for active management than the fees of a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

83.     From 2010 to the present, the Plan included and continues to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (32–34 options), fixed income and high-yield bond (39–53 options), international (59–64 options), large cap domestic equities (86–95 options), mid cap domestic equities (30–36 options), small cap domestic equities (23–30 options), real estate (6 options), money

---

[16] Available at
http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

55

market (14–16 options), and target date investments (4 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants and can lead to "decision paralysis".

84.    For example, Defendants' inclusion of *22* large cap domestic blend investments as of December 31, 2014, are summarized below and compared to a single lower-cost alternative that was available to the Plan: the Vanguard Institutional Index Fund-Inst Plus (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Large Cap Blend Investments | 2014 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| CREF Equity Index | $44,403,290 | 37 bps | 2 bps | 1750% |
| CREF Stock | $315,203,142 | 46 bps | 2 bps | 2200% |
| Deutsche Core Equity | $5,326,348 | 53 bps | 2 bps | 2550% |
| DWS S&P 500 Index | $1,908,446 | 34 bps | 2 bps | 1600% |
| Fidelity Disciplined Equity | $2,834,242 | 39 bps | 2 bps | 1850% |
| Fidelity Growth & Income | $22,175,247 | 52 bps | 2 bps | 2500% |
| Fidelity Large Cap Core Enhanced Index | $161,447 | 45 bps | 2 bps | 2150% |

56

| Large Cap Blend Investments | 2014 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| Fidelity Large Cap Stock | $3,604,131 | 88 bps | 2 bps | 4300% |
| Fidelity Mega Cap Stock | $1,556,293 | 68 bps | 2 bps | 3300% |
| Fidelity Spartan 500 Index | $37,499,775 | 4 bps | 2 bps | 100% |
| Fidelity Spartan Total Market Index | $15,879,973 | 5 bps | 2 bps | 150% |
| TIAA-CREF Equity Index | $7,844,471 | 5 bps | 2 bps | 150% |
| TIAA-CREF S&P 500 Index | $8,210,706 | 6 bps | 2 bps | 200% |
| VALIC Annuity - VALIC Company I Growth & Income | $972,847 | 165 bps | 2 bps | 8150% |
| VALIC Annuity - VALIC Company I Large Cap Core | $1,038,951 | 163 bps | 2 bps | 8050% |
| VALIC Annuity - VALIC Company I Stock Index | $38,746,472 | 114 bps | 2 bps | 5600% |
| VALIC Vanguard 500 Index | $37,573,536 | 5 bps | 2 bps | 150% |
| Vanguard 500 Index | $88,952,273 | 5 bps | 2 bps | 150% |
| Vanguard Growth & Income | $11,018,557 | 37 bps | 2 bps | 1750% |
| Vanguard Large-Cap Index | $2,029,041 | 23 bps | 2 bps | 1050% |

| Large Cap Blend Investments | 2014 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| Vanguard PRIMECAP Core | $3,255,720 | 50 bps | 2 bps | 2400% |
| Vanguard Total Stock Market Index | $39,726,862 | 17 bps | 2 bps | 750% |
| Total | $689,921,770 | | | |

85.    With over *$359 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps, respectively.



86.     Many other large cap index funds are also available at far lower costs than the Plan's large cap blend funds. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund-Inst Plus, Plan participants would have avoided losing in excess of $2 million in fees in 2014 alone, and many more millions since 2010.

87.     In addition, Defendants selected and continue to retain multiple passively managed index options in the same investment style. Rather than a fund whose investment manager actively selects stocks or bonds to hold and generate investment returns in excess of its benchmark, passively managed index funds hold all or a representative sample of securities in a specific index, such as the S&P 500 index. The sole investment strategy of an index fund is to track the performance of a specific market index. No stock selection or research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower.

88.     For example, in the large cap blend investment style, Defendants provided up to fifteen separate index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market.

89.    Since index funds merely hold the same securities in the same proportions as the index,[17] having multiple index funds in the Plan provides no benefit to participants. Instead, it hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

90.    Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plan would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

91.    Overall, Defendants failed to pool the assets invested in duplicative investment options for the same investment style into a single investment option, as set forth in ¶83, which caused Plan participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

---

[17] Another example of an index is the Dow Jones Industrial Average.

# V. Defendants imprudently retained historically underperforming Plan investments.

92.     Given the overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plan investments, numerous investment options in the Plan historically underperformed for years lower-cost alternatives that were available to the Plan.

