# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID CLARK, KEITH A. FEATHER,
JORGE LOPEZ, THOMAS C. MEHEN, AND
KATHI LUCAS, individually and as
representatives of a class of participants and
beneficiaries on behalf of the Duke Faculty
and Staff Retirement Plan,

                         *Plaintiffs*,

 v.

DUKE UNIVERSITY, THE DUKE
INVESTMENT ADVISORY COMMITTEE,
KYLE CAVANAUGH, TIM WALSH,
JAMES S. ROBERTS, RHONDA
BRANDON, STEVE SMITH, WARREN
GRILL, ANDERS HALL, RICHARD
SCHMALBECK, MICHAEL LAZAR, DR.
NAN JOKERST, ERIC KOEHRSEN, AND
JEAN SHIELDS,

                         *Defendants*.

No. 1:16-cv-01044-CCE-LPA

AMENDED COMPLAINT—
CLASS ACTION

JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT

1.      Plaintiffs David Clark, Keith A. Feather, Jorge Lopez, Thomas C. Mehen,

and Kathi Lucas individually and as representatives of a class of participants and

beneficiaries in the Duke Faculty and Staff Retirement Plan (the "Plan"), bring this action

under 29 U.S.C. §1132(a)(2) on behalf of the Plan against Defendants Duke University,

the Duke Investment Advisory Committee, Kyle Cavanaugh, Tim Walsh, James S.

Roberts, Rhonda Brandon, Steve Smith, Warren Grill, Anders Hall, Richard Schmalbeck,

Michael Lazar, Dr. Nan Jokerst, Eric Koehrsen, and Jean Shields for breach of fiduciary duties under ERISA.[1]

2. ERISA imposes "high standards" of conduct on plan fiduciaries—"the highest known to the law." *Tatum v. RJR Pension Inv. Comm*, 761 F.3d 346, 355–56 (4th Cir. 2014) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). In exercising those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

3. The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plan—which are among the largest 0.018% of defined contribution plans in the United States—have tremendous bargaining power to demand low-cost administrative and investment management services. As fiduciaries to the Plan, Defendants are obligated to limit the Plan's expenses to a reasonable amount, to ensure that *each* fund in the Plan is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plan; and to analyze the costs and benefits of alternatives for the Plan's

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

administrative and investment structure. Defendants must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plan's service providers.

4.      Instead of using the Plan's bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plan, Defendants squandered that leverage by allowing the Plan's conflicted third party service providers—TIAA-CREF, Fidelity, VALIC and Vanguard—to dictate the Plan's investment lineup, to link their recordkeeping services to the placement of their investment products in the Plan, and to collect unlimited asset-based compensation from their own proprietary products.

5.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

3

7.    **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan are administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

8.    **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

  a.    The named Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent or excessive fee options in the Plan because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had

4

satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b.     The named Plaintiffs and all participants in the Plan were financially harmed by Defendants' improper bundling of some of the Plan's investment products, improperly allowing the companies who did recordkeeping for the Plan to require inclusion of their investment products in the Plan, instead of each investment option being independently selected.

c.     The named Plaintiffs' individual accounts in the Plan were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1) invested in the CREF Stock and TIAA Real Estate accounts—which were improperly bundled with TIAA's recordkeeping services and which Defendants also failed to remove from the Plan when it was clear from past poor performance and their excessive fees that they were imprudent investments—at a time when those options underperformed prudent alternatives in which those assets would have been invested had Defendants not breached their fiduciary duties (Plaintiff Lucas), (2) invested in excessive-cost investment options, including funds that paid revenue sharing to the Plan's recordkeepers and higher-cost share classes of mutual funds in the Plan which were priced for small investors when far lower-cost but otherwise identical share classes of the same mutual funds were available for inclusion in the Plan

because of the enormous size of the Plan, resulting in a loss of retirement savings (all Plaintiffs), and (3) through their investments in those mutual funds and other investments and the fees charged on their investments in those funds, paid a portion of the Plan's excessive administrative and recordkeeping fees, which would not have been incurred had defendants discharged their fiduciary duties to the Plan, and resulting in a loss of retirement savings (all Plaintiffs).

      d.      Specifically, during the class period, Plaintiff Mehen invested in the higher-cost share class of Vanguard 500 Index, as well as the Columbia Balanced Z; Plaintiff Clark invested in the Fidelity Freedom 2030; Plaintiff Feather invested in the CREF Social Choice and TIAA Traditional; Plaintiff Lopez invested in the T. Rowe Price Retirement 2035; and Plaintiff Lucas invested in Fidelity Disciplined Equity, Fidelity Emerging Markets, Fidelity Europe, Fidelity Growth Strategies, Fidelity Small Cap Stock, and CREF Stock. Through their investments in these funds, each Plaintiff paid excessive investment management fees and each was assessed a portion of the Plan's excessive administrative and recordkeeping fees. Plaintiffs would have paid less had Defendants monitored revenue sharing, solicited competitive bids, consolidated recordkeepers, or reduced fees to reasonable levels in accordance with their fiduciary duties under ERISA.

## PARTIES

### The Duke Faculty and Staff Retirement Plan

9.      The Duke Faculty and Staff Retirement Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

10.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

11.     Faculty and staff members of Duke University are eligible to participate in the Plan, which provides the only source of retirement income for many employees of Duke University. Plan participants' retirement income depends upon deferrals of employee compensation, employer matching contributions, and performance of investment options net of fees and expenses.

12.     As of December 31, 2014, the Plan held $4.7 billion in assets and had 37,939 participants with account balances. As such, it is one of the largest defined contribution plans in the United States, ranking in the top 0.018% in asset size of all defined contribution plans that filed a Form 5500 with the Department of Labor. Plans of such great size are commonly referred to as "jumbo plans".

### Plaintiffs

13.     David Clark resides in Durham, North Carolina and works for the Transportation Department at Duke University. He is a participant in the Plan under 29

7

U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

14.     Keith A. Feather resides in Hillsborough, North Carolina, and is a Case Manager at Duke University. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

15.     Jorge Lopez resides in Apex, North Carolina, and is a Service Access Manager for Duke Family Medicine. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

16.     Thomas C. Mehen resides in Irvine, California, and is a Physics Professor at Duke University. He is participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

17.     Kathi Lucas resides in Durham, North Carolina, and is currently retired. She previously served as Project Leader in Duke's Clinical Research Institute at Duke University. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

**Defendants**

18.     Duke University ("Duke") is a non-profit corporation organized under North Carolina law with its principal place of business in Durham, North Carolina. Under Sections 13.02, 13.03, and 13.08 of the Plan, Duke is the Named Fiduciary and Plan Administrator with fiduciary responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Under the terms of the

8

Plan, Duke has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable Duke to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan, and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

19.     Duke is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

20.     Under Section 13.09 of the Plan, Duke University as the Plan Administrator is responsible for all matters relating to the Plan, including, but not limited to: resolving questions about eligibility to participate in the Plan, making decisions about claims for benefits, and resolving questions regarding the Plan's administration and operation. The Plan Administrator may delegate responsibility for any aspect of the Plan's administration to other individuals or entities. Duke formed an Investment Advisory Committee to assist with the administration of the Plan. However, Duke University remains the Named Fiduciary and Plan Administrator under 29 U.S.C. §1002(16)(A)(i).

21.     Rather than screening individuals for their qualification and suitability to be an ERISA fiduciary or appointing specific individuals to be members of the Investment

9

Advisory Committee, the Plan's Investment Policy Statement designates particular Duke offices to be members of the Committee. The Chairman of the Committee is the Vice President of Human Resources, Duke University. The permanent members of the Committee include: the Vice President for Finance and Treasurer, Duke University; Executive Vice Provost for Finance and Administration, Duke University; the Chief Financial Officer and Treasurer of Duke University Health System; Chief Human Resources Officer, Duke University Health System; and the President of DUMAC, Inc. The permanent members may designate individuals to serve in their place if approved by the Duke University Vice President.

22.　　The current members of the Investment Advisory Committee include the following individuals, named as Defendants herein: Kyle Cavanaugh (Vice President of Human Resources), Tim Walsh (Vice President of Finance), James S. Roberts (Executive Vice Provost for Finance and Administration), Rhonda Brandon (Chief Human Resources Officer, Duke University Health System), and Steve Smith, former Chief Human Resources Officer of the Duke University Health System, previously served as a committee member.

23.　　Additional members of the Investment Advisory Committee during the proposed class period, include the following individuals named as Defendants herein: Warren Grill, Anders Hall, Richard Schmalbeck, Michael Lazar, Dr. Nan Jokerst, Eric Koehrsen, and Jean Shields.

10

24.     The Vice President of Human Resources is responsible for the day-to-day operation of the Plan. These responsibilities include, but are not limited to: developing criteria for the selection and retention of Plan investment options and service providers; approving the form and contents of agreements with service providers; assuring compliance with the Internal Revenue Code, ERISA and applicable regulations; and reviewing 29 U.S.C. §1104(a) participant disclosures and 29 U.S.C. §1108(b)(2) service provider disclosures.

25.     The Investment Advisory Committee and its individual members are fiduciaries to the Plan because they exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

26.     Because the Investment Advisory Committee, its individual members, and their delegates have acted as alleged herein as the agents of Duke University, all of them are collectively referred to as "Defendants."

## ERISA FIDUCIARY STANDARDS

27.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of

11

          (i)       providing benefits to participants and their beneficiaries; and

          (ii)     defraying reasonable expenses of administering the plan;

[and]

    (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

28.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

29.    "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig*., 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros,* 744 F.2d at 279 (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries

must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

      30.    In addition to the duties of loyalty and prudence, fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with ERISA. 29 U.S.C. §1104(a)(1)(D). An investment policy statement or IPS is a governing plan document within the meaning of 29 U.S.C. §1104(a)(1)(D). *See* 29 C.F.R. §2509.94-2 (1994), replaced by 29 C.F.R. §2509.08-2(2)(2008) ("Statements of investment policy issued by a named fiduciary authorized to appoint investment managers would be part of the 'documents and instruments governing the plan' within the meaning of ERISA Sec. 404(a)(1)(D)."). "Fiduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001). A "failure to follow written statements of investment policy constitutes a breach of fiduciary duty." *Id.* (citing *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241–42 (2d Cir. 1989)). A violation of investment guidelines is an independent breach of fiduciary duty, regardless of whether the action was otherwise prudent. *See* 29 U.S.C. §1104(a)(1)(D).

31.     The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented

by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are

considered *per se* violations because they entail a high potential for abuse. Section

1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a
> transaction, if he knows or should know that such transaction constitutes a
> direct or indirect –
> (A)     sale or exchange, or leasing, of any property between the plan and a
> party in interest;
> * * *
> C)     furnishing of goods, services, or facilities between the plan and
> party in interest;
> (D)     transfer to, or use by or for the benefit of a party in interest, of any
> assets of the plan…

32.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29

U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly

participating in a breach by another fiduciary and knowingly failing to cure any breach of

duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing
> such act or omission is a breach; [or]
>
> (2)     if, by his failure to comply with section 1104(a)(1) of this title
> in the administration of his specific responsibilities which
> give rise to his status as a fiduciary, he has enabled such other
> fiduciary to commit a breach; or

14

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

33.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

**I.     Defined contribution plans, services, and fees.**

34.     When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue*, 552 U.S.at 255.

35.     Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account. Participants direct plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by

the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

36.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

37.     The plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

38.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[2] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans

_____

[2] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

like the Plan, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

39.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

40.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—*i.e.*, proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## II.    Defined contribution recordkeeping.

41.    Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

42.    There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plan.

43.    Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when

18

faced with such conflicted fund recommendations, fiduciaries must independently assess

whether the provider's investment product is the best choice for the plan, or whether the

purpose of providing benefits to participants would be better accomplished by

considering other investment managers who may offer superior funds at a better price.

## III.    Defined contribution investment options.

44.    Defined contribution fiduciaries have exclusive control over the particular

investment alternatives available in the plan to which participants direct and allocate their

plan accounts, and the returns on which are credited to participants' accounts.

45.    Each investment option is typically a pooled investment product, such as a

mutual fund, and invests in a diversified portfolio of securities in a broad asset class such

as fixed income, bonds, or equities. Fixed income funds may include conservative

principal protection options, such as stable value funds, or other diversified portfolios of

government or corporate debt securities. Equity funds invest in diversified portfolios of

stocks of large, mid, or small domestic or international companies in a particular style

such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks

and bonds in varying percentages.

46.    Investment options can be passively or actively managed. In a passively

managed or "index" fund, the investment manager attempts to match the performance of

a given benchmark index by holding a representative sample of securities in that index,

such as the S&P 500. In an actively managed fund, the investment manager uses her

judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an

attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

47.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[3] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

48.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

49.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%).

revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

50.     The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (analyzing common law of trusts and Restatement (Third) of Trusts §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

51.     Academic and financial industry literature demonstrates that high expenses

are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

52.     In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

## IV. Revenue sharing: a practice that can lead to excessive fees if not properly monitored and capped.

53.     There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

54.     In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Jumbo defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

55.     A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

56.     As an example, a fiduciary of a 20,000 participant, $2 billion plan may

23

issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000-participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $3 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

57.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage

24

would be adjusted downward so that the *plan* is still paying the same $600,000 price that was negotiated at the plan level for services to be provided to the plan.

58.     The Defendants use a different method of paying for recordkeeping for the Plan, through "indirect" revenue sharing payments from the plan's mutual funds. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

59.     In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

60.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

61.     As to the second critical element—determining the price that would be

available on a flat per-participant basis—making that assessment for a jumbo plan requires soliciting bids from competing providers. In multi-billion dollar plans with over 10,000 participants, such as the Plan, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for jumbo plans have also declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—*i.e.,* a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'"). Industry experts recognize that this principle applies fully in the 403(b) context, just as in the 401(k) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2*.[4] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence*

---

[4] Available at http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2.

*Request for Proposal*.[5] Engaging in in this RFP process "allows plan sponsors . . .to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id.* Prudent fiduciaries of defined contribution plans—including 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years.

## V.  Bundled services and open architecture.

62.     As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services companies entered this burgeoning retirement plan market. These providers often marketed "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free" plans, meaning there were supposedly no additional fees beyond the revenues the provider received from having their investment funds in the plan. These purportedly free plans had a significant condition—in order to obtain the free pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan—a group of handpicked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees. Thus, under these closed arrangements, funds were included in some defined contribution

---

[5] Available at http://www.wphealthcarenews.com/403b-retirement-plans-why-a-due-diligence-request-for-proposal/.

plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

63.    In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an interest in including in the plan because the funds provide it with revenue sharing and investment fees. Instead, the fiduciary is free to reject the recordkeeper's conflicted fund recommendations, can independently assess whether another investment manager offers a superior product at a more attractive price, and can include such funds in the plan's investment lineup. Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price. There are recordkeepers in the market that exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from funds in the plan. In light of these benefits, prudent fiduciaries of large defined contribution plans have largely rejected bundling and embraced open architecture platforms.