## A. CREF Stock Account

93.     The CREF Stock Account is one of the largest, by asset size, investment options in the Plan with over $300 million in assets, and has been included as an investment option from 2010 to date. In its fund fact sheet and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has underperformed consistently for years and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plan.

94.     TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plan without a prudent

61

process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

95. As generally understood in the investment community, passively managed investment options should be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and extremely unlikely to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth in paragraphs ¶¶64–66. This extreme unlikelihood is even greater in the large cap market because such big companies are the subject of many analysts' coverage, unlike smaller stocks which are not covered by many analysts, leading to potential inefficiencies in pricing.

96. The efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund

62

manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, Returns from Investing in Equity Mutual Funds 1971 to 1991, 50 J. Fin. 549, 571 (1995).[18]

97.    Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks…The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.

****

Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*, Active Equity Portfolio Management, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

98.    Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds,

_____

[18] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

99.     Defendants failed to undertake such analysis when they selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. Defendants also provided the fund option without conducting a prudent analysis to determine whether this actively managed fund would outperform index funds, net of fees, over the long term. This occurred despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market and that active managers do not outperform passive managers, net of fees, in this investment style.

100.    Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

101.    Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index

benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014.[19] For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund-Inst Plus (VITPX) and the Vanguard Institutional Index-Inst Plus (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.

---

[19] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plan's Form 5500 with the Department of Labor.



CREF Stock Account
One-, Five-, and Ten-Year Investment Returns
Compared to Benchmarks
(as of Dec. 31, 2014)

102. The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund-Inst Plus (2 bps) and the Vanguard Institutional Index-Inst Plus (2 bps).

103. Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF

Stock Account include the Vanguard Diversified Equity (VDEQX), the Vanguard PRIMECAP-Adm (VPMAX), and the Vanguard Capital Opp.-Adm (VHCAX).



**CREF Stock Account**
**One-, Five-, and Ten- Year Investment Returns Compared to Actively Managed Benchmarks**
(as of Dec. 31, 2014)

73%–196% greater than CREF return

28%–37% greater than CREF return

20%–56% greater than CREF return

Legend: CREF Stock Account · VDEQX · VPMAX · VHCAX

104. The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[20]



---

[20] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm, the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and for the Vanguard Capital Opportunity Fund-Adm, 5.89%.



CREF Stock Account
Five-Year Investment Returns Compared to
Actively Managed Benchmarks
(as of Dec. 31, 2009)

174%–206%
greater than
CREF return

6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%

5 Year

■ CREF Stock Account ■ VPMAX ■ VHCAX



CREF Stock Account
Ten-Year Investment Returns Compared to
Actively Managed Benchmarks
(as of Dec. 31, 2009)

3130%–5790%
greater than
CREF return

6.00%
5.00%
4.00%
3.00%
2.00%
1.00%
0.00%

10 Year

■ CREF Stock Account ■ VPMAX ■ VHCAX

69

105.  Despite the consistent underperformance, the CREF Stock

Account, with an expense ratio of 46 bps as of December 31, 2014, was more

expensive than better-performing actively managed alternatives: the

Vanguard Diversified Equity-Inv (40 bps), the Vanguard PRIMECAP-Adm

(35 bps), and the Vanguard Capital Opp.-Adm (40 bps).

106.  Besides this abysmal long-term underperformance of the CREF

Stock Account compared to both index funds and actively managed funds, the

fund was recognized as imprudent in the industry. In March 2012, an

independent investment consultant, AonHewitt, recognized the imprudence

of the CREF Stock Account and recommended to its clients they remove this

fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*,

INBRIEF, at 3 (July 2012).[21] This recommendation was made due to numerous

factors, including the historical underperformance, high turnover of asset

management executives and portfolio managers, and the fund's over 60

separate underlying investment strategies, greatly reducing the fund's ability

to generate excess returns over any substantial length of time. *Id.* at 4–5.

107.  The Supreme Court has recently and unanimously ruled that

ERISA fiduciaries have "a continuing duty to monitor investments and

remove imprudent ones[.]" *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1829 (2015).

_____

[21] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite continuing to underperform lower-cost investment alternatives that were readily available to the Plan.