64.    Open, transparent architecture allows for greater control over revenue

sharing arrangements if they are used at all, and indeed, allows a fiduciary to eliminate revenue sharing altogether. If revenue sharing payments are used, they can effectively be "kickbacks" to induce recordkeepers to advocate for a fund to be included in the plan's investment lineup or even attempt to dictate its inclusion. An independent assessment of each fund is thus essential and required by ERISA to determine whether the fund should be included in the plan based strictly on its merits as an investment, regardless of whether it provides revenue sharing.

## VI.    403(b) plans share common fiduciary duties with 401(k) plans.

65.    Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

66.    Plans sponsored by tax-exempt organizations such as private universities, unlike churches and public schools, are subject to Title I of ERISA and its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f). To the best of Plaintiffs' knowledge, the Plan has never qualified for the safe harbor, and thus has long been subject to ERISA's fiduciary requirements. In the Plan's annual reports (Forms 5500) filed with the Department of Labor, Defendants have acknowledged

the Plan is subject to ERISA.

67.     Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007. Sponsors of 403(b) plans were given almost one-and-a-half years to prepare for the effective date of the regulations, January 1, 2009. The regulations required certain employers to become more involved with administering their plans than they had previously, potentially disqualifying those plans from satisfying the ERISA safe harbor and subjecting the plans to ERISA fiduciary requirements for the first time. However, for plans like the Plan that were *already* subject to ERISA's fiduciary requirements because they were never safe-harbor plans, the IRS regulations had no effect on the Plan's status for ERISA fiduciary purposes; ERISA already required Defendants to be actively involved in exercising care, prudence, skill, and diligence in administering the Plan for the exclusive benefit of participants.

68.     When §403(b) was first enacted in 1958, plan assets could only be invested in insurance company annuity contracts. 26 U.S.C. §403(b)(1). In 1974, §403(b) was amended to allow 403(b) plans to invest in custodial accounts holding mutual fund shares. 26 U.S.C. §403(b)(7).

69.     Regardless of any differences between 401(k) and 403(b) plans, both types of plans have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert

familiar with investment practices, to operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent. Participants in both types of plans depend on their plan fiduciaries to ensure that retirement savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

VII. **Historical practice of multiple recordkeepers and placement of many investment options in 403(b) plans, which some fiduciaries failed to evaluate as required.**

70. As the Department of Labor has recognized, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the employer or plan administrator, instead of fiduciaries evaluating investment options placed in the plan. Field Assistance Bulletin 2009-02.

71. Some 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own investment products in the plan, unlike 401(k) plans which had a single recordkeeper. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan*

*Sponsor's Responsibility to Participants*?[6] Indeed, sponsors of these plans often took a

"'hands off' approach to plan oversight." *Id*. This practice resulted in plans having

excessive recordkeeping costs and structures involving multiple recordkeepers with each

recordkeeper having its own investment options in the plan. This left participants with the

task of navigating a haphazard collection of duplicative and overlapping investment

options from the various recordkeepers, and ultimately led to them paying excessive and

unnecessary fees, both for recordkeeping and for investment products in the plans. *Id*. In

some cases the recordkeeper insisted on its own funds being included in the plan without

any resistance or analysis of those funds by the fiduciaries.

**VIII.  TIAA-CREF's bundled 403(b) plan services.**

72.     TIAA-CREF is an insurance company financial services provider that

historically has dominated the market for services to educational institution 403(b) plans,

and has heavily marketed to them. TIAA-CREF consists of two companion

organizations: Teachers Insurance and Annuity Association of America (TIAA), and

College Retirement Equities Fund (CREF). The services that TIAA-CREF provides to

403(b) plans include annuities, mutual funds, insurance coverage, trust services, and

administrative services.

73.     Although TIAA-CREF's marketing materials suggest that it is a

"nonprofit" organization, that is misleading. In 1998, Congress revoked both TIAA's and

CREF's statuses as tax-deductible 501(c)(3) charitable organizations because TIAA-

_____

[6] Available at http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

CREF "competed directly with for-profit insurance companies and mutual fund groups." Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007).[7] As a result, they are subject to federal income taxation and are not 501(c)(3) charitable organizations.

74.    While CREF is organized as a New York not-for-profit corporation, TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating surplus" is spent, loaned, and otherwise distributed to some of its subsidiaries as well. An example is Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion. TIAA receives dividends from these for-profit subsidiaries.[8]

75.    TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA, including the following subsidiaries for which TIAA files consolidated federal income tax returns:

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| 730 Texas Forests Holdings, Inc. | | X |
| Covariance Capital Management, Inc. | | X |
| GreenWood Resources, Inc. | | X |
| JWL Properties, Inc. | | X |
| ND Properties, Inc. | | X |
| Nuveen Asia Investments, Inc. | | X |
| Nuveen Holdings, Inc. | | X |

---

[7] Available at http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

[8] Available at https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| Nuveen Investments, Inc. | | X |
| Nuveen Investments Advisers, Inc. | | X |
| Nuveen Investments Holdings, Inc. | | X |
| Nuveen Investments Institutional Services Group, LLC | | X |
| Nuveen Investment Solutions, Inc. | | X |
| Nuveen Securities, LLC | | X |
| Oleum Holding Company, Inc. | | X |
| Rittenhouse Asset Management, Inc. | | X |
| T-C Europe Holdings, Inc. | | X |
| T-C SP, Inc. | | X |
| T-C Sports Co., Inc. | | X |
| T-Investment Properties Corp. | | X |
| TCT Holdings, Inc. | | X |
| Teachers Advisors, Inc. | | X |
| Teachers Personal Investors Service, Inc. | | X |
| Terra Land Company | | X |
| TIAA Asset Management Finance Company, LLC | | X |
| TIAA-CREF Life Insurance Company. | | X |
| TIAA-CREF Tuition Financing, Inc. | | X |
| TIAA-CREF Trust Company, FSB | | X |
| Westchester Group Asset Management, Inc. | | X |
| Westchester Group Farm Management, Inc. | | X |
| Westchester Group Investment Management Holding, Inc. | | X |
| Westchester Group Investment Management, Inc. | | X |
| Westchester Group Real Estate, Inc. | | X |

*See 2015 Annual Statement of the Teachers Insurance and Annuity Association of America* 39, 112–19 (Jan. 26, 2016).[9]

76.     Also, consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[10] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). When expressed as a percentage of assets under management, TIAA's CEO had the very highest compensation rate among reporting investment companies. In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015. *Id.*



77.     Adding to this, and undercutting any claim that it operates as a non-profit, TIAA's compensation disclosures further state that its employees' compensation and benefits programs are linked to "*profitability*." TIAA Compensation Disclosures (emphasis added).

78.     Responding to criticism that TIAA-CREF's CEO and other executives "garnered salaries and bonuses significantly greater than similar pension fund operations," TIAA-CREF responded that such extremely high pay was justified because "the company had to compete for top-level employees with major financial services corporations." Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History.*[11] Critics found this justification dubious because the "flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested

_____

[11] Available at http://www.fundinguniverse.com/company-histories/teachers-insurance-and-annuity-association-college-retirement-equities-fund-history/.

nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id.*

79.     Upon information and belief, TIAA and the other Plan service providers, including VALIC, Fidelity, and Vanguard, used their position as recordkeepers to obtain access to participants, learning their ages, length of employment, contact information, the size of their accounts, and choices of investments, and used that information for their benefit in marketing lucrative investment products and wealth management products to participants as they neared retirement and before retirement. This has been documented by former TIAA employees in multiple recent reports in the New York Times.[12]

80.     A recent New York Times article dated November 9, 2017, states that New York's attorney general has issued subpoenas to TIAA for documents related to its "dubious" sales practices. *Id.* The article goes on: "TIAA has previously said it puts its clients first and has maintained that because its 855 financial advisers and consultants do not receive commissions on the products they sell they are unbiased. But former employees and TIAA regulatory filings challenge this view, pointing out that the company awards bonuses to sales personnel when they steer customers into more expensive in-house products and services." *Id.* The article also describes how TIAA's role as a recordkeeper provides TIAA with access to sell individuals additional retail

---

[12] Gretchen Morgenson , The Finger-Pointing at the Finance Firm TIAA, N.Y. Times, Oct. 21, 2017, https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-financefirm-tiaa.html. See also Gretchen Morgenson, TIAA Receives New York Subpoena on Sales Practices, N.Y. Times, Nov. 9, 2017, https://www.nytimes.com/2017/11/09/business/tiaasubpoena.html.

Case 1:16-cv-01044-CCE-LPA   Document 72   Filed 12/27/17   Page 37 of 147

products including IRAs. "Most of TIAA's clients invest with the firm because their employers have hired it to administer their workers' retirement plans . . . The company earns a record-keeping fee from the institutions whose accounts it oversees, but can generate far more revenue when investors buy its annuities and funds. This presents the potential for conflict." *Id*.

81.     The value of TIAA's use of its position as a recordkeeper to the Plan to market and sell lucrative products to soon-to-be-retired participants and retired participants was substantial and far greater than would be true of recordkeepers who do not sell investment products, thus conveying a stamp of approval by the Defendants of TIAA and the other Plan service providers who marketed their products.

82.     Despite this, upon information and belief, the Defendants allowed TIAA and the other Plan service providers to market and sell their services and investment products in this way, benefitting TIAA and the service providers enormously, yet obtaining no benefit to the Plan from this, either by reduced recordkeeping fees or requiring TIAA and the other service providers to make direct payments to the Plan for the use of this information. This is even more lucrative to TIAA and the other Plan service providers because Defendants are using them as recordkeepers and using their products.

83.     Upon information and belief, the Plan's other service providers—VALIC, Vanguard, and Fidelity—also took part in this practice and the Defendants did nothing to

prevent it or ensure that the Plan obtained a benefit either through reduced recordkeeping fees or direct payments to the Plan.

84.    In benchmarking (and justifying) its executives' compensation packages, TIAA disclosed the following sixteen *for-profit* financial services and insurance companies as the peer group it used for competitive analysis:

The comparator group used in the market competitive analysis consists of the following sixteen companies (the "Peer Group"), which were selected based on being of similar size and complexity in the asset management and insurance industries:

| Affiliated Managers Group | Invesco | Principal Financial |
|---|---|---|
| Ameriprise Financial | Legg Mason | Prudential Financial |
| Bank of NY Mellon | Lincoln National | T. Rowe Price |
| Charles Schwab | MassMutual Financial | Voya Financial |
| Franklin Resources | MetLife | |
| The Hartford Financial | Northern Trust | |

85.    TIAA-CREF provided its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, a fixed annuity product, TIAA-CREF required that the CREF Stock Account and Money Market Account also be put in the plan, and required the plan to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, the Duke fiduciaries locked the Plan into an arrangement in advance in which certain investments could not be removed from the plan—*even if the funds were not prudent investments or would become imprudent in the future*. By accepting this arrangement, Defendants failed to implement an open architecture platform and use another recordkeeper who could provide the same administrative services at lower cost. Compounding this bundling requirement by TIAA, Defendants used multiple recordkeepers, each with their own investment products, resulting in an inefficient and excessively expensive plan structure, as described in more

39

detail below.

86. There is no shortage of high-quality, low-cost alternatives to TIAA-CREF's products in the defined contribution plan market. For example, many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option, providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account at much lower cost. Fiduciaries of 403(b) defined contribution plans must engage in a cost-benefit analysis to evaluate each investment option and determine whether it is prudent and in the exclusive best interest of participants, in light of TIAA-CREF's restrictions and superior market alternatives in the market, to lock their plans into an arrangement that precludes the removal of imprudent plan investments and results in excessive plan fees. Defendants failed to perform such an evaluation of the funds and services TIAA-CREF required. Defendants also failed to evaluate whether participants would be better served by using superior low-cost alternatives to TIAA-CREF's products when they could have saved millions of dollars in administrative and investment management costs by hiring a different recordkeeper. As explained below, prudent 403(b) fiduciaries have engaged in this analysis and overhauled their plans for the benefit of participants.

40

## IX.  Move to consolidation and open architecture in 403(b) plans.

87.    Under the 2007 final regulations that became effective January 1, 2009,[13] certain employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. DOL separately published revised Form 5500 annual reporting rules effective January 1, 2009, that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. The regulations are expressly intended to make 403(b) plans more like 401(k) plans.

88.    Once the final regulations were published, many 403(b) plan fiduciaries recognizedthat fulfilling their fiduciary obligations—whether on an ongoing basis or for the first time—required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants. While the Plan have long been subject to ERISA because their employer match was sufficient for the Plan to be "established or maintained" as ERISA plans under 29 U.S.C. §1002(2)(A)—and, indeed Defendants have informed the Department of Labor in the Plan's Forms 5500 that the Plan are subject to ERISA—even if they had not previously been subject to ERISA's requirements, there can be no doubt that 403(b) plan

---

[13] The regulations gave 403(b) plans almost a year and a half to make changes necessary to comply before the regulation became effective January 1, 2009.

fiduciaries could not just accept investment options provided by the same providers who did recordkeeping for the plan in order to comply with ERISA's requirements that all fees be reasonable and investments be prudent.

89.     Once these regulations were published, some non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009. As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

90.     For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single party." *See* LMU 403(b) Retirement Plan Project Overview, at 1.[14] "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services."[15] Beginning in 2008, to assist LMU in assessing the plan's investment options and recordkeeping services, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TAA-CREF.[16]

---

[14] Available at http://www.lmu.edu/AssetFactory.aspx?vid=33038
[15] *Id*. at 2.
[16] *See* http://www.lmu.edu/AssetFactory.aspx?vid=32045.

42

LMU consolidated from two recordkeepers to one effective on the date the final regulation became effective, January 1, 2009. Loyola Marymount's fiduciaries recognized that a dual recordkeeper structure would require its employees to pay higher fees for overlapping services, and because consultants, legal counsel, and all of the recordkeeping firms interviewed recommended that LMU use only one record keeper, starting in January 2009. LMU 403(b) Retirement Plan Project Overview, at 2. Moreover, LMU selected Diversified as the new recordkeeper because Diversified "is not an investment manager and therefore, does not require that certain investment options be offered by LMU." *Id.* LMU was therefore able to offer "best in class" funds in each fund category. *Id.* at 6.

91.     Similarly, following the new IRS 403(b) regulations, the fiduciaries of the Pepperdine University Retirement Plan recognized the implications of maintaining four different recordkeepers. In order to comply with the regulations and its fiduciary responsibilities, Pepperdine determined that it must make certain changes to the plan, including "Consolidating recordkeeping (by having one fund provider manage administration for multiple providers or by moving to a sole administrator scenario)." *See* Pepperdine University Participant Q & A.[17] Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper which does not offer

---

[17] Available at http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf.

proprietary investments, as the "sole administrator" and consolidated from four recordkeepers (Fidelity, TIAA-CREF, Vanguard and Prudential) to a single recordkeeper. Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination. *Id.* Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option." Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO.[18] Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale." *Id.*

92.     Pepperdine also recognized that the bundled model demanded by certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's investment menu— *whether or not those investments offered participants the best range of choice, value, and relative performance*." *Id.* (emphasis added). Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—could identify as being the 'best options in their respective asset classes.'" *Id.* After weighing and analyzing a variety of factors,

---

[18] Available at
http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." *Id.* The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants." *Id.*

93.    In the fall of 2008, in response to the new, not yet effective regulations and required changes within the defined contribution industry, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue recognized that "*[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector." James S. Almond, *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue University (emphasis added).[19] Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses.

---

[19] Available at http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx.