108.   Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

109.   Had Defendants removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives, or the passively managed lower-cost alternatives, see ¶¶101 and 103, Plan participants would not have lost in excess of $100 million of their retirement savings from the fund being retained in the Plan.[22]

---

[22] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

71

B.    **TIAA Real Estate Account**

110.    Defendants selected and continue to offer the TIAA Real Estate Account as one of the real estate investment options in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index-Inst (VGSNX).

111.    With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is also over *10 times more expensive* than the Vanguard REIT Index-Inst with an expense ratio of 8 bps.



112.   This underperformance occurred for years before 2009 and has continued after 2009. The TIAA Real Estate Account significantly underperformed the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[23] Despite this, Defendants selected and retained it in the Plan.



_____

[23] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index-Inst was 5.49%.





74

113.   This underperformance continued after 2009. The TIAA Real

Estate Account significantly underperformed the Vanguard REIT Index-Inst

over the one-, five-, and ten-year periods ending December 31, 2014.[24]



114.   As the Supreme Court unanimously ruled in *Tibble*, prudent

fiduciaries of defined contribution plans continuously monitor plan

investment options and replace imprudent investments. *Tibble*, 135 S. Ct. at

---

[24] Performance data provided as of December 31, 2014 to correspond to the
most recent filing of the Plan's Form 5500 with the Department of Labor.

1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

115.   Had the amounts invested in the TIAA Real Estate Account instead been invested in the lower-cost and better-performing Vanguard REIT Index-Inst, Plan participants would not have lost in excess of $22 million of their retirement savings from the fund being retained in the Plan.[25]

## ERISA'S FIDUCIARY STANDARDS

116.   ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

---

[25] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index-Inst to compensate participants who have not been reimbursed for their losses.

76

man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

117. Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the pln.

118. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

119. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

77

(2)    if, by his failure to comply with section 1104(a)(1) of
       this title in the administration of his specific
       responsibilities which give rise to his status as a
       fiduciary, he has enabled such other fiduciary to
       commit a breach; or

(3)    if he has knowledge of a breach by such other
       fiduciary, unless he makes reasonable efforts under
       the circumstances to remedy the breach.

120.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a

civil action to enforce a breaching fiduciary's liability to the plan under 29

U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties
> imposed upon fiduciaries by this subchapter shall be personally
> liable to make good to such plan any losses to the plan resulting
> from each such breach, and to restore to such plan any profits of
> such fiduciary which have been made through use of assets of the
> plan by the fiduciary, and shall be subject to such other equitable
> or remedial relief as the court may deem appropriate, including
> removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

121.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of

the Plan to bring an action individually on behalf of the Plan to enforce a

breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

122.    In acting in this representative capacity and to enhance the due

process protections of unnamed participants and beneficiaries of the Plan, as

an alternative to direct individual actions on behalf of the Plan under 29

78

U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Duke Faculty and Staff Retirement Plan from August 10, 2010, through the date of judgment, excluding the Defendants.

123.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

79

c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

80

Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

124.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

125.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.     Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s]

81

demonstrated its well-earned reputation as a pioneer and the leader in the field". *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

   b.   The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter, Bogard & Denton as exceptional:

Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a

82

401(k) plan. Class Counsel performed substantial work…,
investigating the facts, examining documents, and consulting and
paying experts to determine whether it was viable. This case has
been pending since September 11, 2006. Litigating the case
required Class Counsel to be of the highest caliber and committed
to the interests of the participants and beneficiaries of the
General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS

123349 at 8–9 (S.D.Ill. Nov. 22, 2010).

      c.    Schlichter, Bogard & Denton handled the only full trial of

an ERISA excessive fee case, resulting in a $36.9 million judgment for

the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v.*

*ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees

after trial, the district court concluded that "Plaintiffs' attorneys are

clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305,

2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following

remand, the district court again awarded Plaintiffs' attorney's fees,

emphasizing the significant contribution Plaintiffs' attorneys have

made to ERISA litigation, including educating the Department of Labor

and courts about the importance of monitoring fees in retirement plans.