The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." *Id.* Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." *Id.* Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3–4 million per year* which is then compounded over time." *Id.* (emphasis added).

94.     Likewise, California Institute of Technology (CalTech) TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting. *Caltech Names TIAA-CREF Recordkeeper,* Institutional Investor (Dec. 10, 2009).[20] In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the Department of Labor, between 2013 and 2015, CalTech negotiated over *$15 million* in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

_____

[20] Available at http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.

95. Extensive industry literature shows that these sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce recordkeeping and investment management fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

96. In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014).[21] Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market." *Id.* at 3.

97. Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings. Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff." *Id.* at 4. "The multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers

---

[21] Available at https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf.

resulting in costs that are meaningfully higher than under a single recordkeeper model." *Id.* at 5. Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants." *Id.*

98.     *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." *Id.* Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." *Id.* at 6. An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." *Id.* An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup. *Id.*

99.     Further, according to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[22]

100.    Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, unlike the Duke Plan, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28

---

[22] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

investment fund options.[23] An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan fiduciaries had made changes to their plans as a result of the new 403(b) regulations that became effective January 1, 2009.[24]

101.    The majority of plans use a single recordkeeper because a "**multi-recordkeeper platform is inefficient**" and squanders the ability to leverage a plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[25] "By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants," while allowing participants to "benefit from a more manageable number of institutional-quality investment options to choose from." *Id.* Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

102.    AonHewitt, an independent investment consultant, similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers,"

---

[23] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.

[24] PSCA's 2010 Benchmarking Survey of 403(b) Plans at 45.

[25] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

"[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[26]

103.    Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[27]

104.    The recommendations of these independent, widely used investment consultants are buttressed by other industry literature supporting the fact that the use of a single recordkeeper provides reasonable fees. *See, e.g.,* Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to

---

[26] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[27] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[28] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[29]

105.    Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[30]

**DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS**

106.    The Defendants' continued retention of four recordkeepers and 400 of their proprietary funds—which the recordkeepers required to be included in the Plan—while

---

[28] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.
[29] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.
[30] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

51

excluding superior low-cost alternatives from other managers, demonstrates that, in contrast with the comprehensive plan reviews conducted by the similarly situated fiduciaries described above, the Defendants failed to adequately engage in a similar analysis. Had the Defendants conducted such a review of the Plan, they would not have allowed the Plan to continue to pay excessive administrative fees; would not have maintained an inefficient four-recordkeeper structure; would not have continued to include over *400* investment options in the Plan, including duplicative funds in numerous investment styles and higher-cost retail share classes for which identical lower-cost versions of the same funds were available; and would not have retained investment options in the Plan despite a sustained track record of underperformance. This follows because a prudent process would have produced a different outcome.

## I.     The Plan's 400 investments and four recordkeepers.

107.    The Defendants exercise exclusive control over the investment options that are included in the Plan, and determine which investment options to remove from the Plan. The Defendants also exercise exclusive control over hiring a recordkeeper for the Plan, and negotiating and approving the recordkeeper's compensation.

108.    The Defendants have hired and retained *four* recordkeepers for the Plan, and allowed each of those providers to put their own proprietary investment funds in the Plan—a total of over 400 options as of year-end 2014. These investment options include mutual funds and insurance company variable annuity products offered by the: the Teachers Insurance and Annuity Association of America and College Retirement Equities

Fund ("TIAA-CREF"), the Vanguard Group, Inc. ("Vanguard"), Fidelity Investments

Institutional Operations Company ("Fidelity"), and the Variable Life Insurance Company

("VALIC").

109.    Among the 400 available investments as of year-end 2014, 40 were TIAA-

CREF options, nearly 100 were Vanguard options, over 200 were Fidelity options, and

almost 100 were VALIC options. These investments included retail and institutional

share class mutual funds, insurance separate accounts, variable annuity options, and fixed

annuity options. The retail share class mutual funds are designed for small individual

investors, not jumbo retirement plans such as the Plan, and are identical in every respect

to institutional share classes of the same funds, except for much higher fees.

110.    The Defendants allowed the Plan's recordkeepers to essentially put the

entirety of their investment offerings in the Plan. The Defendants agreed to include in the

Plan virtually every Fidelity mutual fund available in the market, including allowing

Fidelity to put newly-created funds in the Plan without any prior screening by a fiduciary.

The Defendants made a substantially similar arrangement with Vanguard, placing

virtually every mutual fund in the Vanguard Family of Funds in the Plan, including new

Vanguard funds, without any prior screening or additional notice. The Defendants

therefore caused *hundreds* of mutual fund investments to be provided in the Plan without

making any independent determination that such investments were prudent, reasonably

priced, and provided for the exclusive purpose of providing benefits to Plan participants.

This shows that the Defendants failed to employ a prudent and loyal process in the

selection and retention of Plan investment options.

111.    The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA and are dependent upon the claims-paying ability of TIAA. The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan.

112.    The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

113.    The TIAA Real Estate Account is an insurance separate account maintained by TIAA. An insurance separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets.

114.    The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

115.    The Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management and other expenses, depending on the type of investment and share class.

116.    The Fidelity investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management and other expenses, depending on the type of investment and share class.

117.    Mutual funds have shareholders who are not participants in the Plan, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in the mutual funds, including participants in the Plan pay the expenses.

118.    The VALIC investment options offered to Plan participants include fixed and variable annuity account options. These options charge varying amounts for investment management in addition to distribution, marketing, and other expenses. The value of each participant's investment in these variable accounts will change over time based on investment experience and the expenses of the account. The variable accounts include insurance company pooled separate accounts that invest in underlying mutual funds advised by VALIC or other mutual fund companies, such as Vanguard. For these options, VALIC charges fees *in addition to* the expense ratio of the underlying mutual funds, which can reach *multiples* of the total fees charged by the mutual funds. For instance, VALIC charged 118 bps for the VALIC Vanguard Lifestrategy Conservative Growth Fund when the underlying Vanguard Lifestrategy Conservative Growth Fund (VSCGX) charged 13 bps, an increase of *over 807%. See infra* ¶149.

119.   The VALIC fixed accounts invest in the general account of VALIC and depend upon the claims-paying ability of VALIC. These options offer a fixed rate of return to participants.

120.   As of December 31, 2014, of the Plan's $4.7 billion in net assets, TIAA-CREF funds accounted for $1.3 billion, Vanguard funds accounted for $887 million, Fidelity funds accounted for $1.6 billion, and VALIC funds accounted for $903 million.

**II.    The Defendants improperly allowed TIAA-CREF to require the inclusion of its investment products in the Plan and TIAA-CREF to require it to provide recordkeeping for its proprietary options.**

121.   ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to remove imprudent investments no matter how long they have been in a plan, *Tibble*, 135 S. Ct. at 1828–29.

122.   As noted, TIAA-CREF offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA-CREF required that the plan also offer its flagship CREF Stock Account and Money Market Account, and to also use TIAA as recordkeeper for its proprietary products. By linking use of TIAA as a recordkeeper to including these funds in the Plan, TIAA drove uncapped revenue to its recordkeeping arm.

123.   TIAA's financial interests were also served insofar as TIAA was able to use its position as recordkeeper to obtain access to the Plans' participants, acquiring information about their ages, length of employment, contact information, the size of their

accounts, and choices of investments, and then used this information for its benefit in marketing lucrative investment products and wealth management products to participants as they neared retirement and before retirement. This practice has been documented by former TIAA employees in multiple recent reports in the New York Times described in more detail above.

124.    By allowing the Plan to enter such a bundled arrangement with TIAA-CREF, Duke agreed to lock its employees into funds which Duke did not analyze. It can never be prudent to lock in a fund in a plan for the future no matter what its expenses or its performance. To do so creates a structure which at the outset, and on an ongoing basis, violates the ERISA's requirement that fiduciaries must independently monitor investment options on an ongoing basis and remove those that are imprudent. *Tibble*, 135 S. Ct. at 1828–29. The Defendants thus failed to discharge their duty to independently evaluate whether each investment option was prudent for the Plan, and whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants, and whether it was prudent to include and retain the CREF Stock and Money Market accounts and the TIAA Traditional in the Plan. Instead of acting solely in the interest of participants, the Defendants allowed TIAA's financial interest to dictate the Plan's investment selections and recordkeeping arrangement. Because the Defendants allowed CREF Stock to be locked into the Plan, the Defendants could not satisfy their duty to evaluate for inclusion and retention in the Plan, whether it was prudent at the time of inclusion and whether it should be removed if imprudent. As a result of the

Defendants' breach in allowing CREF Stock to be retained in the Plan because TIAA-CREF demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plan suffered massive losses compared to prudent alternatives, as discussed in more detail below.

125.    As noted above, the Plan offers the TIAA Traditional Annuity. This option is a fixed annuity contract that returns a contractually specified minimum interest rate. An example of the restrictions and penalties for withdrawal imposed by this Annuity include a 2.5% surrender charge if a participant withdraws his or her investment in a single lump sum within 120 days of termination of employment.

126.    The Plan includes TIAA-CREF's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities with four layers of expenses that invest in underlying securities for a given investment style.

127.    The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

      a.    "administrative expense" charge (24 bps);[31]

      b.    "distribution expense" charge (9.5 bps);

      c.    "mortality and expense risk" charge (0.5 bps); and

---

[31] Expenses are stated as of May 1, 2014.

d. "investment advisory expense" charge (ranging from 4 to 12.5 bps).

128.    Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to the Plan's participants, and the other two provide no benefit to the Plan's participants.

a. **Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than the size of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plan's assets outpaced the growth in participants, the fees paid to TIAA-CREF likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

b. **Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, in a retirement plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged for such wholly useless expenses causes a loss of retirement assets to participants with no benefit.

c.  **Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the Plan, the participant does not make the choice of whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no benefit for paying such a charge, year after year, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Moreover, most participants in retirement plans recordkept by TIAA-CREF do not elect to annuitize their holdings in their variable annuity accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

d.  **Investment advisory expense charge (or investment management fees):** It is a fundamentally established principle of investment management that larger asset size enables the asset holder to obtain lower investment management fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up, at pre-specified

60

asset thresholds to pass along economies of scale to the investor. For example, if $5 million is a breakpoint, one fee, based on a percentage of assets, will be charged on the first $5 million, and a lesser percentage will be charged on the next portion of the assets, or on all assets. A large investor will therefore be charged a lower fee, on a percentage of assets, than a smaller investor to recognize the economies of scale generated from the higher asset levels. Jumbo plans, such as the Duke Plan, can command extremely low fees. Despite this recognized principle, TIAA-CREF has not instituted *any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plan's fiduciaries did not obtain the lower investment management fees that come with the Plan's enormous asset size. As a result, the Plan, with billions of dollars invested in CREF variable annuities, pay the same asset-based fee as the smallest clients with a tiny fraction of their total assets, resulting in a windfall to TIAA-CREF and excessive fees paid by Duke's employees and retirees.

129. The excessiveness of this investment management fee is even more egregious because of the way critics have documented how CREF "manages" the CREF Stock Account by investing nearly two out of every three dollars in companies held by its benchmark index, the Russell 3000 Index. *See supra* ¶78.

130. The TIAA Real Estate Account is an insurance separate account maintained by TIAA. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA

Real Estate Account is made up of the same four layers of excessive expenses detailed above, and even adds a fifth layer for a so-called "liquidity guarantee." As of May 1, 2013, these charges consisted of the following:

      a.   "administrative expense" charge (26.5 bps);

      b.   "distribution expense" charge (8 bps);

      c.   "mortality and expense risk" charge (0.5 bps);

      d.   "liquidity guarantee" (18 bps); and

      e.   "investment management expense" charge (36.5 bps).

131.    The 18 bps "liquidity guarantee" expense of the TIAA Real Estate Account is yet another excessive fee that is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index (Inst), which has a *total* expense ratio of 8 bps. *See infra* ¶¶210–212.

132.    As noted, the TIAA-CREF mutual funds in the Plan charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class. Thus, Duke Plan participants are paying for marketing costs of funds which their employer has placed in their retirement plan when such marketing costs provide no benefit to them. Other mutual funds that were available to the Plan do not include such marketing costs.

## III.    The Defendants caused the Plan to pay excessive administrative and recordkeeping fees.

133.    As set forth above, recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are

numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans like the Plan. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price and will readily respond to a request for proposal.

134.    Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate for a complex jumbo plan is to obtain an actual fee quote comparison, prudent fiduciaries of jumbo defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

135.    As set forth above, extensive industry literature and the experience of similarly situated fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees. Instead of leveraging the size of the participant base to take advantage of economies of scale, using multiple recordkeepers eliminates a plan's leverage. Instead of obtaining pricing based on a 37,000 participant plan from one recordkeeper, the Defendants spread recordkeeping of participants among *four* recordkeepers, who pushed their own products on the Plan. This took away the Plan's ability to obtain favorable pricing.

136.    As set forth above, extensive industry literature and the experience of similarly situated defined contribution plan fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees, while the use of a single recordkeeper offers many benefits such as leveraging the plan's participant base to

obtain economies of scale to ensure that participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

137.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continued to contract with *four* separate recordkeepers for the Plan: TIAA-CREF, Vanguard, Fidelity, and VALIC. There was no loyal or prudent reason for the Defendants to maintain this inefficient and costly structure of multiple recordkeepers, which has caused the Plan's participants to pay excessive and unreasonable fees for recordkeeping and administrative services.

138.    The Plan's recordkeepers receive compensation through revenue sharing payments from the Plan's investments.

139.    Instead of obtaining a flat per-participant rate or sufficient rebates of excessive revenue sharing back to the Plan, the Defendants allowed the Plan's four recordkeepers to collect excessive asset-based revenue sharing as payment for administrative services.

140.    Based upon information from sources including industry experts, the Plan's TIAA-CREF investments kicked back the following amounts of asset-based revenue sharing to the TIAA-CREF  recordkeeping entity:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |

| TIAA-CREF Investment | Revenue Share |
|---|---|
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

141.  Vanguard is also compensated for recordkeeping services based on revenue sharing payments it receives from the higher-cost retail share classes of the Vanguard mutual funds that Defendants included in the Plan instead of the available lower-cost institutional class shares.

142.  Fidelity's recordkeeping division is compensated based on internal and external revenue sharing it receives from the Fidelity and non-Fidelity mutual funds in the Plan.

143.  VALIC's recordkeeping division is compensated based on internal and external revenue sharing it receives from the VALIC annuities and mutual funds in the Plan.

144.  In addition, TIAA-CREF, Vanguard, Fidelity and VALIC also receive additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

145.  Instead of discharging their fiduciary duties to act prudently and in the exclusive interest of participants, the Defendants served TIAA-CREF's, Fidelity's, VALIC's, and Vanguard's financial interests. Instead of conducting a request for proposals for recordkeeping and evaluating the prudence of retaining each fund in the

Plan, the Defendants placed and retained proprietary funds of the recordkeepers in the Plan that would provide them with steady streams of compensation from revenue sharing payments and investment management fees.

146.    The Defendants were also required under ERISA to determine and monitor all sources of TIAA-CREF's, Fidelity's, VALIC's, and Vanguard's compensation, and to ensure that the compensation was limited to a reasonable amount for the services provided. *George*, 641 F.3d at 798–99. Had the Defendants discharged those duties, they would not have selected and retained as Plan investments options proprietary funds of the Plan's recordkeepers while failing to consider non-proprietary alternatives, and would not have allowed the Plan to pay the following excessive sums for recordkeeping.