Of special importance is the significant, national contribution
made by the Plaintiffs whose litigation clarified ERISA standards
in the context of investment fees. The litigation educated plan
administrators, the Department of Labor, the courts and
retirement plan participants about the importance of monitoring

recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

   d. Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison Int'l,* in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

   e. The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[26] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s,*

---

[26] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

N.Y. TIMES (Mar. 29, 2014);[27] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[28] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[29] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[30] Jess Bravin and Liz Moyer, *High-Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [31] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[32] Mark Miller, *Are 401(k) Fees Too High? The High Court May Have an Opinion*, REUTERS (May 1, 2014);[33] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[34]

---

[27] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[28] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[29] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[30] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[31] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[32] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[33] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[34] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

## COUNT I

### Breach of Duties of Loyalty and Prudence—                          Unreasonable
### Administrative Fees

126.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

127.   This Count alleges breach of fiduciary duties against all Defendants.

128.   The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

129.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See George v. Kraft Foods Global, Inc., 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. Tussey, 746 F.3d at 336.

130. Defendants failed to engage in a prudent and loyal process for selecting a recordkeeper. Rather than consolidating the Plan's administrative and recordkeeping services under a single service provider, Defendants retained four recordkepers to provide recordkeeping services. This failure to consolidate the recordkeeping services eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper. This conduct was a breach of the duties of loyalty and prudence.

131. Moreover, Defendants failed to solicit competitive bids from vendors on a flat per-participant fee. Defendants allowed the Plan's recordkeepers to receive asset-based revenue sharing and hard dollar fees, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plan. As the amount of assets grew, the revenue sharing payments to the Plan's recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

132. Total Plan losses will be determined after complete discovery in this case and are continuing.

133.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

134.  Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence— Unreasonable Investment Management Fees and Performance Losses

135.  Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

136.  This Count alleges breach of fiduciary duties against all Defendants.

137.  The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable

88

expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

138.  As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

139.  Defendants selected and retained as Plan investment options mutual funds and insurance company variable annuities with higher expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times.

140.  Rather than consolidating the Plan's over 400 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment

89

options causes participant confusion.  In addition, Defendants, as fiduciaries charged with operating as prudent financial experts, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plan's investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other lower-cost options available to the Plan. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities, and insurance company pooled separate accounts. In so doing, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. Therefore, Defendants breached their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

141. The same conduct by Defendants shows a failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

142. Defendants failed to engage in a prudent process for the selection and retention of Plan investment options. Rather, Defendants used more expensive funds with inferior historical performance than investments that were available to the Plan.

143. CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

144. TIAA Real Estate Account: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plan despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

145. Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the

91

Plan's investment options were retained for reasons other than the best interest of the Plan and its participants, and were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

146.   Total Plan losses will be determined  after complete discovery in this case and are continuing.

147.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

148.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

## Failure to Monitor Fiduciaries

149. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

150. This Count alleges breach of fiduciary duties against Defendant Duke University.

151. Defendant Duke University has the responsibility to control and manage the operation and administration of the Plan, including the selection of Plan service providers, with all powers necessary to enable Defendant Duke University to properly carry out such responsibilities.

152. A monitoring fiduciary must ensure that its monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

153. To the extent any of Defendant Duke University's fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

154. Defendant Duke University breached its fiduciary monitoring duties by, among other things:

93

a.       Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.       Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistently underperforming Plan investments, in violation of ERISA;

c.       Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

94

d.      Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better-performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

e.      Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

155.   Had Defendant Duke University discharged its fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members, lost tens of millions of dollars of retirement savings.

## JURY TRIAL DEMANDED

156.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plan to include only prudent investments;

- Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

96

- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

August 10, 2016                      Respectfully submitted,

                                     /s/ David B. Puryear, Jr.
                                     David B. Puryear, Jr.
                                     NC State Bar No. 11063
                                     PURYEAR AND LINGLE, P.L.L.C.
                                     5501-E Adams Farm Lane
                                     Greensboro, NC 27407
                                     (336) 218-0227
                                     puryear@puryearandlingle.com

                                     SCHLICHTER, BOGARD & DENTON LLP
                                     Jerome J. Schlichter*
                                     Michael A. Wolff*
                                     Troy A. Doles*
                                     Heather Lea*
                                     Kurt C. Struckhoff*
                                     Sean E. Soyars*
                                         *appearing by special appearance
                                     100 South Fourth Street, Ste. 1200
                                     St. Louis, Missouri 63102
                                     (314) 621-6115
                                     jschlichter@uselaws.com
                                     mwolff@uselaws.com
                                     tdoles@uselaws.com
                                     hlea@uselaws.com
                                     kstruckhoff@uselaws.com
                                     ssoyars@uselaws.com

                                     Attorneys for Plaintiffs