147.    Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level (roughly 30,000), and the recordkeeping market, a reasonable recordkeeping fee for the Plan would have been a fixed amount between $700,000 and $1.1 million (approximately $30 per participant with an account balance).

148.    Based on schedules regarding the direct and indirect compensation levels shown on the Plan's Forms 5500 filed with the Department of Labor and upon information regarding the rate of internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the Plan paid at least $6.4 to $10.4 million (or approximately $280 per participant with an account balance) per year

from 2010 to 2014, *over 830%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

149. This is a *very* conservative total because this amount excludes asset-based revenue sharing payments VALIC received from the Plan's $900 million investment in VALIC variable and fixed accounts. This information was not disclosed to Plan participants. These asset-based payments for recordkeeping and administrative services are substantial. For instance, on each of the variable accounts, VALIC charged fees *47% to 807%* higher than the fees actually charged by the underlying mutual funds, and received additional compensation through revenue sharing payments from proprietary mutual funds and other third-party mutual funds. Based on information presently available to Plaintiffs, the amounts currently charged by VALIC on its variable annuity products and the expenses of the underlying mutual funds are set forth below.

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC American Beacon Holland Large Cap Growth Fund | 196 bps | American Beacon Holland Large Cap Growth Fund (Inv) (LHGFX) | 116 bps | 68.97% |
| VALIC Ariel Appreciation Fund | 192 bps | Ariel Appreciation Fund (Inv) (CAAPX) | 112 bps | 71.43% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Ariel Fund | 182 bps | Ariel Fund (Inv) (ARGFX) | 102 bps | 78.43% |
| VALIC Asset Allocation Fund | 150 bps | VALIC Company I Asset Allocation Fund (VCAAX) | 70 bps | 114.29% |
| VALIC Blue Chip Growth Fund | 163 bps | VALIC Company I Blue Chip Growth Fund (VCBCX) | 83 bps | 96.39% |
| VALIC Broad Cap Value Income Fund | 165 bps | VALIC Company I Broad Cap Value Income Fund (VBCVX) | 85 bps | 94.12% |
| VALIC Capital Conservation Fund | 143 bps | VALIC Company I Capital Conservation Fund (VCCCX) | 63 bps | 126.98% |
| VALIC Core Equity Fund | 160 bps | VALIC Company I Core Equity Fund (VCCEX) | 80 bps | 100.00% |
| VALIC Dividend Value Fund | 162 bps | VALIC Company I Dividend Value Fund (VCIGX) | 82 bps | 97.56% |
| VALIC Emerging Economies Fund | 174 bps | VALIC Company I Emerging Economies Fund (VCGEX) | 94 bps | 85.11% |
| VALIC Foreign Value Fund | 159 bps | VALIC Company I Foreign Value Fund (VCFVX) | 79 bps | 101.27% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Global Social Awareness Fund | 142 bps | VALIC Company I Global Social Awareness Fund (VCSOX) | 62 bps | 129.03% |
| VALIC Global Strategy Fund | 144 bps | VALIC Company I Global Strategy Fund (VGLSX) | 64 bps | 125.00% |
| VALIC Government Securities Fund | 144 bps | VALIC Company I Government Securities Fund (VCGSX) | 64 bps | 125.00% |
| VALIC Growth Fund | 160 bps | VALIC Company I Growth Fund (VCULX) | 80 bps | 100.00% |
| VALIC Growth & Income Fund | 165 bps | VALIC Company I Growth & Income Fund (VCGAX) | 85 bps | 94.12% |
| VALIC Health Sciences Fund | 185 bps | VALIC Company I Health Sciences Fund (VCHSX) | 105 bps | 76.19% |
| VALIC International Equities Index Fund | 124 bps | VALIC Company I International Equities Index Fund (VCIEX) | 44 bps | 181.82% |
| VALIC International Government Bond Fund | 145 bps | VALIC Company I International Government Bond Fund (VCIFX) | 65 bps | 123.08% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC International Growth Fund | 181 bps | VALIC Company I International Growth Fund (VCINX) | 101 bps | 79.21% |
| VALIC Large Cap Core Fund | 163 bps | VALIC Company I Large Cap Core Fund (VLCCX) | 83 bps | 96.39% |
| VALIC Large Capital Growth Fund | 155 bps | VALIC Company I Large Capital Growth Fund (VLCGX) | 75 bps | 106.67% |
| VALIC Mid Cap Index Fund | 116 bps | VALIC Company I Mid Cap Index Fund (VMIDX) | 36 bps | 222.22% |
| VALIC Mid Cap Strategic Growth Fund | 161 bps | VALIC Company I Mid Cap Strategic Growth Fund (VMSGX) | 81 bps | 98.77% |
| VALIC Money Market I Fund | 131 bps | VALIC Company I Money Market I Fund (VCIXX) | 51 bps | 156.86% |
| VALIC NASDAQ-100 Index Fund | 133 bps | VALIC Company I NASDAQ-100 Index Fund (VCNIX) | 53 bps | 150.94% |
| VALIC Science & Technology Fund | 178 bps | VALIC Company I Science & Technology Fund (VCSTX) | 98 bps | 81.63% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Small Cap Fund | 173 bps | VALIC Company I Small Cap Fund (VCSMX) | 93 bps | 86.02% |
| VALIC Small Cap Aggressive Growth Fund | 179 bps | VALIC Company I Small Cap Aggressive Growth Fund (VSAGX) | 99 bps | 80.81% |
| VALIC Small Cap Index Fund | 120 bps | VALIC Company I Small Cap Index Fund (VCSLX) | 40 bps | 200.00% |
| VALIC Small Cap Special Value Fund | 167 bps | VALIC Company I Small Cap Special Values Fund (VSSVX) | 87 bps | 91.95% |
| VALIC Small-Mid Growth Fund | 180 bps | VALIC Company I Small-Mid Growth Fund (VSSGX) | 100 bps | 80.00% |
| VALIC Stock Index Fund | 114 bps | VALIC Company I Stock Index Fund (VSTIX) | 34 bps | 235.29% |
| VALIC Value Fund | 165 bps | VALIC Company I Value Fund (VAVAX) | 85 bps | 94.12% |
| VALIC Aggressive Growth Lifestyle Fund | 140 bps | VALIC Company II Aggressive Growth Lifestyle Fund (VAGLX) | 85 bps | 64.71% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Capital Appreciation Fund | 140 bps | VALIC Company II Capital Appreciation Fund (VCCAX) | 85 bps | 64.71% |
| VALIC Conservative Growth Lifestyle Fund | 142 bps | VALIC Company II Conservative Growth Lifestyle Fund (VCGLX) | 87 bps | 63.22% |
| VALIC Core Bond Fund | 132 bps | VALIC Company II Core Bond Fund (VCCBX) | 77 bps | 71.43% |
| VALIC High Yield Bond Fund | 151 bps | VALIC Company II High Yield Bond Fund (VCHYX) | 96 bps | 57.29% |
| VALIC International Opportunities Fund | 155 bps | VALIC Company II International Opportunities Fund (VISEX) | 100 bps | 55.00% |
| VALIC Large Cap Value Fund | 136 bps | VALIC Company II Large Cap Value Fund (VACVX) | 81 bps | 67.90% |
| VALIC Mid Cap Growth Fund | 140 bps | VALIC Company II Mid Cap Growth Fund (VAMGX) | 85 bps | 64.71% |
| VALIC Mid Cap Value Fund | 160 bps | VALIC Company II Mid Cap Value Fund (VMCVX) | 105 bps | 52.38% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Moderate Growth Lifestyle Fund | 140 bps | VALIC Company II Moderate Growth Lifestyle Fund (VMGLX) | 85 bps | 64.71% |
| VALIC Money Market II Fund | 110 bps | VALIC Company II Money Market II Fund (VIIXX) | 55 bps | 100.00% |
| VALIC Small Cap Growth Fund | 171 bps | VALIC Company II Small Cap Growth Fund (VASMX) | 116 bps | 47.41% |
| VALIC Small Cap Value Fund | 150 bps | VALIC Company II Small Cap Value Fund (VCSVX) | 95 bps | 57.89% |
| VALIC Socially Responsible Fund | 111 bps | VALIC Company II Socially Responsible Fund (VCSRX) | 56 bps | 98.21% |
| VALIC Strategic Bond Fund | 142 bps | VALIC Company II Strategic Bond Fund (VCSBX) | 87 bps | 63.22% |
| VALIC Vanguard LifeStrategy Conservative Growth Fund | 118 bps | Vanguard LifeStrategy Conservative Growth Fund (Inv) (VSCGX) | 13 bps | 807.69% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Vanguard LifeStrategy Growth Fund | 120 bps | Vanguard LifeStrategy Growth Fund (Inv) (VASGX) | 15 bps | 700.00% |
| VALIC Vanguard LifeStrategy Moderate Growth Fund | 119 bps | Vanguard LifeStrategy Moderate Growth Fund (Inv) (VSMGX) | 14 bps | 750.00% |
| VALIC Vanguard Long-Term Investment-Grade Fund | 102 bps | Vanguard Long-Term Investment-Grade Fund (Inv) (VWESX) | 22 bps | 363.64% |
| VALIC Vanguard Long-Term Treasury Fund | 100 bps | Vanguard Long-Term Treasury Fund (Inv) (VUSTX) | 20 bps | 400.00% |
| VALIC Vanguard Wellington Fund | 131 bps | Vanguard Wellington Fund (Inv) (VWELX) | 26 bps | 403.85% |
| VALIC Vanguard Windsor II Fund | 139 bps | Vanguard Windsor II Fund (Inv) (VWNFX) | 34 bps | 308.82% |

150.    Aside from the failures to monitor the amount of revenue sharing payments and to solicit competitive bids, the Defendants also failed to adequately negotiate rebates of excessive fee payments to TIAA-CREF, Fidelity, VALIC, and Vanguard. As a specific example, because the multi-billion dollar plans paid the same percentage of asset-based

fees as much smaller plans that used TIAA-CREF's products and services, the
Defendants could have demanded "plan pricing" rebates from TIAA-CREF based on the
Plan's economies of scale. Just as with investment management fees, the Plan's size
would have enabled Defendants to command a much lower fee. Defendants could have
also demanded similar rebates of all excessive fee payments from Vanguard, VALIC, and
Fidelity. Had the Defendants adequately negotiated for these rebates, the Plan's
recordkeeping fees would have been reduced, avoiding additional losses of retirement
savings.

151.    The impact of excessive fees on employees' and retirees' retirement assets
is dramatic, as the U.S. Department of Labor has found U.S. Dep't of Labor, *A Look at
401(k) Plan Fees,* at 1–2 (Aug. 2013) (finding that a 1% higher level of fees over a 35-
year period makes a 28% difference in retirement assets at the end of a participant's
career).[32]

152.    The Defendants also failed to conduct a competitive bidding process for the
Plan's recordkeeping services. A competitive bidding process for the Plan's
recordkeeping services would have produced a reasonable recordkeeping fee for the Plan.
This competitive bidding process would have enabled Defendants to select a
recordkeeper charging reasonable fees, negotiate a reduction in recordkeeping fees, and
rebate any excess expenses paid by participants for recordkeeping services.

---

[32] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

153.    The Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers, and therefore, caused the Plan to pay unreasonable expenses for administration. Had the Defendants monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $45 million of their retirement savings in the last six years alone through unreasonable recordkeeping fees.[33]

**IV.    Defendants caused the Plan to pay wholly unnecessary and excessive fees by using higher-cost share classes of mutual funds instead of identical versions of the same funds in lower-cost share classes.**

154.    Jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services. If a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because the only difference between the various share classes is fees, selecting a higher-cost share class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

---

[33] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[34]

155.    Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost chare class of the same fund is available, to avoid saddling the plan with unnecessary fees.

156.    Jumbo investors like the Plan can obtain share classes with far lower costs than retail mutual fund shares. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

157.    Moreover, lower-cost share classes of mutual fund investment options were readily available to the Plan. Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform.

For large 401(k) plans with over a billion dollars in total assets…mutual funds will often waive an investment minimum for institutional share classes. It is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.

---

[34] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *27–28 (C.D. Cal. July 8, 2010), *aff'd* 729 F.3d 1110 (9th Cir. 2013).

158.    In fact, Vanguard expressly "reserves the right to establish higher or lower minimum amounts for certain investors", including when the "plan sponsor's aggregate assets within the Vanguard Funds will likely generate substantial economies in the servicing of their accounts."[35]

159.    For Vanguard, TIAA-CREF, Fidelity, and VALIC mutual fund options, as further support of the routine waiver of investment minimums for large institutional investors, fiduciaries of other defined contribution plans have successfully negotiated on behalf of their plan less expensive institutional share classes for a particular mutual fund option despite that fund not meeting the minimum investment threshold.

160.    Therefore, Defendants, knew or should have known that investment providers would have allowed the Plan to provide lower-cost share classes to participants if Defendants had asked.

161.    Despite these far lower-cost options, Defendants selected and continue to retain Plan investment options with far higher costs than were and are available for the Plan based on its size. Moreover, for the *exact same mutual fund option*, Defendants selected and continue to offer far higher-cost share classes of identical mutual funds than were easily available to the Plan. The following table sets forth each higher-cost mutual

---

[35] *See* Vanguard Funds Multiple Class Plan, available at
https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multipleclasspl
anvanguardfun.pdf.

fund share class that was included in the Plan during the proposed class period for which

a significantly lower-cost, but otherwise identical, share class of the same mutual fund

was available. The expense ratio identified for the Plan's investment option and the

lower-cost share class alternative are based on the earliest date during the proposed class

period that the higher-cost fund was included in the Plan:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Funds Washington Mutual-R5 (RWMFX) | 42 bps | American Funds Washington Mutual-R6 (RWMGX) | 37 bps | 13.51% |
| Deutsche Core Equity-S (SCDGX) | 66 bps | Deutsche Core Equity-Inst (SUWIX) | 50 bps | 32.00% |
| Deutsche Core Plus Income-S (SCSBX) | 72 bps | Deutsche Core Plus Income-Inst (SZIIX) | 66 bps | 9.09% |
| Deutsche CROCI Equity Dividend-S (KDHSX) | 102 bps | Deutsche CROCI Equity Dividend-Inst (KDHIX) | 82 bps | 24.39% |
| Deutsche CROCI International-S (SCINX) | 94 bps | Deutsche CROCI International-Inst (SUIIX) | 81 bps | 16.05% |
| Deutsche Emerging Markets Equity-S (SEMGX) | 155 bps | Deutsche Emerging Markets Equity-Inst (SEKIX) | 132 bps | 17.42% |
| Deutsche Enhanced Emerging Markets Fixed Income-S (SCEMX) | 99 bps | Deutsche Enhanced Emerging Markets Fixed Income-Inst (SZEIX) | 81 bps | 22.22% |
| Deutsche Global Equity-S (DBIVX) | 139 bps | Deutsche Global Equity-Inst (MGINX) | 113 bps | 23.01% |
| Deutsche Global Growth-S (SCOBX) | 123 bps | Deutsche Global Growth-Inst (SGQIX) | 120 bps | 2.50% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Deutsche Global High Income-S (SGHSX) | 89 bps | Deutsche Global High Income-Inst (MGHYX) | 73 bps | 21.92% |
| Deutsche Global Income Builder-S (KTRSX) | 77 bps | Deutsche Global Income Builder-Inst (KTRIX) | 60 bps | 28.33% |
| Deutsche Global Small Cap-S (SGSCX) | 130 bps | Deutsche Global Small Cap-Inst (KGDIX) | 113 bps | 15.04% |
| Deutsche GNMA-S (SGINX) | 54 bps | Deutsche GNMA-Inst (GIGGX) | 45 bps | 20.00% |
| Deutsche Gold & Precious Metals-S (SCGDX) | 115 bps | Deutsche Gold & Precious Metals-Inst (SGDIX) | 100 bps | 15.00% |
| Deutsche Health and Wellness-S (SCHLX) | 131 bps | Deutsche Health and Wellness-Inst (SUHIX) | 106 bps | 23.58% |
| Deutsche Large Cap Focus Growth-S (SCQGX) | 111 bps | Deutsche Large Cap Focus Growth-Inst (SGGIX) | 87 bps | 27.59% |
| Deutsche Mid Cap Growth-S (SMCSX) | 109 bps | Deutsche Mid Cap Growth-Inst (BTEAX) | 30 bps | 263.33% |
| Deutsche Mid Cap Value-S (MIDTX) | 110 bps | Deutsche Mid Cap Value-Inst (MIDIX) | 102 bps | 7.84% |
| Deutsche Science and Technology-S (KTCSX) | 106 bps | Deutsche Science and Technology-Inst (KTCIX) | 67 bps | 58.21% |
| Deutsche Short Duration-S (DBPIX) | 63 bps | Deutsche Short Duration-R6 (PPILX) | 50 bps | 26.00% |
| Deutsche Small Cap Growth-S (SSDSX) | 104 bps | Deutsche Small Cap Growth-Inst (SSDIX) | 98 bps | 6.12% |
| Deutsche Small Cap Value-S (KDSSX) | 105 bps | Deutsche Small Cap Value-Inst (KDSIX) | 80 bps | 31.25% |
| Deutsche Strategic Government Securities-S (KUSMX) | 62 bps | Deutsche Strategic Government Securities-Inst (KUSIX) | 51 bps | 21.57% |
| Deutsche World Dividend-S (SCGEX) | 115 bps | Deutsche World Dividend-R6 (SERNX) | 95 bps | 21.05% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity China Region (FHKCX) | 98 bps | Fidelity Advisor China Region-I (FHKIX) | 93 bps | 5.38% |
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond-Inst (FCNVX) | 30 bps | 33.33% |
| Fidelity Dividend Growth (FDGFX) | 92 bps | Fidelity Dividend Growth-K (FDGKX) | 71 bps | 29.58% |
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX) | 125 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA)-I (FIEMX) | 119 bps | 5.04% |
| Fidelity Global Commodity Stock (FFGCX) | 109 bps | Fidelity Advisor Global Commodity Stock-I (FFGIX) | 107 bps | 1.87% |
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth-Z (FZAJX) | 88 bps | 18.18% |
| Fidelity International Real Estate (FIREX) | 114 bps | Fidelity International Real Estate-Inst (FIRIX) | 109 bps | 4.59% |
| Fidelity International Small Cap (FISMX) | 142 bps | Fidelity International Small Cap-Inst (FIXIX) | 131 bps | 8.40% |
| Fidelity International Small Cap Opportunities (FSCOX) | 89 bps | Fidelity International Small Cap Opportunities-Inst (FOPIX) | 88 bps | 1.14% |
| Fidelity Japan (FJPNX) | 80 bps | Fidelity Advisor Japan-I (FJPIX) | 75 bps | 6.67% |
| Fidelity Large Cap Growth (FSLGX) | 86 bps | Fidelity Advisor Large Cap Growth-Inst (FLNOX) | 74 bps | 16.22% |
| Fidelity Latin America (FLATX) | 103 bps | Fidelity Latin America-Inst (FLFIX) | 101 bps | 1.98% |
| Fidelity Low-Priced Stock (FLPSX) | 99 bps | Fidelity Low-Priced Stock-K (FLPKX) | 85 bps | 16.47% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Mega Cap Stock (FGRTX) | 68 bps | Fidelity Mega Cap Stock-Z (FZALX) | 54 bps | 25.93% |
| Fidelity Mid Cap Growth (FSMGX) | 70 bps | Fidelity Advisor Mid Cap Growth-Inst (FGCOX) | 59 bps | 18.64% |
| Fidelity Real Estate Income (FRIFX) | 92 bps | Fidelity Advisor Real Estate Income-I (FRIRX) | 89 bps | 3.37% |
| Fidelity Select Gold (FSAGX) | 94 bps | Fidelity Advisor Gold-I (FGDIX) | 91 bps | 3.30% |
| Fidelity Select Materials (FSDPX) | 94 bps | Fidelity Advisor Materials-I (FMFEX) | 93 bps | 1.08% |
| Fidelity Spartan 500 Index-Inst (FXSIX) | 5 bps | Fidelity Spartan 500 Index-Adv Inst (FXAIX) | 3 bps | 66.67% |
| Fidelity Spartan Extended Market Index-Adv (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index-Adv Inst (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Inflation-Protected Index-Adv (FSIYX) | 10 bps | Fidelity Spartan Inflation-Protected Index-Adv Inst (FIPDX) | 5 bps | 100.00% |
| Fidelity Spartan International Index-Adv (FSIVX) | 12 bps | Fidelity Spartan International Index-Adv Inst (FSPSX) | 6 bps | 100.00% |
| Fidelity Spartan International Index-Inv (FSIIX) | 10 bps | Fidelity Spartan International Index-Adv (FSIVX) | 7 bps | 42.86% |
| Fidelity Spartan International Index-Inv (FSIIX) | 11 bps | Fidelity Spartan International Index-Adv Inst (FSPSX) | 6 bps | 83.33% |
| Fidelity Spartan Long Term Treasury Bond Index-Inv (FLBIX) | 20 bps | Fidelity Spartan Long Term Treasury Bond Index-Adv (FLBAX) | 10 bps | 100.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan Short Term Treasury Index-Inv (FSBIX) | 20 bps | Fidelity Spartan Short Term Treasury Index-Adv (FSBAX) | 10 bps | 100.00% |
| Fidelity Spartan Total Market Index (Ins) (FSKTX) | 6 bps | Fidelity Spartan Total Market Index-Adv Inst (FSKAX) | 5 bps | 20.00% |
| Fidelity Spartan US Bond Index-Inst (FXSTX) | 7 bps | Fidelity Spartan US Bond Index-Adv Inst (FXNAX) | 5 bps | 40.00% |
| Fidelity Stock Selector Small Cap (FDSCX) | 72 bps | Fidelity Advisor Stock Selector Small Cap-I (FCDIX) | 62 bps | 16.13% |
| ICT Treasury Portfolio Deutsche US Treasury Money-S (IUSXX) | 23 bps | ICT Treasury Portfolio Deutsche US Treasury Money-Inst (ICTXX) | 21 bps | 9.52% |
| MFS Value-R4 (MEIJX) | 67 bps | MFS Value-R5 (MEIKX) | 56 bps | 19.64% |
| Oppenheimer Developing Markets-Y (ODVYX) | 103 bps | Oppenheimer Developing Markets-I (ODVIX) | 88 bps | 17.05% |
| PIMCO Total Return-Adm (PTRAX) | 71 bps | PIMCO Total Return-Inst (PTTRX) | 46 bps | 54.35% |
| Prudential Jennison Mid Cap Growth-Z (PEGZX) | 76 bps | Prudential Jennison Mid Cap Growth (Q) (PJGQX) | 60 bps | 26.67% |
| Strategic Advisers International Multi-Manager (FMJDX) | 116 bps | Strategic Advisers International Multi-Manager-F (FMBKX) | 107 bps | 8.41% |
| Strategic Advisers Small Mid Cap Multi-Manager (FNAPX) | 116 bps | Strategic Advisers Small Mid Cap Multi-Manager-F (FARMX) | 106 bps | 9.43% |
| TIAA-CREF Equity Index-Ret (TIQRX) | 33 bps | TIAA-CREF Equity Index-Inst (TIEIX) | 9 bps | 266.67% |
| TIAA-CREF Growth & Income-Ret (TRGIX) | 73 bps | TIAA-CREF Growth & Income-Inst (TIGRX) | 52 bps | 40.38% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF International Equity-Ret (TRERX) | 78 bps | TIAA-CREF International Equity-Inst (TIIEX) | 57 bps | 36.84% |
| TIAA-CREF International Equity Index-Ret (TRIEX) | 35 bps | TIAA-CREF International Equity Index-Inst (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF Large-Cap Growth Index-Ret (TRIRX) | 34 bps | TIAA-CREF Large-Cap Growth Index-Inst (TILIX) | 9 bps | 277.78% |
| TIAA-CREF Large-Cap Value-Ret (TRLCX) | 74 bps | TIAA-CREF Large-Cap Value-Inst (TRLIX) | 49 bps | 51.02% |
| TIAA-CREF Large-Cap Value Index-Ret (TRCVX) | 34 bps | TIAA-CREF Large-Cap Value Index-Inst (TILVX) | 9 bps | 277.78% |
| TIAA-CREF Lifecycle 2010-Ret (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010-Inst (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015-Ret (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015-Inst (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020-Ret (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020-Inst (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025-Ret (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025-Inst (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030-Ret (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030-Inst (TCRIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2035-Ret (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035-Inst (TCIIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2040-Ret (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040-Inst (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045-Ret (TTFRX) | 72 bps | TIAA-CREF Lifecycle 2045-Inst (TTFIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2050-Ret (TLFRX) | 71 bps | TIAA-CREF Lifecycle 2050-Inst (TFTIX) | 46 bps | 54.35% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle Retirement Income-Ret (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income-Inst (TLRIX) | 40 bps | 62.50% |
| TIAA-CREF Mid-Cap Growth-Ret (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth-Inst (TRPWX) | 52 bps | 48.08% |
| TIAA-CREF Mid-Cap Value-Ret (TRVRX) | 74 bps | TIAA-CREF Mid-Cap Value-Inst (TIMVX) | 49 bps | 51.02% |
| TIAA-CREF Real Estate Securities-Ret (TRRSX) | 81 bps | TIAA-CREF Real Estate Securities-Inst (TIREX) | 56 bps | 44.64% |
| TIAA-CREF S&P 500 Index-Ret (TRSPX) | 33 bps | TIAA-CREF S&P 500 Index-Inst (TISPX) | 8 bps | 312.50% |
| TIAA-CREF Small-Cap Blend Index-Ret (TRBIX) | 34 bps | TIAA-CREF Small-Cap Blend Index-Inst (TISBX) | 9 bps | 277.78% |
| TIAA-CREF Small-Cap Equity-Ret (TRSEX) | 80 bps | TIAA-CREF Small-Cap Equity-Inst (TISEX) | 55 bps | 45.45% |
| TIAA-CREF Social Choice Equity-Ret (TRSCX) | 45 bps | TIAA-CREF Social Choice Equity-Inst (TISCX) | 22 bps | 104.55% |
| Valic American Century Mid Cap Value-Inst | 81 bps | American Century Mid Cap Value-R6 (AMDVX) | 65 bps | 24.62% |
| Valic American Funds AMCAP-R4 | 74 bps | American Funds AMCAP-R6 (RAFGX) | 39 bps | 89.74% |
| Valic American Funds EuroPacific Growth-R4 | 85 bps | American Funds EuroPacific Growth-R6 (RERGX) | 50 bps | 70.00% |
| Vanguard 500 Index-Inv (VFINX) | 17 bps | Vanguard Institutional Index-Inst Plus (VIIIX) | 2 bps | 750.00% |
| Vanguard Asset Allocation-Inv (VAAPX) | 27 bps | Vanguard Asset Allocation-Adm (VAARX) | 19 bps | 42.11% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Balanced Index-Inv (VBINX) | 26 bps | Vanguard Balanced Index-Inst (VBAIX) | 8 bps | 225.00% |
| Vanguard Capital Opportunity-Inv (VHCOX) | 48 bps | Vanguard Capital Opportunity-Adm (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index-Inv (VDMIX) | 20 bps | Vanguard Developed Markets Index-Inst Plus (VDMPX) | 6 bps | 233.33% |
| Vanguard Developed Markets Index-Inv (VDVIX) | 20 bps | Vanguard Developed Markets Index-Inst Plus (VTMNX) | 7 bps | 185.71% |
| Vanguard Dividend Appreciation Index-Inv (VDAIX) | 20 bps | Vanguard Dividend Appreciation Index-Adm (VDADX) | 10 bps | 100.00% |
| Vanguard Emerging Markets Stock Index-Inv (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index-Inst (VEMIX) | 15 bps | 133.33% |
| Vanguard Emerging Markets Stock Index-Inv (VEIEX) | 33 bps | Vanguard Emerging Markets Stock Index-Inst Plus (VEMRX) | 10 bps | 230.00% |
| Vanguard Energy-Inv (VGENX) | 38 bps | Vanguard Energy-Adm (VGELX) | 31 bps | 22.58% |
| Vanguard Equity-Income-Inv (VEIPX) | 31 bps | Vanguard Equity-Income-Adm (VEIRX) | 22 bps | 40.91% |
| Vanguard European Stock Index-Inv (VEURX) | 26 bps | Vanguard European Stock Index-Inst (VESIX) | 10 bps | 160.00% |
| Vanguard Explorer-Inv (VEXPX) | 49 bps | Vanguard Explorer-Adm (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index-Inv (VEXMX) | 26 bps | Vanguard Extended Market Index-Inst Plus (VEMPX) | 8 bps | 225.00% |
| Vanguard FTSE All-World ex-US Index-Inv (VFWIX) | 35 bps | Vanguard FTSE All-World ex-US Index-Inst (VFWSX) | 15 bps | 133.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard FTSE All-World ex-US Index-Inv (VFWIX) | 35 bps | Vanguard FTSE All-World ex-US Index-Inst Plus (VFWPX) | 10 bps | 250.00% |
| Vanguard FTSE All-World ex-US Small-Cap Index-Inv (VFSVX) | 78 bps | Vanguard FTSE All-World ex-US Small-Cap Index-Inst (VFSNX) | 30 bps | 160.00% |
| Vanguard FTSE Social Index-Inv (VFTSX) | 29 bps | Vanguard FTSE Social Index-Inst (VFTNX) | 16 bps | 81.25% |
| Vanguard GNMA-Inv (VFIIX) | 23 bps | Vanguard GNMA-Adm (VFIJX) | 13 bps | 76.92% |
| Vanguard Growth & Income-Inv (VQNPX) | 32 bps | Vanguard Growth & Income-Adm (VGIAX) | 21 bps | 52.38% |
| Vanguard Growth Index-Inv (VIGRX) | 26 bps | Vanguard Growth Index-Inst (VIGIX) | 8 bps | 225.00% |
| Vanguard Health Care-Inv (VGHCX) | 36 bps | Vanguard Health Care-Adm (VGHAX) | 29 bps | 24.14% |
| Vanguard High-Yield Corporate-Inv (VWEHX) | 28 bps | Vanguard High-Yield Corporate-Adm (VWEAX) | 15 bps | 86.67% |
| Vanguard Inflation-Protected Securities-Inv (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities-Inst (VIPIX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index-Inv (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index-Inst (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index-Inv (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index-Inst Plus (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Investment-Grade-Inv (VFICX) | 24 bps | Vanguard Intermediate-Term Investment-Grade-Adm (VFIDX) | 11 bps | 118.18% |
| Vanguard Intermediate-Term Treasury-Inv (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury-Adm (VFIUX) | 12 bps | 108.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard International Growth-Inv (VWIGX) | 49 bps | Vanguard International Growth-Adm (VWILX) | 33 bps | 48.48% |
| Vanguard Large-Cap Index-Inv (VLACX) | 26 bps | Vanguard Large-Cap Index-Inst (VLISX) | 8 bps | 225.00% |
| Vanguard Long-Term Bond Index-Inv (VBLTX) | 22 bps | Vanguard Long-Term Bond Index-Inst (VBLLX) | 7 bps | 214.29% |
| Vanguard Long-Term Bond Index-Inv (VBLTX) | 22 bps | Vanguard Long-Term Bond Index-Inst Plus (VBLIX) | 5 bps | 340.00% |
| Vanguard Long-Term Investment-Grade-Inv (VWESX) | 26 bps | Vanguard Long-Term Investment-Grade-Adm (VWETX) | 13 bps | 100.00% |
| Vanguard Long-Term Treasury-Inv (VUSTX) | 25 bps | Vanguard Long-Term Treasury-Adm (VUSUX) | 12 bps | 108.33% |
| Vanguard Mid Cap Index-Adm (VIMAX) | 9 bps | Vanguard Mid Cap Index-Inst Plus (VMCPX) | 6 bps | 50.00% |
| Vanguard Mid Cap Index-Inv (VIMSX) | 26 bps | Vanguard Mid Cap Index-Inst (VMCIX) | 8 bps | 225.00% |
| Vanguard Mid Cap Index-Inv (VIMSX) | 24 bps | Vanguard Mid Cap Index-Inst Plus (VMCPX) | 6 bps | 300.00% |
| Vanguard Mid-Cap Growth Index-Inv (VMGIX) | 26 bps | Vanguard Mid-Cap Growth Index-Adm (VMGMX) | 10 bps | 160.00% |
| Vanguard Mid-Cap Value Index-Inv (VMVIX) | 24 bps | Vanguard Mid-Cap Value Index-Adm (VMVAX) | 10 bps | 140.00% |
| Vanguard Morgan Growth-Inv (VMRGX) | 43 bps | Vanguard Morgan Growth-Adm (VMRAX) | 29 bps | 48.28% |
| Vanguard Pacific Stock Index-Inv (VPACX) | 26 bps | Vanguard Pacific Stock Index-Inst (VPKIX) | 10 bps | 160.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Prime Money Market-Inv (VMMXX) | 23 bps | Vanguard Prime Money Market-Adm (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP-Inv (VPMCX) | 45 bps | Vanguard PRIMECAP-Adm (VPMAX) | 36 bps | 25.00% |
| Vanguard REIT Index-Inv (VGSIX) | 26 bps | Vanguard REIT Index-Inst (VGSNX) | 9 bps | 188.89% |
| Vanguard Short-Term Bond Index-Inv (VBISX) | 22 bps | Vanguard Short-Term Bond Index-Adm (VBIRX) | 11 bps | 100.00% |
| Vanguard Short-Term Bond Index-Inv (VBISX) | 22 bps | Vanguard Short-Term Bond Index-Inst Plus (VBIPX) | 5 bps | 340.00% |
| Vanguard Short-Term Federal-Inv (VSGBX) | 22 bps | Vanguard Short-Term Federal-Adm (VSGDX) | 12 bps | 83.33% |
| Vanguard Short-Term Investment-Grade-Inv (VFSTX) | 24 bps | Vanguard Short-Term Investment-Grade-Inst (VFSIX) | 9 bps | 166.67% |
| Vanguard Short-Term Treasury-Inv (VFISX) | 22 bps | Vanguard Short-Term Treasury-Adm (VFIRX) | 12 bps | 83.33% |
| Vanguard Small Cap Index-Inv (NAESX) | 26 bps | Vanguard Small Cap Index-Inst Plus (VSCPX) | 6 bps | 333.33% |
| Vanguard Small Cap Value Index-Inv (VISVX) | 26 bps | Vanguard Small Cap Value Index-Inst (VSIIX) | 8 bps | 225.00% |
| Vanguard Small-Cap Growth Index-Inv (VISGX) | 26 bps | Vanguard Small-Cap Growth Index-Inst (VSGIX) | 8 bps | 225.00% |
| Vanguard Total Bond Market Index-Inv (VBMFX) | 22 bps | Vanguard Total Bond Market Index-Inst Plus (VBMPX) | 5 bps | 340.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total International Stock Index-Inv (VGTSX) | 22 bps | Vanguard Total International Stock Index-Inst Plus (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index-Inv (VTSMX) | 17 bps | Vanguard Institutional Total Stock Market Index-Inst Plus (VITPX) | 2 bps | 750.00% |
| Vanguard Total World Stock Index-Inv (VTWSX) | 45 bps | Vanguard Total World Stock Index-Inst (VTWIX) | 23 bps | 95.65% |
| Vanguard U.S. Growth-Inv (VWUSX) | 45 bps | Vanguard U.S. Growth-Adm (VWUAX) | 29 bps | 55.17% |
| Vanguard Value Index-Inv (VIVAX) | 26 bps | Vanguard Value Index-Inst (VIVIX) | 8 bps | 225.00% |
| Vanguard Wellesley Income-Inv (VWINX) | 28 bps | Vanguard Wellesley Income-Adm (VWIAX) | 21 bps | 33.33% |
| Vanguard Wellington-Inv (VWELX) | 30 bps | Vanguard Wellington-Adm (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor II-Inv (VWNFX) | 35 bps | Vanguard Windsor II-Adm (VWNAX) | 27 bps | 29.63% |
| Vanguard Windsor-Inv (VWNDX) | 33 bps | Vanguard Windsor-Adm (VWNEX) | 22 bps | 50.00% |
| Western Asset Core Plus Bond-I (WACPX) | 45 bps | Western Asset Core Plus Bond-IS (WAPSX) | 43 bps | 4.65% |

162. These lower-cost share classes have been available for years, some dating back to the early 2000s or before.

163. Because the share classes have identical portfolio managers, underlying investments, and asset allocations, and differ only in cost, Defendants' failure to select

the lower-cost share classes for the Plan's mutual fund options demonstrates that Defendants failed to prudently consider and use the size and purchasing power of the Plan when selecting the Plan's investment options.

164.  Defendants' use of the higher-cost share classes instead of the available lower-cost versions caused Plan participants to lose millions of dollars of their retirement savings due to wholly unnecessary fees.

## V.  Defendants selected and retained a large number of duplicative investment options, diluting the Plan's ability to pay lower fees and confusing participants.

165.  Defendants provided a dizzying array of duplicative funds in the same investment style, thereby depriving the Plan of its bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and leading to what industry experts have described as "decision paralysis" for participants. *See, e.g.*, Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009) ("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions."). Defendants placed *over 400* investment options in the Plan, in the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and stable value.

166.    Having such an overwhelming number of investment options places a monumental burden on the Plan's participants in selecting options in which to invest. A fund's objectives or goals, investment strategies, principal risks, historical performance, fees and expenses, and fund managers and advisers, among other information are set forth in a prospectus. Prospectuses are designed to educate a potential investor and provide material information to enable her to make an informed, prudent investment decision. For the Fidelity Freedom Funds alone, the prospectus and supporting materials filed with the Securities and Exchange Commission span almost *800* printed pages.[36] If a Duke Plan participant were to review the prospectuses of all *400* investment options in the Plan, this would require reading many thousands of pages of materials. This is a virtually impossible burden. Even for the Plan's fiduciaries, it is inconceivable that they have read the prospectuses and supporting materials of the 400 funds they have selected and retained.

167.    In comparison to the 400-option Duke Plan, defined contribution plans in 2014 had an average of 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[37] This provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding confusion. This number of options provides participants with a choice of investment styles while maintaining a larger pool of assets in each

---

[36] *See* Fidelity Freedom Funds Prospectus, Form N-1A (May 28, 2016), available at https://www.sec.gov/Archives/edgar/data/880195/000137949116004218/filing717.htm.
[37] Available at https://www.callan.com/research/files/990.pdf.

investment style, which benefits participants by avoiding participant confusion and obtaining lower fees. It also is the output of an evaluation and selection by prudent fiduciaries of the "best in class" investment choice in a particular investment style. Indeed, since it is the fiduciaries in a plan who ERISA holds to a standard of a prudent financial expert, it is important for fiduciaries to perform that selection role for the exclusive benefit of participants who are not financial experts.

168.    A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plan would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

169.    Fund selections must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. This removes the benefit of pooling assets consistent with the size of the Plan. Assembling a haphazard lineup of over 400 duplicative options,

proprietary to the Plan's recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

170.   Within each asset class and investment style deemed appropriate for a participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. In contrast to the investment lineup assembled by Defendants, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and investment style. When many investment options in a single investment style are included in a plan, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

171.   Moreover, if a participant puts her assets in each of the funds within a given investment style, as commentators have said they are likely to do,[38] when many actively managed funds are included within the same investment style, this results in those participants effectively having an index return. This is because the investments are spread so broadly over that investment style. Yet the participants will be paying much higher fees for active management than the fees of a passive index fund.

172.   In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. *See* The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of

---

[38] Ian Ayres & Quinn Curtiss, *Beyond Diversification: The Pervasive Problem of Excessive Fees and Dominated Funds in 401(k) Plans*, 124 YALE L.J. 1476, 1481 (2015)("It is well established that some investors naively diversify by spreading their plan investments across all fund offerings.").

anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[39]

173.    Moreover, having many actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return even though the plan is paying fees for active management that are much higher than the fees of a passive index fund.

174.    From 2010 to the present, the Plan included and continues to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (32–34 options), fixed income and high-yield bond (39–53 options), international (59–64 options), large cap domestic equities (86–95 options), mid cap domestic equities (30–36 options), small cap domestic equities (23–30 options), real estate (6 options), money market (14–16 options), and target date investments (4 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants and can lead to "decision paralysis".

---

[39] Available at http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

175.    For example, Defendants' inclusion of *22* large cap domestic blend investments as of December 31, 2014, are summarized below and compared to a single lower-cost alternative that was available to the Plan: the Vanguard Institutional Index Fund-Inst Plus (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Large Cap Blend Investments | 2014 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| CREF Equity Index | $44,403,290 | 37 bps | 2 bps | 1750% |
| CREF Stock | $315,203,142 | 46 bps | 2 bps | 2200% |
| Deutsche Core Equity | $5,326,348 | 53 bps | 2 bps | 2550% |
| DWS S&P 500 Index | $1,908,446 | 34 bps | 2 bps | 1600% |
| Fidelity Disciplined Equity | $2,834,242 | 39 bps | 2 bps | 1850% |
| Fidelity Growth & Income | $22,175,247 | 52 bps | 2 bps | 2500% |
| Fidelity Large Cap Core Enhanced Index | $161,447 | 45 bps | 2 bps | 2150% |
| Fidelity Large Cap Stock | $3,604,131 | 88 bps | 2 bps | 4300% |
| Fidelity Mega Cap Stock | $1,556,293 | 68 bps | 2 bps | 3300% |
| Fidelity Spartan 500 Index | $37,499,775 | 4 bps | 2 bps | 100% |
| Fidelity Spartan Total Market Index | $15,879,973 | 5 bps | 2 bps | 150% |
| TIAA-CREF Equity Index | $7,844,471 | 5 bps | 2 bps | 150% |
| TIAA-CREF S&P 500 Index | $8,210,706 | 6 bps | 2 bps | 200% |

| Large Cap Blend Investments | 2014 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| VALIC Annuity - VALIC Company I Growth & Income | $972,847 | 165 bps | 2 bps | 8150% |
| VALIC Annuity - VALIC Company I Large Cap Core | $1,038,951 | 163 bps | 2 bps | 8050% |
| VALIC Annuity - VALIC Company I Stock Index | $38,746,472 | 114 bps | 2 bps | 5600% |
| VALIC Vanguard 500 Index | $37,573,536 | 5 bps | 2 bps | 150% |
| Vanguard 500 Index | $88,952,273 | 5 bps | 2 bps | 150% |
| Vanguard Growth & Income | $11,018,557 | 37 bps | 2 bps | 1750% |
| Vanguard Large-Cap Index | $2,029,041 | 23 bps | 2 bps | 1050% |
| Vanguard PRIMECAP Core | $3,255,720 | 50 bps | 2 bps | 2400% |
| Vanguard Total Stock Market Index | $39,726,862 | 17 bps | 2 bps | 750% |
| **Total** | $689,921,770 | | | |

176.    With over *$359 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps, respectively. Moreover, the CREF Stock Account has also been recommended for removal from defined contribution plans by an independent consultant. *See infra* ¶205.



**Excessive Expense Ratio of CREF Stock Account and CREF Equity Index Account**

177.    Many other large cap index funds are also available at far lower costs than the Plan's large cap blend funds. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (VIIIX), Plan participants would have avoided losing in excess of $2 million in fees in 2014 alone, and many more millions since 2010 to the present and continuing into the future.

178.    In addition, Defendants even selected and continue to retain multiple passively managed index options in the same investment style. In contrast to an actively-managed fund, in which the investment manager selects stocks or bonds in an attempt to generate investment returns in excess of the fund's benchmark, passively managed index funds simply attempt to replicate a market index, such as the S&P 500, by holding a

representative sample of securities in the index. Because no stock selection or research is needed, index funds fees are much lower than the fees of actively-managed funds in the same investment style, as set forth in ¶¶50–52, 187–194.

179. For example, in the large cap blend investment style, Defendants provided up to fifteen separate index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market.

180. Since index funds merely hold the same securities in the same proportions as the index,[40] having multiple index funds of the same category or investment style in the Plan provides no benefit to participants. *Cf.* Lewis Braham, *Indexing Just Got Cheaper*, Barron's (November 7, 2016)(quoting Morningstar CEO, Joe Mansueto, for the principle that "[b]asic market indexes are virtually interchangeable"). Instead, it hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

181. Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, as set forth in ¶175, the Plan would have generated higher investment returns, net of fees, and participants would not have lost millions of dollars of retirement assets.

---

[40] Another example of an index is the Dow Jones Industrial Average.

## VI.    Defendants imprudently and disloyally retained historically underperforming Plan investments.

182.    The Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plan's investments resulted in options being retained in the Plan despite years of historical underperformance compared to superior lower-cost alternatives, causing massive losses to the Plan compared to what those assets would have earned if invested in prudent alternatives.

183.    The excessive fees in the Plan's investments were not justified by superior investment returns. Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plan's investments resulted in options being retained in the Plan despite years of historical underperformance compared to superior lower-cost alternatives, which caused massive losses to the Plan compared to what those assets would have earned if invested in prudent alternatives. As of September 30, 2016, *forty percent of the Plan's investment options*—140 of the 354 investment options in the Plan—underperformed their respective benchmarks over the previous 5-year period.[41] These underperforming funds include the following:

---

[41] These results are based on the performance and benchmark for each fund available for download at: https://www.valic.com/valic/internet/us/en/Tier_1_Fee_Report_v1.xls, https://www.valic.com/valic/internet/us/en/Tier_2_Fee_Report_v1.xls, and https://www.valic.com/valic/internet/us/en/Tier_3_Fee_Report_v1.xls. For certain funds, the "Russell 300 Index" was incorrectly listed as the benchmark. To correct this error, the calculations herein used the "Russell 3000 Index" as disclosed in the annual participant fee disclosures.

| Fund Name | Ticker Symbol |
|---|---|
| AM FDS Washington Mutual R5 | RWMFX |
| AMER FUNDS AMCAP R4 | RAFEX |
| AMERICAN CEN INFL-ADJ BOND INS | AIANX |
| CREF Equity Index R3 | QCEQIX |
| CREF Inflation-Linked Bond R3 | TIILX |
| CREF Money Market R3 | QCMMIX |
| CREF Stock R3 | QCSTIX |
| Deutsche CROCI Equity Dividend Instl | KDHIX |
| Deutsche Emerging Markets Equity Instl | SEKIX |
| Deutsche Enhanced Global Bond S | SSTGX |
| Deutsche Global Income Builder Instl | KTRIX |
| Deutsche GNMA Institutional | GIGGX |
| Deutsche Gold & Precious Metals Instl | SGDIX |
| Deutsche Large Cap Focus Growth Instl | SGGIX |
| Deutsche Latin America Equity S | SLAFX |
| Deutsche Mid Cap Growth Institutional | BTEAX |
| Deutsche S&P 500 Index S | SCPIX |
| DFA Emerging Markets I | DFEMX |
| DREYFUS BOND MARKET INDEX | DBIRX |
| Fidelity | FFDKX |
| Fidelity 500 Index Institutional | FXSIX |
| Fidelity Advisor  Stock Sel All Cp | FSSKX |
| Fidelity Advisor  Value Strategies | FVSKX |
| Fidelity Asset Manager  20% | FASIX |
| Fidelity Asset Manager  30% | FTANX |
| Fidelity Asset Manager  40% | FFANX |
| Fidelity Asset Manager  50% | FASMX |
| Fidelity Blue Chip Value | FBCVX |
| Fidelity Canada | FICDX |
| Fidelity Capital Appreciation | FCAKX |
| Fidelity Conservative Income Bond | FCONX |
| Fidelity Contrafund K | FCNKX |
| Fidelity Disciplined Equity | FDEKX |
| Fidelity Dividend Growth | FDGKX |

Case 1:16-cv-01044-CCE-LPA   Document 72   Filed 12/27/17   Page 101 of 147

| Fund Name | Ticker Symbol |
|---|---|
| Fidelity EMEA | FEMEX |
| Fidelity Emerging Markets | FKEMX |
| Fidelity Equity Dividend Income | FETKX |
| Fidelity Equity-Income | FEIKX |
| Fidelity Export and Multinational | FEXKX |
| Fidelity Extended Market Index Premium | FSEVX |
| Fidelity Focused Stock | FTQGX |
| Fidelity Freedom K  2005 | FFKVX |
| Fidelity Freedom K  2010 | FFKCX |
| Fidelity Freedom K  2015 | FKVFX |
| Fidelity Freedom K  Income | FFKAX |
| Fidelity Global Balanced | FGBLX |
| Fidelity Global Commodity Stock | FFGCX |
| Fidelity Global Strategies | FDYSX |
| Fidelity GNMA | FGMNX |
| Fidelity Government Income | FGOVX |
| Fidelity Growth & Income | FGIKX |
| Fidelity Growth Discovery | FGDKX |
| Fidelity Growth Strategies | FAGKX |
| Fidelity Independence | FDFKX |
| Fidelity Inflation-Protected Bond | FINPX |
| Fidelity Intermediate Bond | FTHRX |
| Fidelity Intermediate Government Income | FSTGX |
| Fidelity Intermediate Trs Bd Idx Prem | FIBAX |
| Fidelity Large Cap Core Enhanced Index | FLCEX |
| Fidelity Large Cap Growth Enhanced Idx | FLGEX |
| Fidelity Large Cap Value Enhanced Index | FLVEX |
| Fidelity Latin America | FLATX |
| Fidelity Leveraged Company Stock | FLCKX |
| Fidelity Limited Term Government | FFXSX |
| Fidelity Low-Priced Stock | FLPKX |
| Fidelity Magellan | FMGKX |

| Fund Name | Ticker Symbol |
|---|---|
| Fidelity Mega Cap Stock | FGRTX |
| Fidelity Mid-Cap Stock | FKMCX |
| Fidelity Mortgage Securities | FMSFX |
| Fidelity New Millennium | FMILX |
| Fidelity Select Energy | FSENX |
| Fidelity Select Energy Service Port | FSESX |
| Fidelity Select Gold | FSAGX |
| Fidelity Select Natural Gas | FSNGX |
| Fidelity Select Natural Resources Port | FNARX |
| Fidelity Short-Term Bond | FSHBX |
| Fidelity Short-Term Treasury Bd Idx Prm | FSBAX |
| Fidelity Small Cap Stock | FSLCX |
| Fidelity Stk Selec Lg Cp Val | FSLVX |
| Fidelity Stock Selector Mid Cap | FSSMX |
| Fidelity Stock Selector Small Cap | FDSCX |
| Fidelity Strategic Real Return | FSRRX |
| Fidelity Total Market Index Instl | FSKTX |
| Fidelity US Bond Index Institutional | FXSTX |
| Fidelity Value Discovery | FVDKX |
| Lord Abbett Develop Grth Fd  I | LADYX |
| MFS Value R6 | MEIKX |
| Oppenheimer Developing Markets Y | ODVYX |
| Prudential Jennison Growth Z | PJFZX |
| Prudential Jennison Mid Cap Growth Z | PEGZX |
| RIDGEWORTH FDS LARGE CAP VAL | STVTX |
| T. ROWE PRICE RTMT 2010 | TRRAX |
| T. ROWE PRICE RTMT BALANCED | TRRIX |
| T.ROWE PRICE RET 2005 | TRRFX |
| TIAA-CREF Eq Index-Inst | TIEIX |
| TIAA-CREF Gr & Inc-Inst | TIGRX |
| TIAA-CREF Lfcyle Rtmt Inc-Inst | TLRIX |
| TIAA-CREF Lg-Cap Val Idx-Inst | TILVX |
| TIAA-CREF Lg-Cap Val-Inst | TRLIX |
| TIAA-CREF Lifecycle 2010-Inst | TCTIX |

| Fund Name | Ticker Symbol |
|---|---|
| TIAA-CREF Mid-Cap Gr-Inst | TRPWX |
| TIAA-CREF Mid-Cap Val-Inst | TIMVX |
| TIAA-CREF S&P 500 Idx-Inst | TISPX |
| TIAA-CREF Sm-Cap Bl Idx-Inst | TISBX |
| TIAA-CREF Social Ch Eq-Inst | TISCX |
| VANGUARD 500 IDX ADM (offered by VALIC) | VFIAX |
| Vanguard 500 Index Fund Adm (offered by Vanguard | VFIAX |
| Vanguard Capital Value Fund | VCVLX |
| Vanguard Diversified Equity Inv | VDEQX |
| Vanguard Dividend Apprec Idx Inv | VDAIX |
| Vanguard Dividend Growth Fund | VDIGX |
| Vanguard Emerging Mkts Stk Idx Inv | VEIEX |
| Vanguard Energy Fund Investor | VGENX |
| Vanguard Equity Income Fund Inv | VEIPX |
| Vanguard Explorer Fund Investor | VEXPX |
| Vanguard Extended Mkt Index Inv | VEXMX |
| Vanguard GNMA Fund Investor Shares | VFIIX |
| Vanguard High Dividend Yld Idx Inv | VHDYX |
| Vanguard Inflation-Protect Sec Inv | VIPSX |
| Vanguard Inter-Term Treasury Inv | VFITX |
| Vanguard Large-Cap Index Fund Inv | VLACX |
| Vanguard LifeStrategy Consrv Grwth | VSCGX |
| Vanguard LifeStrategy Income Fund | VASIX |
| Vanguard Mid-Cap Growth Fund | VMGRX |
| Vanguard Mid-Cap Growth Index Inv | VMGIX |
| Vanguard Morgan Growth Fund Inv | VMRGX |
| Vanguard Precious Metals & Mining | VGPMX |
| Vanguard S-T Investment-Grade Inv | VFSTX |
| Vanguard Selected Value Fund | VASVX |
| Vanguard Short-Term Bond Index Inv | VBISX |
| Vanguard Short-Term Federal Inv | VSGBX |
| Vanguard Short-Term Treasury Inv | VFISX |
| Vanguard Small-Cap Growth Idx Inv | VISGX |
| Vanguard Target Retirement 2010 | VTENX |

Case 1:16-cv-01044-CCE-LPA Document 72 Filed 12/27/17 Page 104 of 147

| Fund Name | Ticker Symbol |
|---|---|
| Vanguard Target Retirement Income | VTINX |
| Vanguard Total Bond Mkt Index Inv | VBMFX |
| Vanguard Total Stock Mkt Idx Inv | VTSMX |
| Vanguard Value Index Fund Inv | VIVAX |
| Vanguard Windsor Fund Investor | VWNDX |
| Vanguard Windsor II Fund Inv | VWNFX |

184. Had Defendants conducted a prudent investment review process *of all the investment options in the Plan* many of these options that consistently failed to meet performance objectives would have been eliminated by the Defendants from the Plan or replaced. The Defendants' failure to do so—along with their admitted failure to monitor over 300 investment options—caused the Plan substantial losses compared to prudent alternative investments that were available to the Plan. Two funds in particular demonstrate the severe harm to the Plan resulting from Defendants' breaches of fiduciary duties: the CREF Stock Account and TIAA Real Estate Account.

A.      **CREF Stock Account**

185.    TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. In its fund fact sheets and participant disclosures to the Plan's participants, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. For its benefit, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Instead of controlling each plan option allowed in the Plan, and acting for the sole benefit of the Plan's

participants, as ERISA requires, the Defendants allowed TIAA-CREF to dictate that the CREF Stock Account would be placed and retained in the Plan. They did so without a prudent process to determine whether there were other prudent alternatives in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

186.    The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform its benchmark TIAA and Defendants told participants was the proper one, and underperformed lower-cost actively and passively managed investments that were available to the Plan, yet has not been removed from the Plan nor frozen to new investments. The CREF Stock Account is one of the largest, by asset size, investment options in the Plan with over $300 million in assets, and has been included as an investment option from 2010 to date.

187.    As understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis. This extreme unlikelihood is even greater in the large cap market because such companies are

the subject of many analysts' coverage, while smaller stocks are not as widely covered by analysts and thus are subject to potential inefficiencies in pricing.

188.    Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[42] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

189.    To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

190.    If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent

---

[42] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

107

Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

191.　Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

192.　Moreover, the efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, Returns from Investing in Equity Mutual Funds 1971 to 1991, 50 J.

FIN. 549, 571 (1995).[43]

193.    Academic literature overwhelmingly concludes that active managers

consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive
> investing. Dozens of studies have examined the performance of mutual funds and
> other professional-managed assets, and virtually all of them have concluded that,
> on average, active managers underperform passive benchmarks…The median
> active fund underperformed the passive index in 12 out of 18 years [for the large-
> cap fund universe]…The bottom line is that, over most periods, the majority of
> mutual fund investors would have been better off investing in an S&P 500 Index
> fund.
>
> ****
>
> Most of the dismal comparisons for active managers are for large-cap domestic
> managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*,

ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

194.    Prudent fiduciaries of large defined contribution plans must conduct an

analysis to determine whether actively managed funds, particularly large cap, will

outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned

decision as to whether it is in participants' best interest to offer an actively managed large

cap option for the particular investment style and asset class, in light of the higher costs

of active management.

---

[43] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

195.    The Defendants failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be included and retained in the Plan. This is particularly true given TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. By allowing the Plan to be bound by this requirement, the Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plan.

196.    Additionally, as detailed above, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plan's participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plan collectively invested over *$300 million* in the CREF Stock Account.

197.    Had the Defendants engaged in a prudent investment review and monitoring process, they would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

198.    The CREF Stock Account did not merely experience poor performance in a single year or two. Its historical performance has been persistently poor for many years compared to both available lower-cost index funds and the Russell 3000 Index benchmark, provided to the Plan's participants as the appropriate benchmark in

participant communications.

199.    The Defendants and TIAA-CREF identified the Russell 3000 Index as the appropriate benchmark to evaluate the fund's investment results, as shown in the excerpt below that was provided to the Plan's participants.[44]

| Investment Name / Benchmark | Morningstar Category | Ticker Symbol | Inception Date |
|---|---|---|---|
| CREF Stock Account R3 | Large Blend | QCSTIX | 04/24/2015 |

**Russell 3000 Index**

200.    The CREF Stock Account did not merely underperform in a single year or two. Historical performance of the CREF Stock Account has been persistently poor for many years compared to this identified benchmark index (Russell 3000 Index), and also as compared to available low-cost index funds. Additionally, the Plan's investment policy statement (or IPS) specified the S&P 500 Index as the benchmark for U.S. Equity Large Cap Blend investment options. The following chart compares the investment returns of the CREF Stock Account to its benchmark (the Russell 3000) and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014. The chart also compares the investment returns of the

---

[44] Available at https://www.valic.com/Images/TIAA_info_with_2060_fund.pdf

CREF Stock Account to the S&P 500 over the same period. For each comparison, the CREF Stock Account dramatically underperformed the benchmarks and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.



201.    The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index

alternatives: the Vanguard Total Stock Market Index Fund-Inst Plus (2 bps) and the Vanguard Institutional Index-Inst Plus (2 bps).

202. Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard PRIMECAP-Adm (VPMAX) and the Vanguard Capital Opp.-Adm (VHCAX).



203.    This sustained underperformance went back even further. The CREF Stock

Account also had a long history of substantial underperformance compared to these

actively managed alternatives over the one-, five-, and ten-year periods ending December

31, 2009.[45]



---

[45] For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm,
the investment returns of the investor share class for ten-year performance were used
because the admiral share class for each of these funds was not offered until November
12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and
for the Vanguard Capital Opportunity Fund-Adm, 5.89%.



CREF Stock Account
Five-Year Investment Returns Compared to
Actively Managed Benchmarks
(as of Dec. 31, 2009)

174%–206%
greater than
CREF return

5 Year

■ CREF Stock Account   ■ VPMAX   ■ VHCAX



CREF Stock Account
Ten-Year Investment Returns Compared to
Actively Managed Benchmarks
(as of Dec. 31, 2009)

3130%–5790%
greater than
CREF return

10 Year

■ CREF Stock Account   ■ VPMAX   ■ VHCAX

115

204.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better-performing actively managed alternatives: the Vanguard PRIMECAP-Adm (35 bps) and the Vanguard Capital Opp.-Adm (40 bps).

205.    Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012).[46] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

206.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829. In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite continuing to underperform lower-cost investment alternatives that were readily available to the Plan.

---

[46] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

207.    Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

208.    Had the Defendants removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives, or the passively managed lower-cost alternatives, see ¶¶200 and 202, Plan participants would not have lost in excess of $100 million of their retirement savings from the fund being retained in the Plan.[47]

## B.    TIAA Real Estate Account

209.    The Defendants selected and continue to offer the TIAA Real Estate Account as one of the real estate investment options in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index-Inst (VGSNX).

---

[47] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

210.    With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real

Estate Account is also over *10 times more expensive* than the Vanguard REIT Index-Inst

with an expense ratio of 8 bps.



211.    This underperformance occurred for years before 2009 and has continued

after 2009. The TIAA Real Estate Account significantly underperformed the Vanguard

REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[48]

Despite this, Defendants selected and retained it in the Plan.

---

[48] The return of the investor share class was used for ten-year performance because the
institutional share class was not offered until December 2, 2003. The return since
inception for the Vanguard REIT Index-Inst was 5.49%.





119



TIAA Real Estate Account
Ten-Year Investment Returns Compared to
REIT Index Fund (VGSNX)
(as of Dec. 31, 2009)

239% greater than TIAA return

    TIAA Real Estate Account    VGSNX

212.  This underperformance continued after 2009. The TIAA Real Estate

Account significantly underperformed the Vanguard REIT Index-Inst over the one-, five-,

and ten-year periods ending December 31, 2014.



**TIAA Real Estate Account
One-, Five-, and Ten-Year Investment Returns
Compared to REIT Index Fund (VGSNX)**
(as of Dec. 31, 2014)

213.    As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

214.    Had the amounts invested in the TIAA Real Estate Account instead been invested in the lower-cost and better-performing Vanguard REIT Index-Inst, Plan

participants would not have lost in excess of $22 million of their retirement savings from the fund being retained in the Plan.[49]

## VII. The Defendants' retention of the CREF Stock Account also violated the Plan's Investment Policy Statement.

215. Defendants developed an IPS governing the selection, monitoring, and removal of Plan investment options. This governing Plan document established specific criteria when an investment option shall be terminated from the Plan, which included the following non-exclusive reasons:

- Significant underperformance relative to the fund's benchmark and peer group.
- Acceptance of significantly more risk than the fund's benchmark index.
- Change or loss of key personnel, such as a fund manager and those servicing the account.
- Significant change, increase, or loss of assets under management.
- Evidence that actual portfolio characteristics do not follow published investing style.
- Performance patterns not logically explainable in terms of the published style, or performance out-of-step with a manager's style peer group, particularly (but not exclusively) if resulting in under performance or excessive volatility.

216. Moreover, the IPS specifically mandated specific investment performance for retention in the Plan.

All actively managed funds are expected to outperform the market benchmark and provide above median results relative to its peer group over the majority of observable cumulative and rolling three-year periods.

_____

[49] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index-Inst to compensate participants who have not been reimbursed for their losses.

217.    Despite the criteria set forth in the IPS, the CREF Stock Account consistently violated these mandatory terms, yet the Defendants have never removed the option from the Plan.

218.    For instance, the CREF Stock Account has significantly underperformed its benchmark and peer group. Beginning in September 30, 2011, the CREF Stock Account ranked below the median of its Morningstar peer group based on one-year return, and between September 30, 2011 and December 31, 2015, the fund performed below the median of its peer group for 14 out of 18 quarters. Starting September 30, 2012, the fund performed below the median of its peer group based on three-year total returns. Between September 30, 2012 and December 31, 2015, the fund performed below the median of its peer group based on three-year returns for 12 of 14 quarters, including *11* consecutive quarters ending December 31, 2015. By June 30, 2015, the fund performed below its peer group based on five-year returns, and for 6 consecutive quarters ending December 31, 2015. As graphically illustrated above, the fund has significantly underperformed its IPS benchmark and prudent alternatives that were readily available to the Plan. *See supra* ¶¶200–203.

219.    The CREF Stock Account has clearly not met the IPS's expected performance criteria of outperforming the market benchmark and providing above median results compared to its peer group "over the majority of observable cumulative and rolling three-year periods."

220.     In addition, significant changes in key personnel have impacted the fund. As noted by an independent investment consultant, the firm "has had material turnover with significant shuffling every few years among the executive and portfolio manager ranks."[50] In January 2012, TIAA-CREF announced the departure of Scott Evans, the president of the asset management group. In November 2011, TIAA-CREF announced the retirement of the Chief Investment Officer and change of the head of public markets and fixed income.

221.     The CREF Stock Account has also incurred significantly more risk, contrary to the terms of the IPS. Developed by Nobel Laureate William Sharpe, the Sharpe ratio is a risk-adjusted return measure that is "designed to measure the expected return per unit of risk[.]"[51] The higher the fund's Sharpe ratio, the better its returns have been relative to the risk it has assumed. Between March 31, 2012 and December 31, 2015, the CREF Stock Account had a Sharpe ratio below (lower) than the median of its peer group for 15 out of 16 quarters, including *12* consecutive quarters. Therefore, the fund has experienced consistently lower risk-adjusted performance compared to its peer group.

222.     Finally, as demonstrated by the dramatic underperformance compared to large cap blend benchmarks and indices, the CREF Stock Account has not followed its published large cap blend investment style and its performance has been "out-of-step"

---

[50] *See* AonHewitt, *TIAA-CREF Asset Management*, at 4.
[51] *See* William F. Sharpe, *The Sharpe Ratio*, J. PORTFOLIO MGMT (Fall 1994), available at https://web.stanford.edu/~wfsharpe/art/sr/sr.htm.

with its peer group. Again, the CREF Stock Account has violated these provisions of the IPS.

223.    Despite numerous violations of specific criteria set forth in the Plan's IPS, the Defendants failed to take appropriate action and remove the CREF Stock Account to prevent any further losses to Plan participants' retirement savings.

## CLASS ACTION ALLEGATIONS

224.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

225.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Duke Faculty and Staff Retirement Plan from August 10, 2010, through the date of judgment, excluding the Defendants.

226.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

b.　　There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.　　Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct described above.

d.　　Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.　　Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B)

adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

227.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

228.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

    a.    Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in large defined

contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015). In that same case, Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humungous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Abbott*, 2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

b. Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

c. "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v.*

*Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013).

d.      "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at *8 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

e.      U.S. District Court Judge Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 U.S. Dist. LEXIS 184622, at *6 (emphasis added).

f.      U.S. District Judge Herndon of the Southern District of Illinois, recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general..." *Beesley*, 2014 U.S. Dist. LEXIS 12037, at *8.

g.    The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work … investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–

9 (S.D.Ill. Nov. 22, 2010).

h.    Schlichter, Bogard & Denton handled the only full trial of an ERISA

excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was

affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc*., 746 F.3d 327 (8th Cir.

2014). In awarding attorney's fees after trial, the district court concluded that

"Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc*.,

No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012).

Following remand, the district court again awarded Plaintiffs' attorney's fees,

emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA

litigation, including educating the Department of Labor and federal courts about

the importance of monitoring fees in retirement plans:

"Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

i.     In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "[t]he law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

j.     Recently, in approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are

131

operated and managed which will result in participants and retirees receiving significant savings[.]"

k.       On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

l.       Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

m.       The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees,*

*Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[52] Gretchen

Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[53] Liz

Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[54]

Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16,

2014);[55] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST.

J. (Aug. 25, 2015);[56] Jess Bravin and Liz Moyer, *High Court Ruling Adds*

*Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [57] Jim

Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[58]

Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*,

REUTERS (May 1, 2014);[59] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison*

*Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[60]

---

[52] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[53] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[54] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[55] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[56] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[57] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[58] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[59] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[60] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

## COUNT III

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

## Unreasonable Administrative Fees

229.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

230.    Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

231.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George,* 641 F.3d at 798–99. Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying … through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

232.    Defendants' process for monitoring and controlling the Plan's recordkeeping fees was a fiduciary breach in that Defendants failed to: monitor the amount of the revenue sharing received by the Plan's recordkeepers, determine if those

134

amounts were competitive or reasonable for the services provided to the Plan, or use the Plan's size to reduce fees or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover, Defendants failed to solicit bids from competing providers on a flat per-participant fee basis. As the Plan's assets grew, the asset-based revenue sharing payments to the Plan's recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

233.    The Defendants also failed to account for the fact that TIAA-CREF, Fidelity, VALIC, and Vanguard used their position as recordkeepers to obtain access to participants, gaining valuable information including participants' contact information, their choices of investments, the size of their accounts, their employment status, and their age among other things. The Defendants allowed these service providers to then use this information to sell lucrative products to plan participants as they neared retirement age without receiving any compensation for the use of this valuable, personal information. This information was even more lucrative for the service providers because the Defendants are using these service providers as recordkeepers and are offering their products in the Plan to participants.

234.    By allowing TIAA-CREF, Fidelity, VALIC, and Vanguard to put their proprietary investments in the Plan without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, the

Defendants failed to act in the exclusive interest of participants.

235.    In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, the Defendants failed to engage in a timely and reasoned decision-making process to determine whether the Plan would similarly benefit from consolidating the Plan's administrative and recordkeeping services under a single provider. Instead, The Defendants continue to contract with *four* separate recordkeepers. This failure to consolidate the recordkeeping services eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper. The Defendants' failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. *George*, 641 F.3d at 788.

236.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

237.    The Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

238.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the

circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Administrative Services and Fees

239.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

240.    As service providers to the Plan, TIAA-CREF, Fidelity, VALIC, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

241.    By causing the Plan to use TIAA-CREF, Fidelity, VALIC, and Vanguard as the Plan's recordkeepers from year to year, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF, Fidelity, VALIC, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF, Fidelity, VALIC, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to, or use by or for the benefit of TIAA-CREF, Fidelity, VALIC, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF, Fidelity, VALIC, and Vanguard and in connection with the Plan's investments in funds that paid revenue sharing to TIAA-CREF, Fidelity, VALIC, and Vanguard.

242.    Moreover, by allowing TIAA-CREF, Fidelity, VALIC, and Vanguard to

exploit their positions as recordkeepers to glean valuable information about the Plan's participants and to use that information to market and sell lucrative financial products to the Plan's participants outside of their investments already in the Plan, the Defendants caused the Plan to engage in transactions that they knew or should have known constituted an exchange of property between the Plan and TIAA-CREF, Fidelity, VALIC, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF, Fidelity, VALIC, and Vanguard, and a transfer of Plan assets to TIAA-CREF, Fidelity, VALIC, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time these entities harvested information from the Plan's records or used the Plan's participant information to sell outside retirement products and wealth management services to the Plan's participants.

243.    Under 29 U.S.C. §1109(a), the Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

244.    Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT V

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

## Unreasonable Investment Management Fees, Unnecessary Marketing and Distribution (12b-1) Fees and Mortality and Expense Risk Fees, and Performance Losses

245.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

246.    The Defendants are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently. The Defendants had a continuing duty to evaluate and monitor the Plan's investments on an ongoing basis and to "remove imprudent ones" regardless of how long a fund has been in the plan. *Tibble*, 135 S. Ct. at 1829.

247.    These duties required the Defendants to independently assess whether each option was a prudent choice for the Plan, and not simply to follow the recordkeepers' fund choices or to allow the recordkeepers to put their entire investment lineups in the Plan's menus. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

248.    In making investment decisions, the Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plan, the recordkeepers' financial interest in having their proprietary investment products included in the Plan, and whether the higher cost of

139

actively managed funds was justified by a realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

249.    The Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times.

250.    Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA-CREF, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

251.    Rather than consolidating the Plan's *over 400* investment options into a core lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, the Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion and inaction. In addition, as a fiduciary required to operate as a prudent financial expert, *Katsaros,* 744 F.2d at 279. The Defendants knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return

before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plan's investment offerings included the use of mutual funds and variable annuities with retail expense ratios far in excess of other lower-cost options available to the Plan. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. A large majority of the Plan's options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plan, which Defendants failed to consider. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. This was a breach of fiduciary duties.

252.    The Defendants failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period. This resulted in the Plan continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plan. As of September 30, 2016, *forty percent of the Plan's investment options*—140 of the 354 investment options in the Plan—underperformed their respective benchmarks

over the previous 5-year period.

253.    CREF Stock Account: Defendants included and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index, which Defendants and TIAA told participants was the appropriate benchmark.

254.    TIAA Real Estate Account: Defendants included and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

255.    Had Defendants engaged in a prudent investment review process, they would have concluded that these options were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan, and thus should be removed from the Plan or, at a minimum, frozen to new investments.

256.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

257.    The Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

258.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to

commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

**COUNT VII**

**Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(D)**

**Violation of Plan Investment Policy Statement—CREF Stock Account**

259.    Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

260.    The Defendants violated the provisions of the Plan's IPS in violation of 29 U.S.C. §1104(a)(1)(D) by including and retaining the CREF Stock Account in the Plan even though it significantly underperformed its benchmark and peer group, consistently underperformed its benchmark and peer group over cumulative and rolling three-year periods, incurred significantly more risk than its benchmark index, consistently had a change or loss of key personnel impacting the performance of the fund, and failed to follow the published large cap blend investing style, among other violations.

261.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

262.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to

143

commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## JURY TRIAL DEMANDED

263.    Under Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached its fiduciary duties as described above;
- Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duty;
- Determine the method by which losses to the Plan under 29 U.S.C. §1109(a) should be calculated;
- Order the Defendants to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees;

144

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);
- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, or otherwise in violation of ERISA;
- Reform the Plan to include only prudent investments;
- Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;
- Require the fiduciaries to select investments and service providers based solely on the merits of those selections, and avoid bundling funds or products serving the interests of the recordkeepers and other service providers;
- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;
- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

145

December 27, 2017                    Respectfully submitted,

                                     /s/ Jerome J. Schlichter
                                     Jerome J. Schlichter, MO State Bar No. 32225*
                                     Michael A. Wolff, MO State Bar No. 38207*
                                     Troy A. Doles, MO State Bar No. 47958*
                                     Heather Lea, MO State Bar No. 49872*
                                     Sean E. Soyars, MO State Bar No. 57317*
                                     Kurt C. Struckhoff, MO State Bar No. 61873*
                                     ETHAN D. HATCH, MO State Bar No. 68126*
                                     SCHLICHTER, BOGARD & DENTON, LLP
                                     100 South Fourth Street, Ste. 1200
                                     St. Louis, MO 63102
                                     Phone: (314) 621-6115
                                     Fax: (314) 621-5934
                                     jschlichter@uselaws.com
                                     mwolff@uselaws.com
                                     tdoles@uselaws.com
                                     hlea@uselaws.com
                                     ssoyars@uselaws.com
                                     kstruckhoff@uselaws.com
                                     *Admitted *Pro Hac Vice*

                                     *Lead Counsel for Plaintiffs*

                                     /s/ David B. Puryear, Jr.
                                     David B. Puryear, Jr.
                                     North Carolina State Bar No. 11063
                                     PURYEAR AND LINGLE, PLLC
                                     5501-E Adams Farm Lane
                                     Greensboro, NC 27407
                                     (336) 218-0227
                                     puryear@puryearandlingle.com

                                     *Local Counsel for Plaintiffs*

146

**CERTIFICATE OF SERVICE**

I hereby certify that on December 27, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Jerome J. Schlichter