IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID CLARK, et al.,          *   Case No. 1:16CV1044
                              *
          Plaintiffs,         *
                              *
vs.                           *   Greensboro, North Carolina
                              *   February 26, 2018
DUKE UNIVERSITY, et al.,      *   9:30 a.m.
                              *
          Defendants.         *
*******************************

**TRANSCRIPT OF HEARING ON MOTION FOR CLASS CERTIFICATION**
BEFORE THE HONORABLE CATHERINE C. EAGLES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        SEAN E. SOYARS, ESQUIRE
                          Schlichter Bogard & Denton, LLP
                          100 S. 4th Street, Suite 1200
                          St. Louis, MO 63102

                          DAVID B. PURYEAR, JR., ESQUIRE
                          Puryear and Lingle, PLLC
                          5501-E Adams Farm Lane
                          Adams Farm Professional Center
                          Greensboro, NC 27407

For the Defendant:        JEREMY P. BLUMENFELD, ESQUIRE
                          ABBEY M. GLENN, ESQUIRE
                          Morgan Lewis & Bockius, LLP
                          1701 Market Street
                          Philadelphia, PA 19103

                          STACY K. WOOD, ESQUIRE
                          Parker Poe Adams & Bernstein
                          Three Wachovia Center
                          401 S. Tryon Street, Suite 3000
                          Charlotte, NC 28202

Court Reporter:           Lori Russell, RMR, CRR
                          P.O. Box 20593
                          Winston-Salem, North Carolina 27120

1      **P R O C E E D I N G S**

2          **THE COURT:**  Good morning.

3      (Simultaneous response from counsel.)

4          **THE COURT:**  All right.  We're here in Clark against

5    Duke University, 16CV1044, on Plaintiff's motion for class

6    certification; and when we finish talking about that, if I can

7    ask everyone in the room to remind me, I'd also just like to

8    talk about maybe some logistics for going forward in terms of

9    managing the summary judgment motion, which I assume is

10   forthcoming at some point.  That is what usually happens.  All

11   right.  I have a number of questions, but I think for the most

12   part I'll just ask them as we go along.

13       I would ask the Plaintiff to address in their presentation

14   the Plan losses, what normally we would call damages, and how

15   you -- this is for my education -- how you understand that

16   works.  I'm curious about that because the arguments, to some

17   extent, turn on is this individual damages, is it Plan damages,

18   who -- I want to know just in the big picture kind of way how

19   you intend to prove the losses.  And then just assume that you

20   won.  Then what happens? Who gets the money and what happens

21   to the money?  If you can, both of you -- I'd ask the Defendant

22   to address that as well -- just to give me a little -- I've got

23   a number of these things going on, but I haven't tried one and

24   I don't -- I haven't gotten to that part of my big, big book on

25   ERISA in the office.  So I'll ask you-all to educate me a

1  little bit and then address the other arguments.

2     I would say I definitely would like to hear what people

3  have to say on the constitutional standing argument and then

4  there were some arguments the Plaintiff made in the reply brief

5  that the Defendant might want to address.  I'll just let

6  you-all start however you want to and I'll ask my questions as

7  we go along.

8        Before we do that, if I can ask everyone to please

9  identify themselves for the record and the court reporter's

10 benefit and mine.  For the Plaintiff.

11          **MR. PURYEAR:**  David Puryear for the Plaintiffs.  I'm

12 here with Sean Soyars of the Missouri Bar.

13          **THE COURT:**  All right.  Mr. Soyars.  Thank you.

14 Mr. Puryear, nice to see you again.

15          **MS. WOOD:**  Stacy Wood for the Defendants.  I'm here

16 with Jeremy Blumenfeld and Abbey Glenn, who have been admitted

17 pro hac vice.

18          **THE COURT:**  Good morning.

19          **MR. BLUMENFELD:**  And Ms. Pamela Bernard, general

20 counsel for the university, is also here.

21          **THE COURT:**  All right.  I have a number of Duke cases.

22 I recognize her.  It's -- I don't have all of Duke's cases, I

23 will say, so there we are.

24     Okay.  And, Mr. Soyars, you'll be arguing?

25          **MR. SOYARS:**  Yes, Your Honor.

1      **THE COURT:**  Go ahead.  If you want to use that, why

2  don't we move it back a little bit so you're not -- and we'll

3  need to get a microphone there.  If you want, you can argue

4  from the table, but if you prefer the podium, we'll get you a

5  mike.

6      **MR. SOYARS:**  That's fine.  I can use the table.

7      **THE COURT:**  I kind of use the Superior Court method of

8  letting people argue from the table.  But if you can stand,

9  yes.  I can hear better actually when people stand up.

10      **MR. SOYARS:**  In this case, participants in the Duke

11  Faculty and Staff Retirement Plan are bringing suit in a

12  representative capacity and contend that the fiduciaries

13  breached their duties in two general respects.

14      First, causing the Plan to pay excessive administrative

15  fees primarily for recordkeeping.  Now, the fees were paid by

16  revenue sharing by which the investments in the Plan paid a

17  portion of the fees to the record-keepers.  This Plan had four

18  record-keepers:  TIAA, Fidelity, Vanguard, and VALIC.

19      So the excessive fees -- there were three reasons for the

20  excessive fees.  One, the Defendants allegedly failed to

21  monitor the amount that the Plan paid through revenue sharing.

22      They failed to leverage the Plan size because this is a

23  40,000 participant plan and they hired four separate

24  record-keepers.  So instead of obtaining the full leverage of

25  the 40,000-participant base, they essentially divided that up,

1   resulting in a higher fee.

2        And, third, that they failed to determine the -- the market

3   rate for the services that were being provided through a

4   competitive bidding process.  So as a result, the Plan at the

5   Plan level paid as much as $10.4 million a year when the market

6   rate was $1.1 million a year.  Well, that comes out to an

7   average of $280 per participant when the market rate was about

8   $30 per participant.

9        **THE COURT:**  I'm sorry.  Say that -- that seems what

10  you just said seems backwards.  Oh, 208.

11       **MR. SOYARS:**  280 about, yeah.

12       **THE COURT:**  All right.

13       **MR. SOYARS:**  So Your Honor's question about the -- how

14  does it work, how are damages proven in a case like this, our

15  firm actually handled a case called *Tussey versus ABB* that went

16  to trial on this same type of excessive investment manage -- or

17  excessive recordkeeping revenue sharing claim; and so the way

18  the court determined the damages in that case was to look at

19  the amount the plan paid each year, compared that to the market

20  rate, which was established with expert testimony, and that

21  resulted in a $13.4 million award to the plan.

22       **THE COURT:**  Where was that?  What court?

23       **MR. SOYARS:**  That was the Western District of

24  Missouri.  It went up to the Eighth Circuit.  The Eighth

25  Circuit affirmed the judgment for the participants and that --

1    there is still an investment -- one of the investment claims is

2    still pending, so the judgment hasn't been paid.

3        But the cases say that under Section 1109(a) the fiduciary

4    has to make good the losses to the plan.  So the plan number is

5    the key number.  It's not -- it's not a collection of

6    individual claims like might be the case in an employment

7    discrimination suit.  It's a plan claim, so plan losses are

8    what's important.

9        So that $13.4 million in the *ABB* case, that's paid into the

10   plan and the fiduciaries come up with some type of allocation

11   method.  It can be pro rata based on how much each of the

12   participants paid out of the excessive fees over the class

13   period and then that amount would be deposited to their

14   accounts.

15       Now, the second claim is failing to prudently monitor the

16   Plan's investment options, resulting in investments in the Plan

17   that charged excessive fees.  In particular, there are 138

18   mutual funds in the Plan for which the Defendants provided a

19   retail share class, which is designed for an individual

20   investor, when the Plan, which had $5 billion in assets, could

21   have easily qualified for an institutional share class, which

22   is the exact same investment, but it charges a lower fee.  So

23   that fee differential was used for the revenue sharing

24   payments, so that drove up the costs of the administration and

25   also resulted in excessive investment management payments.

1    That's another case that our firm has handled that went up
2  to Supreme Court and also went to trial -- two separate trials.
3  That's called *Tibble versus Edison International.*  And so the
4  way damages were determined there, you look at the expense
5  ratio.  Let's say the retail fee might be 100 basis points, 1
6  percent, when there was an institutional class for 80 basis
7  points.  So that fee differential is just multiplied by the
8  assets of the fund throughout the class period, added together,
9  and that amount is then paid to the plan.  That judgment
10 actually was paid and was distributed to the plan's
11 participants.
12    Then that went up to the Supreme Court.  The Supreme Court
13 held that the fiduciaries had an ongoing duty to monitor the
14 mutual funds in the plan regardless of how long they have been
15 in the plan.  So it went back down and there was a second trial
16 on funds that had been initially selected outside the
17 limitations period.  There was another judgment for the
18 plaintiffs and I believe that judgment has also now been paid.
19    So that's how those -- that's how those types of issues are
20 handled from a damages perspective; and under the statute, it's
21 the plan's losses is the key.
22    So then aside from the excessive fees, there were two
23 investment options that underperformed, the CREF Stock and TIAA
24 Real Estate Accounts.
25        **THE COURT:**  So when I was looking back at my order on

1  the motion to dismiss -- and I did not go back and review all

2  the briefing in connection with that motion, but I did read my

3  order on it.  And so Count VII of the -- I can't remember now

4  if it's the complaint or amended complaint, but in any event,

5  it was a breach of the fiduciary duty by retaining the CREF

6  Stock fund in the Plan, but I -- this TIAA Real Estate plan,

7  was it specifically mentioned in one of the counts?

8         **MR. SOYARS:**  It is.  It's in Count V.

9         **THE COURT:**  Count V, that's the breach by providing

10  imprudent investment options which charged excessive fees and

11  underperformed prudent alternatives.  And now you're talking

12  about the underperforming aspect of that?

13         **MR. SOYARS:**  Right.  So there's the retail versus

14  institutional share class and then the underperformance is the

15  other aspect of that.

16         **THE COURT:**  And the only two funds you're claiming

17  violate -- violated the duty here are these two?

18         **MR. SOYARS:**  Right.  And we point out in the amended

19  complaint that a large number of funds underperformed, but we

20  think that's more evidence that there was a flawed process;

21  that there were funds that were being retained that weren't

22  justifying the fees that were being charged.  But the only two

23  that specifically resulted in damages that we're -- that we're

24  challenging are the CREF Stock and the TIAA Real Estate.

25         **THE COURT:**  Okay.  And who gets -- okay.  Well, you

1  proceed and then I'll ask my questions you don't answer.

2      **MR. SOYARS:**  So these are funds that at the beginning

3  of the class period had a long underperformance history that

4  Plaintiffs contend a prudent fiduciary in the same circumstance

5  would have looked at that track record and decided that they

6  should be removed from the Plan.

7      So the way that a damages claim for that is handled, again,

8  it's the losses to the plan.  The seminal case on that is

9  called *Donovan v. Bierwirth,* B-i-e-r-w-i-r-t-h -- I believe

10  it's a 1982 Second Circuit case -- that looks to trust law and

11  the remedy under trust law, which the Supreme Court has advised

12  lower courts to look at in interpreting ERISA, is to restore

13  the plan to the position it would have been in but for the

14  breach.  And so the way -- so you look at a prudent alternative

15  to what would have been in the Plan.  If they had looked -- if

16  the Defendants had looked at these funds and said, "They

17  shouldn't be in the Plan.  We should replace it with something

18  else," where would those assets have gone and how would they

19  have performed over that time period?

20      So, again, that would be -- that's a single number that is

21  awarded to the Plan and then it can be -- it can be distributed

22  by -- based on who was invested in that fund during that time

23  period and these are records that the record-keeper would have

24  that the Defendants have access to apportioned to the money

25  they lost.

1      **THE COURT:** So the excess -- I'm just going to call it

2  the excessive fees part. That is something that you would say

3  everybody in the Plan was damaged by.

4      **MR. SOYARS:** Yes.

5      **THE COURT:** But the other part, these two

6  underperforming funds, would you still say everybody in the

7  Plan was damaged or would you say it was the people who

8  invested in those two plans?

9      **MR. SOYARS:** Well, the Plan is damaged and that is

10  the -- the cause of action is the Plan's claim. So those

11  options were in the Plan for every participant of the Plan.

12  Everyone had that -- had that imprudent option in the menu of

13  options that they had to choose from. The damage award would

14  ultimately be distributed likely to the people who were

15  invested in the fund.

16      **THE COURT:** Okay. All right. Go ahead.

17      **MR. SOYARS:** So for class certification purposes, the

18  critical fact about these claims is that they arise from

19  plan-level decisions. So Defendants, they decided the same

20  method of paying for recordkeeping across the board for --

21  every participant was subject to the same -- the method that

22  the -- that was established for the Plan. The menu investment

23  options was the same for everyone. And the courts in the cases

24  that we cite in the briefs, they've readily determined that

25  these types of plan-wide claims easily satisfy Rule 23.

1    **THE COURT:**  So can I ask you how the whole issue of

2  constitutional standing, which is an individual -- issue about

3  individual plaintiffs, overlaps with this -- the fact that in

4  ERISA cases the damages are to the plan?

5    **MR. SOYARS:**  Right.  So -- yeah, that is the

6  Defendants -- their primarily argument isn't really disputing

7  the Rule 23 elements as much, but it's emphasizing this Article

8  III standing issue.

9    **THE COURT:**  Which the Supreme Court has been very

10  serious about lately.  I mean, maybe not just lately, but

11  particularly lately.

12    **MR. SOYARS:**  Absolutely.  But, you know, the Fourth

13  Circuit has addressed this in the *In Re Mutual Funds* case; and

14  it says if the plaintiffs have alleged a loss of their

15  individual accounts, that's suffices for Article III standing.

16  It's undisputed that as -- in the complaint here, paragraph 8,

17  we go through how each person has invested in higher-cost share

18  classes, paid revenue sharing, has invested in these

19  underperforming options.  They don't dispute that there's an

20  injury to these people -- to these Plaintiffs' accounts.  What

21  they're saying is that's not enough for Article III standing,

22  you have to have invested in every single fund of the Plan

23  personally in order to represent a class; and that really

24  stretches Article III standing beyond what the bounds of the

25  Supreme Court have said, which is -- it's -- the Eighth Circuit

1    in *Braden* addresses this; that as long as a plaintiff, like our

2    Plaintiffs have, establish a loss to their account, under the

3    statute, Section 1132(a)(2), they can pursue relief that sweeps

4    beyond their own injury.  Your Honor cited these cases in the

5    order in *Sims* that they have a statutory cause of action to

6    obtain relief for the entire plan.

7        And so the theories are really across-the-board theories,

8    so the remaining funds in the Plan were subject to the same

9    course of conduct as the funds that the Plaintiffs themselves

10   invested in.  So it's really not an Article III issue because

11   there is an injury that has been alleged that hasn't been

12   challenged.  It's really a typicality and adequacy issue.

13       We cite the -- aside from the *Sims* order, the order in a

14   case called *Glass Dimensions* out of the District of

15   Massachusetts seems very close on point.  There were 260 funds

16   at issue.  The plaintiffs invested in three of them.  They had

17   standing and also a represented class for the other 257 options

18   because all of the options were subject to the same course of

19   conduct.

20       The same is true here.  The Defendants weren't making

21   particular decisions about certain options and handling another

22   group of options a different way.  There was a process -- a

23   Plan-wide process for monitoring the investments at the

24   requisite fees and so --

25           **THE COURT:**  And so I understand that easily as to the

1  excessive fee aspect of your claim.

2          **MR. SOYARS:**  Right.

3          **THE COURT:**  It's a little different, it seems to me,

4  or maybe it's not -- you can explain -- as to your

5  underperforming claim as to these two funds.

6          **MR. SOYARS:**  Right.  And so we have Plaintiffs that

7  are in those funds.

8          **THE COURT:**  Uh-huh.

9          **MR. SOYARS:**  And so --

10         **THE COURT:**  So --

11         **MR. SOYARS:**  So there's clearly standing there.

12         **THE COURT:**  And those are the only two funds?

13         **MR. SOYARS:**  You're right.  And so the cases that the

14  Defendants cite was a type of claim where the plaintiffs were

15  saying, "We want to challenge this fund.  We don't have anyone

16  in this fund."

17         **THE COURT:**  Is that the *David versus Alphin* case?

18         **MR. SOYARS:**  *David versus Alphin.*  So there was a

19  group of funds in that case.  They were all time barred except

20  for one.  So they set out the one fund in a separate count and

21  tried to bring a claim about that fund, and the court found

22  there was no standing.  But that's not the situation here.

23         **THE COURT:**  Because no named Plaintiff had invested in

24  that fund.

25         **MR. SOYARS:**  Exactly.  The same is with the *Fuller*

1  *versus SunTrust* case in the Northern District of Georgia, the

2  same situation.  There was a particular fund that was set out

3  in a separate count and no one had invested in it, which isn't

4  the case here.

5       And Defendants' cases, they actually recognize the same

6  rule that -- that is set forth in the cases that we cite.

7  There's a case, *Yost,* from the Western District of Tennessee.

8  There were two named plaintiffs.  One had invested in the -- it

9  was a group of mutual funds called the First Funds.  One

10 plaintiff had invested in those, didn't invest in all of them,

11 but they could represent the class that included all the funds

12 that were in the plan.  The other plaintiff who didn't invest

13 in those, the court said that plaintiff lacks standing, but the

14 one who did can represent a class that sweeps beyond their own

15 injury.

16            **THE COURT:**  Okay.

17        **MR. SOYARS:**  The Defendants also -- they filed a

18 notice of supplemental authority about the *Troudt versus Oracle*

19 decision.

20            **THE COURT:**  Say again.  Slow down on the name of the

21 case.

22        **MR. SOYARS:**  *Troudt,* T-r-o-u-d-t, *versus Oracle Corp.*

23 from the District of Colorado was decided just two or three

24 weeks ago, and both of our firms are also involved in that

25 case.  That was not a standing decision either.  The defendants

1 had raised the standing arguments, but the court rested its

2 reasoning on -- again, it was a performance claim where they're

3 challenging specific funds -- three specific funds. There were

4 plaintiffs in two of the funds. The third fund there was not a

5 plaintiff, so the court declined to certify class at this time

6 because there was not a showing of adequacy. It wasn't an

7 Article III standing issue at all. And in that case, the

8 defendants did not even challenge that -- the excessive fee

9 claim, which was another plan-wide revenue sharing model, that

10 that was appropriate for certification of a similar definition

11 that we have in this case.

12 So the argue -- the Rule 3 arguments -- or Rule 23

13 arguments that the Defendants make -- the first one they put

14 forth is the statute of limitations based on actual knowledge.

15 So the theory is there has to be individualized inquiry, when

16 did this plaintiff learn of the breach; and under the statute

17 Section 1113(1), it says actual knowledge of the breach. It's

18 not just actual knowledge that funds were in a plan, but that

19 there was a breach of fiduciary duty. Now, that is not an

20 individualized issue in this case because the Defendants are

21 relying on Plan-wide communications that were sent to everyone.

22 **THE COURT:** Let me ask you about that. So I certainly

23 understand your argument that that would be a classwide issue,

24 a common issue, but do they not have the right to -- I believe

25 they made this argument. They said, "Well, yeah, but we still

1   get to ask each Plaintiff -- each class member whether they had

2   other knowledge, individual knowledge.  You know, their broker

3   told them this was a very bad fund" or something, just -- you

4   know, something specific to that individual.

5      And how does that play out, because I'm kind of trying to

6   figure out how the statute of limitations defense works with

7   the damages to the plan?  Do you just have to have one

8   plaintiff -- one named plaintiff or one class member who's not

9   barred by the statute of limitations in order to get damages

10  for the six years or -- do you understand my question about

11  this?  I ask it -- I ask it to the Defendants too for them to

12  address.  So explain that to me if you can.

13         **MR. SOYARS:**  Well, yeah, there are cases that say that

14  the actual knowledge -- the relevant party for that is the

15  plaintiffs themselves.

16         **THE COURT:**  The named plaintiff?

17         **MR. SOYARS:**  The named plaintiff.  The person bringing

18  the suit on behalf of the plan because it's a representative

19  claim.  So the statute authorizes participants, fiduciaries or

20  the Secretary of Labor to bring suits.  So the -- yeah, the

21  named plaintiff.

22         **THE COURT:**  I mean, I say "named plaintiff" back

23  from -- that's what we called them back in the day and I don't

24  know if that's still what you-all call them, but that seems --

25         **MR. SOYARS:**  Right.  Exactly.  So there are cases that

1  say that and, you know, that -- in that sense, then it's really

2  not relevant if anyone else knew about it -- knew about the

3  breach.

4     **THE COURT:**  So is that going to be your position?

5     **MR. SOYARS:**  Well, I think our position is what was --

6  what we set out in the brief, which is that they're -- that the

7  Defendants are saying it's individualized, but they're not

8  relying on an individualized theory and their generalized

9  communications.  I think if --

10     **THE COURT:**  So is this something we're going to talk

11  about at summary judgment?  So you're going to move for summary

12  judgment on the statute of limitations issue?  Is that what

13  you --

14     **MR. SOYARS:**  The Defendants probably will, yeah.

15     **THE COURT:**  Well, I know, but you can move for it too.

16  It's an affirmative defense.  I mean, I'm not asking you to do

17  that.

18     **MR. SOYARS:**  I don't foresee that, but it's an

19  interesting possibility.

20     **THE COURT:**  I mean, I'm just trying to figure out what

21  your positions are going to be on this down the road because I

22  know this is not a Rule 23(b)(3) where I look at manageability

23  as an element; but as I just held in an antitrust case, which

24  was a (b)(3) case, manageability is always an issue in the

25  Court's inherent authority.  You always have to be able to

1  manage it because if you can't manage it, you can't manage it

2  and you shouldn't certify it.  So I'm just trying to figure out

3  how -- how that issue is going to play out as we move along.

4  If I certify it, then what happens?

5          **MR. SOYARS:**  Well, I think how it's going to play out

6  is the Defendants are going to say these are Plan-wide

7  communications and it doesn't matter if anyone actually read

8  them --

9          **THE COURT:**  Right.

10         **MR. SOYARS:**  -- so the facts in these communications

11  establish actual knowledge for the Plaintiffs and anyone else

12  who received them.

13         **THE COURT:**  And they're either right or wrong about

14  that, and there are either material disputes of fact about that

15  or there aren't, and that's how you think it's going to play

16  out.

17         **MR. SOYARS:**  That's how I see it playing out.  That's

18  how I've seen it play out in a number of other cases.

19         **THE COURT:**  So do you dispute their ability to -- so

20  is it your position that individual knowledge of class members

21  beyond what's in the communications from the Defendant is not

22  material?  What's -- I'm trying to --

23         **MR. SOYARS:**  Yeah.  I mean, if the -- under the view

24  that only the named plaintiff's knowledge matters as the

25  plaintiff bringing the suit, then the (inaudible).

1          **COURT REPORTER:**  Can you repeat that?

2          **THE COURT:**  I coughed.  I apologize.

3          **MR. SOYARS:**  That if the only -- if the relevant party

4   for actual knowledge purposes is the named plaintiff, then it

5   is not material whether an actual class member had actual

6   knowledge.

7          **THE COURT:**  So is that what your position -- I mean,

8   is that what you anticipate your position is going to be?  I'm

9   trying to figure out what you're going to be telling me down

10  the road.

11         **MR. SOYARS:**  Well, if the Defendants -- I mean, are

12  they going to go out and get discovery from 40,000 people and

13  ask them if they had actual knowledge?  I don't see that

14  happening.  But if that were to be what's presented, then I

15  think that would be our position, that it's not material.

16         **THE COURT:**  Okay.  I mean, that's what I understand

17  them to be saying, that they're --

18         **MR. SOYARS:**  Well, yeah.  I think it's more

19  hypothetical than real.  I've never seen it happen in a single

20  one of these cases.  And, again, the communications are still

21  the same across the board; and even if it is an individualized

22  issue, for the sake of argument, it's still -- they don't cite

23  really authority for the proposition that that defeats any of

24  the Rule 23(a) elements.

25         **THE COURT:**  You only have to have one issue that's

1  common, right?

2  **MR. SOYARS:**  You only have to have one common issue.

3  It's -- it's relevant to predominance under 23(b)(3).  It would

4  be relevant because there you look at do the common issues

5  outweigh the individualized issues, but a single individualized

6  defense does not destroy even predominance, which is far more

7  demanding than commonality.  So by that logic, there's no -- a

8  single issue would not defeat any of the Rule 23(a) elements

9  even if they're correct that it is an individualized issue.

10  Now, the Fourth Circuit in *Broussard* --

11  **THE COURT:**  Which case?

12  **MR. SOYARS:**  *Broussard,* B-r-o-u-s-s-a-r-d.  It did

13  analyze the individualized nature of the statute of limitations

14  under commonality and typicality, but the case that it cites on

15  the statute of limitations point is a Rule 23(b)(3) case from

16  the Ninth Circuit.

17  And so there -- in the *Broussard* case, there were five

18  reasons why the class was not suitable or the claim was not

19  suitable for class treatment.  It was based on individualized

20  oral representations to individualized franchise owners who

21  were trying to bring a breach of contract case.  So there were

22  five factors, including the statute of limitations; but the

23  statute of limitations on its own, the Fourth Circuit didn't

24  say that that alone would have defeated class certification.

25  **THE COURT:**  Okay.

1      **MR. SOYARS:**  And the remaining authority they cite on
2  that from the Second and Third Circuits are also predominance
3  cases that are looking at an individualized issue and how that
4  relates to common issues, which isn't at issue here.

5      Now, the alleged conflicts that supposedly defeat adequacy,
6  first the Defendants say that the revenue sharing presents a
7  conflict because some people might have paid less than what we
8  allege to be the market rate.  So under revenue sharing, it's
9  asset based, so the amount you pay varies by your plan balance.
10 And so Defendants' theory is that if the asset-based payment
11 arrangement was replaced with a flat fee, where everyone pays
12 $30, some people might wind up paying more, but that was really
13 based on a distortion of what's alleged in the complaint.

14     The Plaintiffs don't allege that the revenue sharing
15 arrangement or any type of asset-based payment arrangement
16 needs to be eliminated in favor of a flat fee.  We point out
17 that under the asset-based arrangement if it's not monitored
18 properly, that can result in excessive fees, which is what
19 happened here.  But if the fee were negotiated, a
20 million-dollar fee for the Plan, that could be allocated to
21 participants as a percentage.  It's a simple matter of looking
22 at how the Plan-level fee relates to the assets in the Plan and
23 then charging everyone the same percentage.  That is
24 permissible under the theory that we're advancing in the case,
25 so there's really no conflict there.

1    And really that argument relates to prospective relief.  If
2  the revenue sharing arrangement under which some people are
3  paying less were replaced with a flat-fee arrangement, would
4  those people object to that.  Well, Defendants, they attached a
5  letter to their -- to their opposition brief where it shows for
6  Vanguard at least they have implemented that payment
7  arrangement.

8         **THE COURT:**  They what?

9         **MR. SOYARS:**  They implemented a flat fee where
10  someone -- where the payment doesn't vary based on the assets
11  in the account.  Even if some people object to the changeover,
12  the Defendants have done it already and there still would be no
13  reason anyone would object to recovering the excessive amounts
14  that the Plan has already paid because that's going to be
15  distributed pro rata among everyone who paid the fees and
16  everyone would benefit from that.

17    The case that they cite is a case against Starbucks where
18  they -- the defendants obtained affidavits from people
19  concerned that a change to the Starbucks tip policy would
20  result in receiving less money.  The Defendants -- if there was
21  anyone to object to the Plan recovering money that they -- that
22  was taken from their retirement savings, these are Duke's own
23  employees.  They could have presented that evidence and there's
24  nothing like that here.

25    And as far as the investment claims, the conflict really

1  there is that some people could have gotten in and out of the

2  TIAA Real Estate Account or the CREF Stock Account such that

3  they actually made money during the time they invested in the

4  fund; and that under the *Spano* case from the Seventh Circuit,

5  that means that was a prudent fund for those people and also --

6  **THE COURT:**  I think I already ruled your way on this

7  one in *Sims*.

8  **MR. SOYARS:**  I think you did.  Defendants don't really

9  address that.

10  **THE COURT:**  I mean, I'll hear from the Defendant,

11  but --

12  **MR. SOYARS:**  You know, I think the same reasoning

13  certainly applies here.  And, you know, in *Langbecker,* there

14  was evidence that 16,000 people had profited.  There's no

15  evidence that anyone profited here.

16  **THE COURT:**  Can I ask you one general question?  In

17  the *Krueger* case, the Minnesota case --

18  **MR. SOYARS:**  Yes.

19  **THE COURT:**  In that case, the court amended the class

20  definition to reflect that some injury is necessary in order

21  for a participant to maintain a claim.  Can you speak to

22  that -- to what the court did in that case and whether you

23  think that is appropriate or not necessary?

24  **MR. SOYARS:**  Well, I think that was based on there was

25  a particular Eighth Circuit case that spoke to absent class

1 members' standing and the adjustment based on that. Some

2 courts have done that. I believe in *Sims* the definition was

3 actually those who were injured -- all the participants of the

4 plan who were injured.

5    I don't think there's a significant difference here because

6 everyone in the Plan contributed at least to the excessive

7 administrative fees, so I don't think there are any uninjured

8 members. But, you know, if that was the type of modification

9 that the Court found appropriate, I don't think the Plaintiffs

10 would object because I think it's still going to capture

11 substantially everyone in the Plan.

12         **THE COURT:** Okay. Thank you.

13         **MR. SOYARS:** Now, the final Rule 23(a) argument that

14 the defense made is that -- that the Plaintiffs just have

15 insufficient knowledge of the claims.

16         **THE COURT:** You don't need to address that.

17         **MR. SOYARS:** Okay.

18         **THE COURT:** If they raise anything during their

19 argument, I'll let you address it on rebuttal.

20         **MR. SOYARS:** Okay. And the final thing I would just

21 like to point out is under (b)(1), the Fourth Circuit case

22 *Zimmerman v. Bell,* which defense cited for the point that it

23 disapproves of (b)(1)(A) treatment for a claim seeking monetary

24 relief, a later Fourth Circuit case, *In re A.H. Robins Co.,* 880

25 F.2d 709 at 730, Footnote 28, pointed out that the same

1  language the Defendants are citing was dictum that was
2  irrelevant to the outcome of the case; and the court in the
3  *A.H. Robins* case cites the Newberg treatise, which points out
4  that the limitation of monetary relief is not supported by the
5  language of the subdivision or the cases interpreting it.
6      Now, Defendants also, they rely on *Dukes -- Wal-Mart Stores*
7  *v. Dukes*, a Supreme Court case from 2011, which says
8  individualized monetary claims belong in 23(b)(3), but the
9  court was not addressing a 23(b)(1) class.  It's a 23(b)(2)
10 class and those were truly individualized claims, employment
11 discrimination claims, where a class member would get an
12 individualized damage award.
13      **THE COURT:**  But in the part of the decision where they
14 say that -- where the Supreme Court says that, they are -- it
15 might be dicta, but they are talking about (b)(1) and (b)(2).
16 They're distinguishing (b)(1) and (b)(2) from (b)(3) cases,
17 so -- I mean, it may not hold exactly what -- I don't remember
18 if the Defendants say it holds that or not, but it certainly
19 does seem to provide some support for their proposition because
20 of the way the Supreme Court discusses it, right?  I mean, do
21 you disagree with that?
22      **MR. SOYARS:**  That is true, but it still talks about an
23 individualized claim, which is just not what we have here where
24 it's a derivative claim for monetary relief for the Plan; and
25 if it were true, then any monetary claim has to be in (b)(3).

 1 Then (b)(1) is a nullity because (b)(2) already covers the

 2 exclusive injunctive relief cases.

 3        **THE COURT:**  I mean, that does seem to be the case.  It

 4 seems like if they're right about that then you would never

 5 have one in an ERISA case.

 6        **MR. SOYARS:**  Right.  So the advisory committee --

 7        **THE COURT:**  Or this kind of -- or in any kind of ERISA

 8 case.  But would you agree -- I mean, if this were just an

 9 imprudent investment -- inclusion of imprudent funds, would

10 your analysis be different on this point?  I mean, you have a

11 much easier time on the excessive fees and overall management.

12 When we get -- but when we get to the imprudent funds -- the

13 two imprudent funds, how would you speak to that part of it?

14        **MR. SOYARS:**  Well, I still do believe that claim

15 satisfies both (b)(1)(A) and (b)(1)(B) because one court could

16 say, "All right.  This was an imprudent fund and the damages

17 are $10 million and Defendants have to remove it."  And another

18 court could say it was a prudent fund.  Another one could say

19 it was imprudent, the damages are 5 million, but they don't

20 have to remove it.  Those are conflicting -- those establish

21 conflicting standards of conduct that the fiduciaries could not

22 comply with at the same time.

23        **THE COURT:**  And that's true only if the plaintiffs in

24 all of those cases, and presumably here in your case -- you are

25 looking at this in the big picture, damages to the Plan, not

1  the way a particular person may have been injured or damaged by

2  the inclusion.

3          **MR. SOYARS:**  Right.

4          **THE COURT:**  A particular named plaintiff or just plain

5  ordinary plaintiff if it's not a class action.

6          **MR. SOYARS:**  Right, because that's what the statute

7  provides for, losses to the plan; and that's what trust law

8  says the remedy is, is to restore the plan to where it would

9  have been.  There's just no cause of action for an

10  individualized claim and the Fourth Circuit points that out in

11  the *In Re Mutual Funds* case.  The money will ultimately flow to

12  participant accounts, but the money is still payable to the

13  plan and it's not payable to the individual.

14          **THE COURT:**  So just educate me a little bit then.

15  Help me understand that.  If –– if a person who had invested in

16  one of these plans came in here as an individual, sued on

17  behalf of the plan, but their evidence was about their own

18  personal harm, I mean, they've obviously proved –– well, they'd

19  have to prove it was an imprudent fund to include in the plan,

20  but the damages or the loss they limited to their own personal

21  loss.  Are you saying that would never be a way that these

22  cases would proceed?  I mean, I'm –– or theoretically could not

23  be a basis.  I appreciate there might be some practical reasons

24  a case would never go that way, but I'm just talking about

25  could that happen.

1       **MR. SOYARS:** It could happen and I think the Court in

2 that position would -- would say that there has to be some

3 procedural safeguards to protect the other class members and

4 that was actually addressed by the Second Circuit in a case

5 *Coan v. Kaufman.* It's C-o-a-n versus Kaufman, K-a-u-f-m-a-n.

6 It's a 2006 decision. And the plaintiff tried to bring that

7 sort of claim that her account was injured, but didn't proceed

8 as a class action or do anything to protect absent class

9 members; and the Second Circuit said that was improper, that

10 there has to be some mechanism to protect everyone who was

11 similarly affected by that breach whose account -- who has an

12 interest in the outcome.

13       **THE COURT:** Okay.

14       **MR. SOYARS:** And that's all I have. Thank you.

15       **THE COURT:** Thank you.

16     For the Defendants.

17       **MR. BLUMENFELD:** Thank you, Your Honor.

18     There are a lot of things that I had intended to cover when

19 I came here this morning and some other things in response to

20 the Court's questions and counsel's arguments, but I appreciate

21 the time and attention. Obviously, we know that you have the

22 briefs, you've read those briefs. We're also cognizant of the

23 *BB&T* decision, and I'm going to try and address some issues

24 that weren't addressed in that case or that we think are

25 distinguishable from our circumstances here.

1      I'm going to start, with the Court's permission, talking

2  about the constitutional standing question.  It is a separate

3  analysis from the question of statutory standing; that is,

4  whether you are a participant in a plan that Congress

5  authorized to sue in 29 U.S.C. 1132(a)(2).  And Plaintiffs'

6  arguments just boils down to exactly that, they have

7  constitutional standing because they have statutory standing

8  because they can bring a claim on behalf of the Plan.  As Your

9  Honor noted earlier, that's just not right and not consistent

10  with Supreme Court precedent in the context --

11          **THE COURT:**  I don't think I said that, but --

12          **MR. BLUMENFELD:**  Well, the Supreme Court has focused

13  on this issue certainly as of late, most recently I believe in

14  the *Spokeo* decision where the court said just because Congress

15  gives you the right to sue doesn't mean you have constitutional

16  standing to sue and that that injury needs to be specific to

17  you and also actual or imminent, not theoretical or

18  hypothetical.  It went on to say essentially just because

19  Congress gives you the right to bring a cause of action doesn't

20  mean that you have constitutional standing to bring that

21  action.

22      I think there is other authority that addresses this issue

23  pretty squarely and that's the *David versus Alphin* decision,

24  not just the district court opinion, but also the Court of

25  Appeals decision from the Fourth Circuit on that precise issue.

1          And what happened in the *David versus Alphin* district court

2    decision is that the named plaintiffs try to bring a claim on

3    behalf of -- it was similar actually to the *BB&T* case in that

4    they were challenging investment options that were proprietary

5    funds in the Bank of America plan and they were also

6    challenging investments in the defined benefit plan for Bank of

7    America.  And with respect to the defined contribution plan,

8    the plaintiffs didn't appeal that dismissal for lack of

9    constitutional standing in that case to the Fourth Circuit, but

10   they did appeal the denial with respect to the defined benefit

11   plan.  And the plaintiffs on the appeal made the same argument

12   that Plaintiffs are making here:  This is a derivative claim on

13   behalf of the plan and so all they need to do is prove that the

14   plan suffered some losses and that's sufficient.

15        And the Fourth Circuit in the *Alphin* case said, "No, as a

16   matter of constitutional Article III jurisprudence, that is

17   incorrect.  You do not have representational standing because

18   the cause of action is one that is supposed to be as a matter

19   of constitutional Article III jurisprudence personal to you.

20   Because you have not suffered a personal injury, you can't

21   press those claims."

22            **THE COURT:**  Okay.  So is your argument that the named

23   Plaintiffs don't have constitutional standing or is your

24   argument that every single class member does not have

25   constitutional standing or is it both?

1      **MR. BLUMENFELD:** Well, it's, Your Honor, that the

2  Plaintiffs don't have constitutional standing to challenge --

3      **THE COURT:** The named Plaintiffs in this case. Let's

4  be specific.

5      **MR. BLUMENFELD:** The named Plaintiffs in this case do

6  not have constitutional standing to challenge investments that

7  they did not make and fees that they did not pay.

8      And so bringing it to sort of the meat of the matter, we're

9  talking about, as counsel made clear a few moments ago, two

10  funds with respect to the performance claims and only two

11  funds; and I'll address it with that understanding, Your Honor.

12  The first is the TIAA Real Estate fund.

13      **THE COURT:** But aren't the Plaintiffs suing on behalf

14  of the Plan? I mean, so really the plaintiff is the Plan. I

15  know the Plan is the defendant too, sort of a bizarre

16  situation, but it's the Plan -- these are rights -- I have a

17  little trouble understanding how this works in ERISA because

18  the rights are created by statute; and so why can't Congress

19  create the rights, define the injury, and set the lawsuit up

20  the way that it wants to when the -- because the Plan is

21  essentially the harmed entity, and so it's not like *Spokeo* or

22  other stuff where I've had to deal with the issue. You've got

23  the Plan that's actually injured or allegedly injured here and

24  so it seems like it's different to me. Is that not so? Why is

25  that not right?

1    **MR. BLUMENFELD:** It is not different. It's like a

2  private Attorney General statute, for example; and what the

3  Supreme Court and other courts have said is Congress can't give

4  you the right to bring a cause of action or a claim for rights

5  or injuries that are not yours, and they can't do it even by

6  creating a cause of action and giving it to you. That's

7  exactly what the Supreme Court said in *Spokeo* they couldn't do.

8    **THE COURT:** Well, yeah, I know they did say statutory

9  standing is not enough. That's, you know, clearly right.

10    **MR. BLUMENFELD:** Yes. And -- and doesn't give you

11  that Article III injury even if they're creating the right and

12  creating the remedy all in the same context.

13    **THE COURT:** Well, so if you're correct about that,

14  then how does anybody really ever sue for this kind of

15  excessive fee claim?

16    **MR. BLUMENFELD:** Well, Your Honor, if a named

17  Plaintiff actually paid that excessive fee or if a named

18  Plaintiff actually invested in an investment option that

19  suffered from underperformance --

20    **THE COURT:** Well, in this case they allegedly did.

21    **MR. BLUMENFELD:** And I'll talk about these two named

22  Plaintiffs with respect to the investment claim in a moment.

23  But if they did, then they have constitutional standing to

24  press that claim.

25    **THE COURT:** All right. And is it your position that

1  none of the named Plaintiffs invested in any of the funds that

2  allegedly had excessive fees?

3          **MR. BLUMENFELD:**  Well, I'll -- so with respect to the

4  excessive fees, one of the things that counsel said was that

5  there were 138 funds where the retail share class was offered

6  and a lower share class might have been available.  They

7  presented no evidence here in their class motion or here today

8  or in the affidavits that the named Plaintiffs submitted that

9  they were invested in any of those 138 mutual funds that

10  allegedly were retail share classes and paid allegedly

11  excessive fees.  None.

12          In the Rule 23 context, first of all, they bear a burden of

13  proof -- and not with respect to the merits, of course, but

14  with respect to proving that the issues are common and that

15  they have standing to assert them, most assuredly; and they

16  have not come forward with any evidence that they invested in

17  any of these 138 investment options.

18          With respect to the fees more generally, Mr. Soyars said

19  today that the average fee, by his estimate, that the Plan paid

20  was $280 and should have been $30, but we know that there are

21  members of the class and maybe even named Plaintiffs who paid

22  less than $30.  We also know that there are 82 investment

23  options in this Plan.  That's a -- you could develop a whole

24  menu of investment options just with those 82 that paid no

25  revenue sharing at all and paid no excessive fees at all

1 because they paid no fees for administrative services at all.

2     **THE COURT:** Well, that's just a defense to the claim.

3 That's just a way of saying these were not excessive fees,

4 these were not imprudent, isn't it? That just goes to the

5 merits.

6     **MR. BLUMENFELD:** It is a defense on the merits

7 separate and apart from that, but Plaintiffs who invested in

8 those 82 funds don't have standing to challenge the fact that

9 there were other funds in the Plan that they didn't invest in

10 that may have led to excessive recordkeeping fees.

11     **THE COURT:** Well, why not? Because if there had not

12 been excessive fees, they might have invested in those plans

13 which they might have thought were better options if the fees

14 were lower. I don't know. I just made that up off the top of

15 my head, but it occurred to me. So why would that not be so?

16     **MR. BLUMENFELD:** So that's the very sort of

17 hypothetical and theoretical type of injury, first of all,

18 there's no evidence of here. None of the Plaintiffs said, "If

19 you offered me an investment option over there, I would have

20 picked that instead of my investment option over here."

21 They're focused on their investment options and they have the

22 right to challenge those investment options as being reasonable

23 or unreasonable, expensive, imprudent, what have you, but not

24 others.

25     It's exactly the sort of argument that the Fourth Circuit

1    in the *David versus Alphin* case rejected because the plaintiffs

2    in that case tried to claim the same sort of "I also was

3    injured."  And to be sure, the plaintiffs in the *David versus*

4    *Alphin* case said the plan has been injured to the tunes of

5    millions of dollars, just like Plaintiffs here say the Plan has

6    been injured to the tunes of millions of dollars.

7        And the Fourth Circuit said that's not enough for

8    constitutional standing and went further to say the fact that

9    you could craft some theoretical basis for claiming an injury

10   is not sufficient for Article III purposes because Article III

11   standard -- Article III standing requires that it be concrete

12   and particularized.  And what -- the language that the Fourth

13   Circuit used in the *Alphin* case was it rejected the plaintiffs'

14   argument because, quote, they rest on a highly speculative

15   foundation lacking any discernable limiting principle.

16       And with respect -- I would say that's exactly what the

17   Plaintiffs' theory is doing here too.  Their argument is, as

18   you were just articulating or asked the question, as long as

19   they find one Plaintiff in the Plan, they could sue for losses

20   to the entire Plan having nothing to do with that participant's

21   account.  And one reading of the statute may give them that

22   right, but Article III does not.

23       In the *Coan versus Kaufman* case, because counsel mentioned

24   it, I'll just say that was a case in which the plaintiff was

25   not trying to recover losses to the named plaintiff's own

1  account.  That plaintiff was trying to do what these Plaintiffs

2  are trying to do, which is bring a claim for losses to the

3  whole plan outside of their own account without satisfying the

4  requirements of Rule 23 and –– and taking steps to ensure –– or

5  taking other steps to ensure they were bringing the action on

6  behalf of the plan.

7      I would note further, Your Honor, that the fact of the

8  matter is the law in the Second Circuit on constitutional

9  standing is just different than it is here in the Fourth

10  Circuit.  We have *David versus Alphin* which makes clear that

11  it's not plan losses that govern.  It is participant losses

12  that govern the Article III inquiry.  That's not the law in the

13  Second Circuit at least as of right now.

14      In the *David versus Alphin* case, the Fourth Circuit also

15  addressed the Solicitor of Labor's arguments so ––

16          **THE COURT:**  So can I ask you, you know, about your

17  constitutional standing argument?  Because in Footnote 6 of

18  your brief, you say the Fourth Circuit has rejected the

19  "plan-wide harm" rationale.

20          **MR. BLUMENFELD:**  Correct.

21          **THE COURT:**  I actually had trouble determining which

22  case said that from your briefing.  So are you saying it's the

23  *David v. Alphin*?  That's the case?

24          **MR. BLUMENFELD:**  The *David v. Alphin* certainly does

25  that.

1    **THE COURT:**  Okay.

2    **MR. BLUMENFELD:**  And if you'd like the page cites,

3  it's -- the case is 704 F.3d 327 and the page cites are 334 to

4  335.  The court goes through the "representational standing"

5  analysis, a trust law analogy, and direct injury, and rejects

6  the very arguments that Plaintiffs are making here on

7  constitutional standing.

8    **THE COURT:**  Okay.

9    **MR. BLUMENFELD:**  So that brings us, I think --

10   **THE COURT:**  Now, the Plaintiffs in their reply brief

11 say that all of your constitutional standing ERISA cases

12 involve challenges to specific options in which no named

13 plaintiff invested, not challenges to management of the plan as

14 a whole.  Is that right?

15   **MR. BLUMENFELD:**  I don't think it is, Your Honor.  The

16 *David versus Alphin* case, for example, was just like the *BB&T*

17 case.  They were challenging all of the investment options and

18 also had challenges similar to the CREF Stock and TIAA Real

19 Estate Account.

20     The *Oracle* case, certainly the plaintiffs were challenging

21 the management of that plan in its entirety.  And there were

22 three specific investment options that they challenged, but the

23 named plaintiffs weren't invested in one of them.

24     And there are a couple of other cases I think that we also

25 cite in our brief for that notion.  These are not just cases

1  involving specific challenges.  These are cases very similar to

2  this one in that they involve allegations of mismanagement

3  regarding the entire plan and certain allegations that are more

4  specific.

5      And I would say further, Your Honor, Plaintiffs are not

6  saying -- and I don't think Mr. Soyars would say today -- that

7  if we managed and had a prudent process with respect to

8  managing one investment option that their claims in their

9  entirety would fail as a matter of law.

10          **THE COURT:**  Say that again.

11          **MR. BLUMENFELD:**  They're not saying that if we managed

12  and monitored one investment option in the Plan then our

13  process was sufficient and their claims would fail as a matter

14  of law.  Their claims necessarily have to be directed to

15  individual investment options, what we did to monitor those

16  investment options, the performance of those investment

17  options.  That's why there are 10 pages in the complaint on the

18  CREF Stock Account and five-plus pages in the complaint

19  regarding the TIAA Real Estate Account.

20          **THE COURT:**  Okay.  But -- I guess -- I'm trying to

21  understand what you're saying about that.

22          **MR. BLUMENFELD:**  That these are -- this is not -- this

23  claim can't be brought just by saying your overall process is

24  deficient.  They have to prove that with respect to the

25  different investment options, with respect to the different

1  decisions that our process was deficient; and the reality is

2  that Plaintiffs who didn't invested in the CREF Stock Account

3  have no interest, no standing, no issue with the CREF Stock

4  Account as an investment option in the Plan, no constitutional

5  injury with respect to the CREF Stock Account in the Plan.

6          **THE COURT:**  But aren't there Plaintiffs who did invest

7  in those two funds?

8          **MR. BLUMENFELD:**  There are -- there are -- there is

9  one named Plaintiff who invested in the CREF Stock Account and

10  the TIAA Real Estate Account; and with the Court's permission,

11  I'll address those two.  I'll start with the TIAA Real Estate

12  Account.

13          **THE COURT:**  Okay.

14          **MR. BLUMENFELD:**  The only Plaintiff who invested in

15  the TIAA Real Estate Account is Keith Feather.  Mr. Feather

16  first invested in the TIAA Real Estate Account in October of

17  2017, over a year after this lawsuit was filed.  That is not

18  sufficient to give him constitutional standing to bring a claim

19  because constitutional standing is an inquiry that is governed

20  by the inception of the lawsuit.  And so he is not an

21  appropriate person who lacks constitutional standing, Article

22  III standing, to bring that claim.

23      There is Supreme Court authority for that notion and there

24  are cases that have been clear that you can't sort of cure that

25  in the middle of the case by trying to create standing by

1  investing in an option that your own complaint alleges is an
2  abysmal investment that no reasonable person would invest in.
3      The other investment option, the CREF Stock Account, was
4  invested in by Ms. Lucas and she invested in the CREF Stock
5  Account before the lawsuit was filed.  So we would acknowledge
6  that she at least has Article III constitutional standing to
7  press that claim, but there are real adequacy problems not
8  about her knowledge or understanding about the case.
9      We took what you said to heart, Your Honor, in the *BB&*T
10  case about the fact that, yes, these cases are complicated and
11  you wouldn't expect an individual class representative to
12  understand the intricacies of their claim.
13      But there are two investment options that these Plaintiffs
14  filed a complaint saying are terrible, abysmal investment
15  options; and like I said, there's 10 pages of that devoted just
16  to the CREF Stock Account.  And yet Ms. Lucas continues to
17  invest in the CREF Stock Account even after her own complaint
18  was filed saying it was a terrible investment.
19      That's an adequacy and typicality issue, Your Honor,
20  because having all of the knowledge that Ms. Lucas is now
21  charged with, which includes the knowledge of her counsel, she
22  herself decided to continue to invest in the CREF Stock Account
23  and not just for a couple of weeks or even a couple of months
24  but for over a year.  Her own investments demonstrate that
25  she's not an adequate representative because her own

1  investments demonstrate that reasonable investors in these

2  circumstances could decide to continue to hold the CREF Stock

3  Account notwithstanding everything that is in Ms. Lucas's own

4  complaint about that.

5      **THE COURT:**  So if she had sold it, would she still

6  have standing?

7      **MR. BLUMENFELD:**  She would have constitutional

8  standing certainly; and with respect to statutory standing,

9  that issue has been litigated, that the fact that you even are

10  no longer a participant in a plan doesn't deprive you of

11  statutory standing.  So, yes, she would have constitutional

12  standing to assert that claim saying it was an imprudent

13  investment and she would have statutory standing to assert the

14  claim.

15      **THE COURT:**  Okay.

16      **MR. BLUMENFELD:**  Now, Your Honor, this is a defined

17  contribution plan; and just to hit the point home, in

18  paragraph 35 of the second amended complaint and paragraph 36

19  of the first amended complaint, Plaintiffs allege that

20  participants' retirement benefits are limited to the value of

21  their own individual investment accounts, which is determined

22  by the market performance of employee --

23      **THE COURT:**  I'm sorry.

24      **MR. BLUMENFELD:**  That's okay.

25      **THE COURT:**  Slow down.  Start over.  Say again.

1        **MR. BLUMENFELD:**  You've got it.  Paragraph 35 of the

2   second amended complaint, the Plaintiffs allege that

3   "participants' retirement benefits are limited to the value of

4   their own individual investment accounts," which is just

5   another way of saying for investment options that they didn't

6   make, for fees they didn't pay, it doesn't affect their

7   retirement benefits, which is why they don't have

8   constitutional standing to assert those claims.

9        Now, with respect to that issue and the ability to stretch

10  beyond the claims that you assert, one of the cases that the

11  Plaintiffs cite is the *Leber versus Citigroup* decision and

12  *Leber* talks about a case out of the Second Circuit called *Long

13  Island Head Start* and that's the same opinion that the *NYU*

14  court relies upon in certifying that case.  What the Second

15  Circuit said in *Long Island Head Start* is that injuries to plan

16  assets are sufficient to confer that standing.  That's directly

17  contrary to the *David versus Alphin* case.  So that may be the

18  law in the Second Circuit, like I said, at least for now, but

19  it's not the law in the Fourth Circuit.

20       With respect to --

21       **THE COURT:**  Before you move away from constitutional

22  standing, let me just see if I have additional questions.

23       **MR. BLUMENFELD:**  Certainly.

24     (Pause in the proceedings.)

25       **MR. BLUMENFELD:**  I'll see if there's anything else I

1  want to add.

2      (Pause in the proceedings.)

3      **THE COURT:**  So in the Plaintiffs' reply brief -- let

4  me just pull that up -- in Footnote 1, they cite a whole lot of

5  cases that they say are class certification orders where the

6  named plaintiff only invested in a portion of the funds

7  challenged, but challenge the defendant's conduct in managing

8  all of the funds.

9      So is it your position that all of those cases are wrongly

10  decided?  Or is it your position that they don't say what the

11  Plaintiffs say?  Or what's -- what -- I mean, there's, what --

12  one, two, three, four, five, six, seven, eight, nine -- at

13  least nine cases in that footnote all across the country.

14      **MR. BLUMENFELD:**  So a few observations, Your Honor.

15  First, a number of those cases are from the Second Circuit; and

16  as I said, the Second Circuit just has a different

17  constitutional standing law on this question.  Some of them are

18  from the Ninth Circuit, which, again, has some different case

19  law on that question that does not follow the *David versus*

20  *Alphin* analysis and --

21      **THE COURT:**  In your brief, did you talk about *David*

22  *versus Alphin* and constitutional standing?  I just didn't

23  realize that.

24      **MR. BLUMENFELD:**  We talked about the district court

25  opinion in *David versus Alphin* in that case, and Plaintiffs

1  came back in their reply and said that *David versus* -- excuse
2  me -- that they have standing to bring this claim because
3  they're seeking losses to the Plan, it's a Plan-wide injury, et
4  cetera; and that's the argument that *David versus Alphin*, a
5  Fourth Circuit opinion, squarely addressed.
6      **THE COURT:**  Okay.  All right.  I just -- if I missed
7  it in your brief, I was about to feel very silly but --
8      **MR. BLUMENFELD:**  You didn't miss anything, Your Honor.
9  We talked about the district court opinion more.
10     **THE COURT:**  All right.  I'm sorry I interrupted you.
11 Go ahead --
12     **MR. BLUMENFELD:**  Not at all.
13     **THE COURT:**  -- with your argument about their --
14     **MR. BLUMENFELD:**  Some of the other cases deal with
15 some of the issues that counsel was talking about; that is,
16 they can deal with excessive fee issues, where it may be that
17 everybody in the plan was paying excessive fees and therefore
18 everybody in the plan would have constitutional standing to
19 assert that claim.  And in that context, that's a different
20 analysis than the underperformance or investment claims.
21     **THE COURT:**  But we have excessive fee arguments and
22 claims in this case.
23     **MR. BLUMENFELD:**  We do.
24     **THE COURT:**  That's where we go back to what you said
25 about there were 82 plans that didn't charge any fees.

1    **MR. BLUMENFELD:**  Correct.  So there are a few elements

2  to this, Your Honor.

3         **THE COURT:**  Or 82 funds.

4         **MR. BLUMENFELD:**  82 funds, yes, Your Honor.

5     And with the Court's permission, I'll turn now to that sort

6  of recordkeeping allegation or excessive fee allegation from a

7  few levels.

8     First, as you heard here today, Plaintiffs' position is

9  they had four record-keepers and they should have reduced it to

10  one record-keeper.  First of all, that's not a claim that is

11  present in any of the other cases, aside from the *NYU* decision

12  where this sort of issue was raised.

13         **THE COURT:**  Where what?

14         **MR. BLUMENFELD:**  Where this sort of issue was raised.

15         **THE COURT:**  Where the plaintiffs -- the class was

16  certified, right?

17         **MR. BLUMENFELD:**  In the *NYU* case.

18         **THE COURT:**  Yes.

19         **MR. BLUMENFELD:**  It was.  And as I said, the *NYU* class

20  was certified.  It focuses on plan-wide injuries because that's

21  the nature of the law in the Second Circuit.  That *Long Island*

22  *Head Start* case just reaches a different conclusion than the

23  Fourth Circuit in *David versus Alphin*.

24         **THE COURT:**  Okay.

25         **MR. BLUMENFELD:**  Now, going from -- the idea in those

1  other cases is everybody has the same record-keeper and

2  Plaintiffs weren't challenging who that record-keeper should be

3  or how many record-keepers there should be.  It was a function

4  of how much are you paying in fees.  And I don't know, frankly,

5  if in all of those cases -- actually, I do know in many of

6  those cases there wasn't a constitutional standing challenge to

7  be able to assert those kinds of claims with respect to the

8  recordkeeping fees.

9      But what I can say is when you look at the circumstance

10  here, you have 82 funds that didn't pay anything for

11  recordkeeping fees and you have no evidence that the named

12  Plaintiffs actually paid more than even $30, the fee that

13  Plaintiffs say would be a reasonable and appropriate fee.

14  Maybe somebody has a complaint about excessive recordkeeping

15  fees if that person paid an excessive recordkeeping fee, but

16  Plaintiffs bear the burden of proof in Rule 23 context, and

17  they have no proof at all that these Plaintiffs paid more than

18  what they're saying a reasonable fee should be under that

19  circumstance.

20      And this case also is different from a conflicts

21  perspective than many of those other cases, putting aside the

22  constitutional standing inquiry, because saying you should have

23  gone to one record-keeper and saying that that record-keeper

24  should have been Vanguard or TIAA or Fidelity or --

25          **THE COURT:**  That's just one of their arguments.  I

1  mean -- you know, they have lots of -- they have lots of
2  arguments that I heard at least today and that I saw in the
3  complaint.  I mean, that's just one.
4       **MR. BLUMENFELD:**  Well, but it's a big part of their
5  allegation because when they talk about the cost savings that
6  they talked about, that was in the context of you should have
7  gotten the bargaining power from going from four record-keepers
8  down to one record-keeper.  That issue in and of itself creates
9  conflicts because, as we heard from the named Plaintiffs, they
10  like the availability of the different record-keepers.  They
11  like the record-keepers that they selected.  So, for example --
12       **THE COURT:**  So just let me ask you.
13       **MR. BLUMENFELD:**  Sure.
14       **THE COURT:**  You cite the testimony of one of the named
15  Plaintiffs who says, "Probably if we win, some people are going
16  to be unhappy," and that's evidence of a conflict.  So I'm
17  unaware of any case or statute that says that an ERISA
18  fiduciary has a duty to make every single plan participant
19  happy and I doubt that that is actually your position, right?
20       **MR. BLUMENFELD:**  That's true, Your Honor.
21       **THE COURT:**  Okay.  And I wonder even if an individual
22  plaintiff's personal opinion is even -- I don't know.  We can
23  talk about this down the road if the case goes forward -- is
24  even admissible about that.  I mean, what difference does it
25  make whether anybody is happy or not?  I was actually a little

1  offended by that argument.  It -- you don't have any duty to

2  make people happy.  You have a duty to offer prudent investment

3  options -- I'm not going to state the duty correctly here.

4  But, you know, the fact that you have an unhappy plan

5  participant is hardly material, right?

6         **MR. BLUMENFELD:**  So, Your Honor --

7         **THE COURT:**  I mean, that doesn't establish a legal

8  conflict.  That just establishes life.  Everybody is unhappy

9  all the time or everybody is unhappy some of the time.  Let me

10 say that again.

11        **MR. BLUMENFELD:**  Hopefully not.

12        **THE COURT:**  I mean --

13        **MR. BLUMENFELD:**  So let me address that in multiple

14 parts and I apologize if our argument was not clear.  Of course

15 fiduciaries have to make decisions all the time that are going

16 to benefit some plan participants and hurt other participants

17 or make some participants happy and other participants unhappy.

18 That is the burden and responsibility and discretion that

19 fiduciaries of a pension plan have.

20        **THE COURT:**  Exactly.

21        **MR. BLUMENFELD:**  But we're talking about --

22        **THE COURT:**  So why does the fact that somebody is

23 going to be unhappy one way or the other even matter?

24        **MR. BLUMENFELD:**  Because the obligations that my

25 clients, the fiduciaries, may have is different than the

1  obligations that class representatives and class counsel have.

2  They don't have the ability and discretion to decide among

3  different groups of class members who they're going to make

4  happy and who they're going to make unhappy.  They are supposed

5  to represent the best interests of the class.

6          **THE COURT:**  Exactly.

7          **MR. BLUMENFELD:**  And if there are conflicts because

8  some class members like one record-keeper as opposed to another

9  or, for example, if there are some --

10          **THE COURT:**  I don't understand how that is a conflict.

11  I mean a legal conflict.  That's just a personal opinion kind

12  of thing.

13          **MR. BLUMENFELD:**  It is the arguments that class

14  counsel will be advancing on behalf of the named Plaintiffs and

15  they have an obligation when they're advancing those arguments

16  to be looking out for all of the members of the class.

17          **THE COURT:**  Exactly so.  But that's a legal obligation

18  about breach of fiduciary duty, not who's happy and who's

19  unhappy.

20          **MR. BLUMENFELD:**  No, but it's about their obligations

21  to advance arguments that they could make some class members

22  worse off or some class members better off.

23          **THE COURT:**  I'm talking about being happy.

24          **MR. BLUMENFELD:**  Well, so let's take it a little bit

25  outside of that construct because I don't think that the

1  testimony was solely in the sense of they might be disappointed

2  and go, "Aw-shucks."

3       **THE COURT:**  Well, your argument is that if you make

4  some class members unhappy, then there's a conflict and I --

5  that's what I -- you argued in your brief; and if that is not

6  your argument, I would like you to disclaim that now; and if it

7  is your argument, I would like you to explain it to me.

8       **MR. BLUMENFELD:**  I'll make it more substantive.  Two

9  of the record-keepers in this Plan offered loans to Plan

10 participants and two did not.

11     So you have Mr. Mehen, for example, who started out

12 investing in the S&P 500 Vanguard Index Fund through Vanguard

13 as the record-keeper, but he decided because of his personal

14 circumstances he wanted to take advantage of the fact that

15 there was a loan feature available not from Vanguard, so he

16 switched his money to VALIC and invested in the same investment

17 option just through VALIC so he could take advantage of that

18 loan.

19     If you switch -- if class counsel advocate that they should

20 have gotten rid of VALIC as a record-keeper, then that means

21 that in the future, for example, Plan participants won't have

22 the ability to take advantage of that loan feature.

23      **THE COURT:**  Okay.  So your argument there is -- I

24 mean, that's a merits argument.  Either it breaches the

25 fiduciary duty to not have a loan feature or it doesn't.  I

1  mean, your argument is, "We -- we didn't breach because we were

2  offering this and that is -- that's not a breach of fiduciary

3  duty."  Their argument is, "Yes, it is because of the excessive

4  fees associated with that."  I don't understand how that is not

5  just a merits problem.

6          **MR. BLUMENFELD:**  It's both, Your Honor, because for

7  them to advance the argument, for example, that we should have

8  gotten rid of the loan program will be --

9          **THE COURT:**  That's not their argument.

10         **MR. BLUMENFELD:**  Well, but it's a necessary

11 consequence to their argument that "you should have eliminated

12 two of the record-keepers or three," excuse me, "of the

13 record-keepers and just had a single record-keeper because some

14 of the record-keepers didn't offer that loan program."  So

15 they're being forced to advocate for a position and this case,

16 as they suggested a little while ago, includes at least some

17 elements of prospective relief.  What they're saying and the

18 basis for their claimed damages is, for example, "You should

19 have gone to one record-keeper and the cheapest one would have

20 been," I'll say one of the four, "Vanguard."

21         **THE COURT:**  No plan participant has a right to a plan

22 that violates the fiduciary's duty.

23         **MR. BLUMENFELD:**  That's true.

24         **THE COURT:**  So --

25         **MR. BLUMENFELD:**  And every class counsel has an

1 | obligation to look out for the interests of the different class
2 | members.

3 |        **THE COURT:**  Exactly.

4 |        **MR. BLUMENFELD:**  And if part of the interests of some
5 | class members is in having, for example, the availability of a
6 | loan program, then it is incumbent upon class counsel not to
7 | advance arguments to the detriment of that group.  That's the
8 | nature of the conflicts.

9 |     You could always say in every case that class
10 | representatives are just trying to maximize the money and
11 | that's essentially what he said, right, the more money the
12 | better.  Of course, everybody has an interest in more money and
13 | nobody at least would be -- have a conflicted interest in
14 | having more money, but -- but when there is a conflict of
15 | interest not just in terms of what the ultimate outcome is but
16 | the arguments that class counsel has to advance to get there,
17 | that's the very sort of conflict among different groups.

18 |     For example, the loan program may cost the Plan money and
19 | so there may be class representatives who didn't take advantage
20 | of those loans who would prefer that the Plan never have
21 | offered a loan program.  And, yes, there's a merits question
22 | about whether it's worth spending the money on the loan program
23 | from my client's perspective, from the fiduciary's perspective;
24 | but there's a conflict problem if they're being put in a
25 | position to advocate for something that gets rid of the loan

1  program that many class members liked and preferred.

2      And there are also other services that are offered with

3  these four different record-keepers -- different services among

4  the four record-keepers; and -- and there are preferences that

5  people have with respect to how their funds get managed.  Those

6  issues as well are additional conflicts when you're going not

7  just from, "You picked your record-keeper and paid him X and

8  you should have paid your record-keeper Y," because there the

9  services are not at issue.

10     But the more basic question of -- this Plan shouldn't have,

11 for example, offered participants the choices that were

12 offered.  "You shouldn't have given participants 400 different

13 investment options to choose from."  Well, some participants

14 like some of the investment options and others like others.

15 And the same with the record-keepers.  You shouldn't have

16 allowed participants the choice --

17         **THE COURT:**  Well, but that's not enough to win.  You

18 can't just come in here and say, "You offered them 400 and you

19 shouldn't have offered 400."  That's not enough to show a

20 breach of fiduciary duty.

21         **MR. BLUMENFELD:**  I would agree.

22         **THE COURT:**  You have to show more than that.  You have

23 to show by choosing to offer 400 plans and fail -- I don't know

24 what all they have to show.  We haven't gotten to summary

25 judgment, so I don't know.  I feel sure that just that fact

1    alone -- I feel sure.  Maybe the Plaintiffs will persuade me

2    otherwise at some point, but it doesn't seem likely that that

3    fact alone is enough.  So I'm just having trouble with your

4    conflicts argument here because if it's a breach of fiduciary

5    duty, then there's no conflict; and if it's not a breach of

6    fiduciary, then you win.

7         **MR. BLUMENFELD:**  But this is not about just the

8    end-game.  This is about the arguments that class counsel is

9    going to make.  For example, when it comes to evaluating the

10   performance of an investment option, some plan participants are

11   going to be, I'll put in quotes, better off; that is, they

12   would have higher damages if the comparison for performance

13   purposes was the Vanguard S&P 500 Fund over a three-year time

14   period.  Other plan participants might be better off, that is,

15   might have higher claims damages, if the comparison was a

16   different investment option over a different time period.

17         **THE COURT:**  The damages are to the Plan, right?

18         **MR. BLUMENFELD:**  Well, in the aggregate, yes, but --

19         **THE COURT:**  And that's what they're seeking.  They're

20   not coming in here -- I mean, I asked him a lot of questions

21   about this because I was concerned -- I actually read your

22   brief and I heard your arguments here.  So you are rebutting an

23   argument that they are not making, which is what happened in

24   the *Sims* case as well.  So -- so help me understand why you are

25   not rebutting -- how you are rebutting a claim that they are

1    actually making, as opposed to a claim that they're not making.

2         **MR. BLUMENFELD:**  At the end of counsel's remarks, he

3    said, "And, yes, the most likely" -- I think is how he put

4    it -- "is that it would be distributed to those people who were

5    harmed by that particular investment or that particular

6    circumstance."

7         And that brings you right back into the very conflict

8    situation and you can't avoid the conflict by saying, "Sorry,

9    we're throwing up our hands.  We're not going to address the

10   question."  Much like counsel was saying, "We're not saying

11   that you need to actually have negotiated to pay fees on a

12   per-participant basis.  You could also do it on an asset

13   basis."  Because what they're doing is essentially running away

14   from a conflict that their own legal theories have created.  So

15   you -- I lost you.

16        **THE COURT:**  Yeah, I'm not following.

17        **MR. BLUMENFELD:**  Okay.  Your Honor, if you think about

18   the recordkeeping fee, for example, Plaintiffs in their

19   complaint say we should have switched to one record-keeper and

20   we should have negotiated a per-participant charge for

21   recordkeeping fees.  And then we pointed out that if you

22   negotiate a per-participant fee for recordkeeping fees, that

23   puts some Plan participants better off, those with higher

24   account balances, and those participants with smaller account

25   balances are worse off, to which counsel's response was, "Well,

1  no, no, no.  You don't have to do it that way.  You could do it

2  on an asset basis."

3      But even making the argument that it should be done on an

4  asset basis is just the reverse of that conflict.  That is to

5  the benefit of participants with smaller account balances and

6  to the detriment of Plan participants with the higher account

7  balances if you do it on an asset basis.

8      And fiduciaries, like I said, they have to make those

9  judgment calls all the time because their situation is such

10 that they have to decide among conflicting interests, but class

11 counsel don't get to do that and class representatives under

12 Rule 23 don't get to do that.  They have to represent

13 individuals who have the same interests, who are absent of any

14 conflict of interest, and that -- a perfect example of that is

15 those participants which, by the way, could include these named

16 Plaintiffs who didn't invest in any of the -- who -- excuse me,

17 who only invested in the 82 funds that didn't pay any

18 recordkeeping fees.  And, again, the Plaintiffs presented no

19 evidence as to what recordkeeping fees they paid.

20         **THE COURT:**  Well, I appreciate that part of your

21 argument.  I'll have them address that part.

22        **MR. BLUMENFELD:**  I would, Your Honor, like to address

23 your question about the "actual knowledge" statute of

24 limitations as well --

25         **THE COURT:**  Uh-huh.

1          **MR. BLUMENFELD:**  -- with one point of clarification,

2   which is obviously the statute of limitations -- the "actual

3   knowledge" statute of limitations would only apply to more than

4   three years prior to the filing of the complaint.  So it

5   doesn't say anything about what people knew or didn't know

6   during the three years immediately preceding the filing of the

7   complaint.

8          **THE COURT:**  Yes.

9          **MR. BLUMENFELD:**  But I think you're absolutely right,

10  Your Honor.  If it's an individualized inquiry and the common

11  documents that we provided to Plan participants are not

12  sufficient, which they've already said and it doesn't surprise

13  me that they've said that, then we certainly are entitled to

14  discovery from absent class members about their actual

15  knowledge.

16         **THE COURT:**  I didn't say you were entitled.  I said

17  you would seek.

18         **MR. BLUMENFELD:**  Seek.

19         **THE COURT:**  Yes, yes.

20         **MR. BLUMENFELD:**  I didn't mean to extend my remarks to

21  the Court.

22         **THE COURT:**  Yes, I understand.

23         **MR. BLUMENFELD:**  And -- and --

24         **THE COURT:**  So how does that work, I mean from your

25  perspective, because from your perspective -- I'm still trying

1   to figure out this damages to the Plan versus individual

2   damages because it is -- I mean, don't you agreed the Plaintiff

3   is correct it is damages to the Plan?  That appears to be so,

4   right?

5           **MR. BLUMENFELD:**  Yes, but.  And the "yes, but" is a

6   reference to the Supreme Court's decision in *LaRue versus*

7   *DeWolff*.  In the *LaRue* case, the Supreme Court was faced with

8   the hypothetical that you were proposing to counsel, which is

9   an individual participant suing essentially just over what

10  happened to his own account, not to the whole plan; and the

11  Supreme Court said that participant's claim can go forward and,

12  yes, it's on behalf of a plan, but it's on behalf of that

13  participant's account in the plan.  And that's the way this

14  issue would shake out in that context.

15          **THE COURT:**  But that's not what we have here.

16          **MR. BLUMENFELD:**  Well, no, it is, Your Honor.  It is

17  exactly what we have here.  If this proceeds as a class action,

18  then we would be entitled to take discovery from each class

19  member about what they actually knew because that would have a

20  bearing on that participant's own account.

21          **THE COURT:**  Okay.  But that's not the Plaintiffs'

22  theory of loss to the Plan in this case.

23          **MR. BLUMENFELD:**  Well, I -- they haven't provided any

24  damages calculations or anything along those lines, so I don't

25  know what their theory is for damages.  I -- I take some

1 comfort in understanding that the only claims of
2 underperformance that are being asserted and I presume,
3 therefore, the only claims of underperformance damages are
4 going to be associated with the CREF Stock Account and the TIAA
5 Real Estate Account. But that still doesn't answer the
6 question, I guess, of how they're going to try and claim
7 damages.

8     What I know is that if we can demonstrate that somebody had
9 actual knowledge about their -- the claims more than three
10 years before the lawsuit was filed -- for example, if we can
11 demonstrate that they knew some of the information that's in
12 the complaint about the CREF Stock Account or the TIAA Real
13 Estate Account -- then that should be sufficient to bar that
14 class member's claims and bar any claims with respect to that
15 class member's account or investments.

16     **THE COURT:** But how would it work about the excessive
17 fees?

18     **MR. BLUMENFELD:** Well, so I don't know on whose behalf
19 that claim is being asserted and we don't know who allegedly
20 paid the excessive fees, if even any of the named Plaintiffs
21 did; but what we could do, I guess, is understand what each
22 Plan participant knew about what their fees were and take
23 discovery about if they believed there was some lower fee that
24 could have been paid or should have been paid and address it in
25 that context.

1    We know, for example, that Mr. Mehen, putting aside

2  Plan-wide communications, was very focused on fees.  That's why

3  he selected the Vanguard S&P 500 Investment Fund as his

4  investment choice and so we have information about his

5  knowledge regarding fees in that context.

6    We also know, of course, what the fees were for all the

7  other investment options from the more general communications;

8  but as you saw no doubt from the *BB&T* case and as we saw here,

9  not everyone reads those communications; and some people

10 understand it better than others; and some people have more

11 knowledge because they talk to their ex-wife, like one of the

12 named Plaintiffs did here, which is why he selected the

13 Fidelity investment options; or because they're a professor and

14 they research these issues as part of their profession and have

15 a very good understanding about fees and the reasonableness of

16 fees.

17    Frankly, some of the cases that counsel was talking

18 about --

19    **THE COURT:**  Okay.  So your position is that even --

20 let's just imagine -- I don't know that this is true.  I'm just

21 imagining.  Let's imagine that one of the named Plaintiffs paid

22 all of these excessive fees or at least paid some of them and

23 that -- and didn't know, okay, and you lose at trial on the

24 documents providing enough information to give actual knowledge

25 and you lose at trial on any individual knowledge that he has,

1  but you're -- it's not a jury trial, right?

2         **MR. BLUMENFELD:**  We would say so, Your Honor.

3  Plaintiffs have a jury demand right now and have not agreed to

4  withdraw it as of yet.

5         **THE COURT:**  I think -- which case did I throw out the

6  jury?  Was it *Sims*?

7         **MR. BLUMENFELD:**  It was.

8         **THE COURT:**  Okay.  Well, in any event, put -- whoever

9  the fact finder is says no statute of limitations defense

10 applies based on the documents provided by the Defendant and

11 the actual named Plaintiff did not have actual knowledge

12 otherwise, just imagine that, and they win, you know, however

13 much they win for the class, for the Plan.

14     Why then does it matter what other class members might or

15 might not have known because the Court is not then responsible,

16 as I understand it from the Plaintiffs' argument -- and you can

17 correct me if you have a different view -- the Plan is

18 responsible for distributing the damages and deciding what to

19 do with them, not the Court, not the fact finder.  So why would

20 you need all of those individual minitrials?

21        **MR. BLUMENFELD:**  I would say, Your Honor, because I

22 think your Step 1 can't happen with respect to the Plan-wide

23 damages without engaging in discovery from every member of the

24 class and to do so would essentially turn Rule 23 on its head.

25 To say --

1    **THE COURT:**  So let me see if I understand what you're

2  saying about that.

3        **MR. BLUMENFELD:**  Sure.

4    **THE COURT:**  You are saying that before the class can

5  recover a nickel, every single class member must not be barred

6  by the statute of limitations?  The three to six I'm talking

7  about, because I heard what you said.

8        **MR. BLUMENFELD:**  Yes.

9    **THE COURT:**  But before you could recover damages that

10  occurred more than three years ago and less than six years ago,

11  every single class member?  So I might not have had actual

12  knowledge, but I cannot recover anything and the class cannot

13  recover anything because some other person that I'm not

14  responsible for knew?

15        **MR. BLUMENFELD:**  No, no.

16        **THE COURT:**  No.  Okay.

17        **MR. BLUMENFELD:**  What I would say, Your Honor, is

18  that's an individualized inquiry and so if -- if a named

19  Plaintiff can prevail on that theory because you find that that

20  named Plaintiff didn't have actual knowledge, then the Plan can

21  recover losses to that named Plaintiff's account, but you can't

22  use Rule 23 to say that as long as one named Plaintiff has a

23  timely cause of action the whole Plan can recover.

24        **THE COURT:**  Okay.  So that -- well that's a

25  substantive claim.  That's a Rule 12(b)(6) summary judgment

1 kind of argument, directed verdict kind of argument, right?  I

2 mean, that -- you are talking to me about the merits there.

3 You are saying that damages are limited in ERISA claims to the

4 individual class representative's damages, right?

5       **MR. BLUMENFELD:**  If a class is certified under Rule

6 23, then they can recover on behalf of a class.

7       **THE COURT:**  Yes.  But you're saying that the damages

8 theory and evidence has to be based on what individuals lost.

9 That's what you're saying to me, right?

10       **MR. BLUMENFELD:**  Correct, Your Honor, at least what --

11       **THE COURT:**  And what I heard the Defendants -- the

12 Plaintiffs say when he was -- because I asked him about this.

13 I mean, I read your briefs.  That's not what they're going to

14 try to prove, at least as to the excessive fees.

15       **MR. BLUMENFELD:**  Of course not.

16       **THE COURT:**  So you're going to be arguing at summary

17 judgment that that is insufficient as a matter of law and the

18 case ought to be dismissed because there's no damages because

19 the method they choose to prove damages is insufficient, it can

20 only be driven by individual losses; is that right?

21       **MR. BLUMENFELD:**  I would say losses to individual

22 participant's accounts.  And what I would say about that, Your

23 Honor, is -- what counsel argued was that in a Rule 23 context

24 only the named Plaintiffs' knowledge actually matters and that

25 can't be the case.  It can't be that Rule 23 all of a sudden

1  eliminates the substantive affirmative defense of actual
2  knowledge that we would have as to all of the 40,000 members of
3  the class and what they actually knew about their claims.

4      And that's the same sort of argument they're making about
5  statutory standing versus constitutional standing, right.
6  They're trying to use essentially Rule 23 in the same way
7  they're trying to use the statute; that is, to circumvent the
8  constitutional standing inquiry that necessarily is precedent
9  to that and to say that they can recover, they were right.
10 Then this could just be David Clark against the Duke University
11 Plan and it wouldn't matter if this was brought as a putative
12 class action or whether the Court certified this case as a
13 class action or not because they could bring the claim on
14 behalf of the Plan as a whole.

15      **THE COURT:** Well, that's what they say and that's why
16 they -- I mean, they make exactly that argument and that's why
17 they say -- I mean, I don't disagree with what you're saying.
18 That's exactly their argument.

19      **MR. BLUMENFELD:** And what I -- my response to that,
20 Your Honor, is that can't be the case.  It can't be that David
21 Clark can come into court and sue over the CREF Stock Account
22 or the TIAA Real Estate Account that he never invested in or to
23 complain about excessive fees when we have no idea what fees,
24 if any, he paid or how much they were or whether he personally
25 was responsible for any excessive fees or suffered any personal

1  constitutional injury as a result of that, which presumably

2  will be based on comparing how much he paid in fees to what

3  they say a reasonable fee would be, at least for purposes of

4  the initial stages of the case.

5          **THE COURT:**  All right.  Well, those are two different

6  things.  I mean, the -- we've got the individual

7  underperforming and the excessive -- I mean, as I said to him,

8  right, you've got to look at them -- they're not the same claim

9  --

10          **MR. BLUMENFELD:**  I agree.

11          **THE COURT:**  -- and you have to look at them -- they

12  raise different issues in connection with the problems that

13  you're raising it seems to me.

14          **MR. BLUMENFELD:**  They both raise issues, but I would

15  agree, Your Honor, they raise different issues in that context.

16          **THE COURT:**  Okay.  Go ahead.

17          **MR. BLUMENFELD:**  Bear with me one moment, Your Honor.

18      (Pause in the proceedings.)

19          **THE COURT:**  So can I -- I just want to repeat to be

20  sure I understand exactly what you're saying.  It is your

21  position that there is no such thing as general damages to the

22  Plan.  The only kinds of damages to the Plan flow from injury

23  to a specific Plan participant's account.  Is that what you're

24  saying?

25          **MR. BLUMENFELD:**  In the context of a defined

1    contribution plan, I think that's the necessary (inaudible).

2        **COURT REPORTER:**  I'm sorry.  You're going to need to

3    repeat that.

4        **THE COURT:**  You may also need to also back up to the

5    microphone.

6        **MR. BLUMENFELD:**  I'm sorry.  I'm used to being at the

7    podium.

8        **THE COURT:**  Well, next time just tell the clerk you

9    want the podium and we'll put it up there with the mike.

10       **MR. BLUMENFELD:**  Thank you, Your Honor.  My

11   apologizes.

12       **THE COURT:**  That's all right.  It's not you-all's

13   fault or ours.  It just, you know, didn't happen this time.

14       **MR. BLUMENFELD:**  Sure.  So I think, Your Honor, that's

15   the necessary conclusion from the Supreme Court's decision in

16   the *LaRue* case where it authorized a plan participant to sue

17   for losses to that participant's account combined with the

18   constitutional standing inquiry.

19      It can't be that Congress intended and allowed a plan

20   participant to go into court -- we shouldn't even be here

21   litigating class certification if David Clark, in and of his

22   own right, could sue for losses to the entire Plan having

23   nothing to do with any of his investments, having nothing to do

24   with the impact on his personal retirement benefits.

25       **THE COURT:**  But if it did have some impact on his

1 account, then --

2      **MR. BLUMENFELD:**  He could recover for the losses to

3 his account.

4      **THE COURT:**  But -- okay.  But he -- you're saying

5 there's no such thing or no valid theory or theory of

6 calculating losses to the Plan other than evidence directed to

7 how the alleged breach of fiduciary duty affected individual

8 Plan participants.

9      **MR. BLUMENFELD:**  I would say further, Your Honor --

10      **THE COURT:**  Wait.  Are you saying that?

11      **MR. BLUMENFELD:**  I believe so, Your Honor, yes.

12      **THE COURT:**  Yes.  And then further you would say?

13      **MR. BLUMENFELD:**  That paragraph -- I want to make sure

14 I have it right.  Paragraph 35 of the second amended complaint

15 makes it clear that their retirement benefits are based on

16 their own individual investment accounts.  And that's true in a

17 defined contribution plan and that's why you can only bring

18 suit, absent a class action on behalf of all of the

19 participants in the Plan, on behalf of the losses to your own

20 individual account.

21      **THE COURT:**  But even in a class action, you contend

22 that the only relevant evidence of loss -- or what we would

23 normally call damages but loss -- is loss to individual plans.

24 Is that what you're saying?  Even in a class action.  Let's

25 imagine I certify the class and we get to summary judgment or

1 | trial and they only offer this kind of evidence that Mr. Soyars
2 | told me about when he was arguing, which is not necessarily
3 | directed at individual accounts.  You would be saying, "You
4 | haven't proved your damages.  You haven't proved your loss."
5 | Is that right?

6 | **MR. BLUMENFELD:**  So, Your Honor, I guess what I would
7 | say about that is I don't know what -- what evidence they're
8 | going to submit in opposition to summary judgment or how
9 | they're going to try and calculate damages or what damages, if
10 | any, they're going to assert over the different time periods.
11 | So I don't know what our response to that would be without
12 | seeing what their claimed damages are going to be.

13 | **THE COURT:**  Okay.  But you heard him tell me earlier
14 | what they anticipate, so if that were what they offered -- I
15 | mean -- because what I hear you saying is you can't just say --
16 | you can't look at it globally.  You have to look at it
17 | individually.

18 | **MR. BLUMENFELD:**  Well, I guess what I don't have a
19 | good understanding of right now, Your Honor, is how the global
20 | would be different from the individual when it comes to looking
21 | at damages on behalf of the entire class.  I can understand it
22 | when we're talking about David Clark in his own right, but if
23 | there's a class that is all Plan participants, I don't know
24 | what the difference would be between the aggregation of those
25 | accounts and the totals that class counsel would be advocating

1  for to be able to say that makes sense to me or doesn't make

2  sense to me and it's sufficient under the statute or

3  insufficient under the statute and also, frankly, sufficient or

4  insufficient under Article III to be able to press that.

5          **THE COURT:**  Okay.  Go ahead.

6          **MR. BLUMENFELD:**  We talked, Your Honor, a couple of

7  times about the 82 investment options that paid no

8  administrative fees.  Just as a point related to that in the

9  absence of any evidence, it's not just those 82 funds because

10 there are lots of other funds that paid some amount of revenue

11 sharing for recordkeeping, but relatively small amounts, such

12 that those participants may have paid substantially less than

13 what class counsel are saying would be a reasonable

14 recordkeeping fee; and those individuals, which could include

15 these named Plaintiffs, again, may not have hit the injury even

16 that they're contending Plan participants suffered as a result.

17         **THE COURT:**  I'm not trying to cut you off.

18         **MR. BLUMENFELD:**  I appreciate that, Your Honor.

19 Unless the Court has other questions for me, if I could just

20 have one moment to confer with counsel.

21         **THE COURT:**  How about if we take a short break?

22         **MR. BLUMENFELD:**  Of course.

23         **THE COURT:**  And then if there's anything you want to

24 add to conclude and then we'll hear the rebuttal.  Let's take a

25 10-minute recess.

1     (A morning recess was taken from 11:12 a.m. until

2 11:27 a.m., all parties present

3           **THE COURT:** Okay. Go ahead.

4           **MR. BLUMENFELD:** Just a few more remarks. The first

5 is I wanted to take a step back and explain how revenue sharing

6 for recordkeeping fees works because I think it helps fit into

7 the arguments that we've been talking about today.

8     The recordkeeping fees through revenue sharing -- and you

9 may have come across this in the context of the *BB&T* case as

10 well -- essentially the way that works is each fund has an

11 expense ratio, and that is disclosed to plan participants, and

12 they choose from among the funds and decide whether they want

13 to pay for that fund with that expense ratio or something else;

14 and then from that expense ratio, the mutual fund company can

15 decide, if it wants to and if it negotiates with the

16 record-keepers, to pay some of that fee in turn to the

17 recordkeeping entity. So if you invest in Fund X, that fund

18 may say that their expense ratio is 40 basis points; and of

19 that 40 basis points, they may decide that they're going to

20 give 10 of that to the record-keeper. When plaintiffs

21 calculate what they think the total recordkeeping fee is,

22 they're just aggregating all of those different percentages

23 from the different investment options.

24     And the reason that's important, Your Honor, for the class

25 certification analysis is because it ties into the issues we've

1  been talking about about constitutional standing and inquiry

2  because it's not like all Plan participants are paying one

3  recordkeeping fee.  Counsel was careful I think in referring to

4  what he believed the average recordkeeping fee to be of $280 a

5  person, but the average, while it may be a useful data point,

6  is not what individual class members paid or were subjected to.

7      And it's also true, because it has to be in the context of

8  a revenue sharing model like this, that Plan participants have

9  a lot of control of how much they pay the record-keeper because

10  they could decide, for example, to invest in that investment

11  option that pays 40 basis points and has 10 for recordkeeping

12  or they could decide to invest in one of the 82 funds that

13  didn't pay anything for recordkeeping.

14      **THE COURT:**  Let me just stop you right there.  I

15  appreciate what you're saying.

16      **MR. BLUMENFELD:**  Yep.

17      **THE COURT:**  The fact that Plan participants have some

18  control over what they choose does not remove the Plan's

19  fiduciary duties to manage, to not have funds that charge

20  excessive fees, to not include imprudent funds, right?

21      **MR. BLUMENFELD:**  I would agree, Your Honor.

22      **THE COURT:**  Okay.

23      **MR. BLUMENFELD:**  The fact that Plan participants have

24  those choices does not mean that the fiduciaries don't have

25  their responsibilities too.

1    **THE COURT:** Okay.

2    **MR. BLUMENFELD:** But it does affect who has been

3  harmed or injured in Plaintiffs' theory and the complaint

4  allegations versus who has not because which Plan participants

5  paid more than $30 of a recordkeeping fee versus which Plan

6  participants paid less or paid nothing are significant

7  inquiries. And as I have said a few times, you know, there

8  isn't even any evidence that the named Plaintiffs paid more

9  than $30.

10   **THE COURT:** So as you -- under your view of

11 constitutional standing and ERISA law, you can never, never

12 have a class action like the Plaintiffs are seeking here

13 because it would require so many named Plaintiffs --

14 practically never because you would never be able to have a

15 named Plaintiff for every, what did you say, 400 funds.

16   **MR. BLUMENFELD:** Yes.

17   **THE COURT:** You know, you would have to have, I don't

18 know, 400 plaintiffs arguably because under your view, you can

19 only certify a class of class members who are exactly alike.

20   **MR. BLUMENFELD:** I wouldn't say that they have to be

21 exactly alike, Your Honor, no.

22   **THE COURT:** Okay. Well, tell me how they don't have

23 to be exactly alike because as I hear your argument, they do

24 have to be exactly alike.

25   **MR. BLUMENFELD:** Well, for example, I think -- I guess

1  I would turn that question a little bit and say Plaintiffs can

2  seek certification of a class challenging the investment

3  options that they invested in and have constitutional standing

4  to assert.  So it's not that no class would possibly be

5  certified.  It's that the scope of any class needs to be

6  governed by Article III and the claims that these Plaintiffs

7  have.

8         **THE COURT:**  Right.  So the only members of the class

9  would be the people who invested in exactly the same thing that

10  the named Plaintiffs invested in because otherwise, under your

11  theory, there would be these conflicts of interest or -- I

12  mean, Defendant -- I don't mean to dismiss Defendants'

13  arguments, but defendants always have arguments against class

14  certification.  You know, I'm trying to figure out not -- you

15  know, what -- how would this actually work if you were right?

16  Because it seems like, if you are right, that a lot of the

17  statutory provisions of ERISA are unconstitutional under

18  constitutional -- you know, you cannot ever apply them because

19  you would never have constitutional standing.  They become

20  meaningless.

21         **MR. BLUMENFELD:**  What I would say, I guess, Your

22  Honor, is, like all statutes, ERISA is subject to Article III

23  of the Constitution and the Fourth Circuit in the *David versus*

24  *Alphin* case said representational standing on behalf of a plan

25  is not sufficient for Article III purposes.  And I have a copy

1  of the opinion and I know --

2      **THE COURT:**  No, I copied it or somebody copied it for

3  me at the break.

4      **MR. BLUMENFELD:**  And I think it addresses that issue

5  squarely.  So it's not that no ERISA class actions could ever

6  be certified and it's not that plaintiffs never have

7  constitutional standing to assert their claims, but it's like

8  everything else.  If you didn't invest in something, you don't

9  have constitutional standing to challenge that investment

10  option.

11      **THE COURT:**  But under your view, you could never have

12  the kind of class action that challenges the overall management

13  of the plan because -- unless you had -- and even if you have a

14  named plaintiff who invested in every single fund, your theory

15  is still that it wouldn't work the way the Plaintiffs are

16  saying in this case because you can't -- because it's not

17  damages to the Plan.  It's individual damages that go through

18  the Plan.

19      **MR. BLUMENFELD:**  So what I would say, Your Honor --

20      **THE COURT:**  I'm trying to understand.

21      **MR. BLUMENFELD:**  Understood.  And I think you're right

22  about the damages essentially going through the Plan, not to

23  the Plan in the context of a defined contribution plan where

24  each participant has his or her own account; but I don't think

25  that's a constitutional infirmity anywhere different than any

1  other statute where if you are not injured -- you don't have an

2  Article III injury that is real or imminent and redressable and

3  that there is causation, you don't have a cause of action to be

4  able to sue.  And the fact that other plan participants may

5  have been injured or the fact that, as Plaintiffs have alleged

6  here, the Plan has been injured, is irrelevant to your

7  constitutional standing to bring that claim.

8      That's exactly what the Fourth Circuit said in *David versus*

9  *Alphin* where the plaintiffs alleged that the plan suffered

10 millions of dollars in losses as a result of those investments

11 and the named plaintiffs were held to lack constitutional

12 standing to assert those claims.

13     **THE COURT:**  So under your view, you could never -- a

14 plaintiff could never recover damages or the plaintiff could

15 never sue on behalf of the plan for the plan to recover damages

16 to the plan if -- only in this failure to manage appropriately.

17 In your view, that always flows only from specific inclusion of

18 specific funds or not including specific -- I mean, I guess it

19 could come up in a number of ways, but it only happens

20 individually.

21     **MR. BLUMENFELD:**  I would say that's true in the

22 context of a defined contribution plan like this one, where the

23 injuries occur to each participant's account.  In the context

24 of a defined benefit plan where nobody has a particular

25 interest, but everybody shares in the overall interests of the

1  plan, the answer might be different.

2       **THE COURT:**  Okay.  So you can never in a defined

3  contribution plan have a general "failure to manage

4  appropriately" claim?

5       **MR. BLUMENFELD:**  What I would say about that, Your

6  Honor, is that's not a cause of action that exists.  There is

7  prudent behavior or imprudent behavior and what it boils down

8  to is the individual decisions that are made over time.  So

9  saying that there is an overarching failure to monitor or

10 failure to manage is really just an aggregation of a whole

11 bunch of different specific events that the Plaintiffs are

12 going to have to prove for a breach of fiduciary duty.

13      **THE COURT:**  Right.  But if they do prove it, you're

14 saying they still can't get any damages.

15      **MR. BLUMENFELD:**  They can get damages for those themes

16 or theories or items that they prove for which they have

17 constitutional standing to assert; that is, the specific

18 decision-making.  If, for example, on the recordkeeping fee, if

19 they want to say in the year 1999 -- excuse me -- in the

20 year 2009 or 2010 the Plan fiduciaries should have eliminated

21 VALIC as a record-keeper, that's an issue that they'll have to

22 present evidence on.  They can't just say, "Overall you failed

23 to manage the Plan and therefore we get damages for every

24 decision that was made or not made during that time period."

25 They have to go decision by decision to say that that decision

1  that you made was a breach of fiduciary duty.

2      And that ties very nicely, I think, to the constitutional

3  Article III requirement.  These Plaintiffs only have

4  constitutional standing to challenge those decisions that cause

5  them an injury, so for investment options that they invested in

6  or for a record-keeper that they utilized if they paid more

7  than what Plaintiffs allege is a reasonable recordkeeping fee

8  and therefore suffered an injury as a result.  I mean, if --

9          **THE COURT:**  Okay.  I guess I'm -- you know, going back

10  to the conflict argument that you made earlier, a decision is

11  either a breach of fiduciary duty or it's not and it's a breach

12  of fiduciary duty as to the entire Plan.  I mean, you cannot

13  breach the fiduciary duty to one Plan participant and have the

14  exact same conduct not be a breach as to another Plan

15  participant, right?

16          **MR. BLUMENFELD:**  If the question is in the context of

17  a Rule 23(b)(1) --

18          **THE COURT:**  No, I'm just saying the decision, whatever

19  the decision is --

20          **MR. BLUMENFELD:**  If the decision is a breach of

21  fiduciary duty to offer an investment option, for example, then

22  it is a breach of fiduciary duty.  I would say it's not subject

23  to perhaps an individual participant circumstance, but there

24  are certainly time elements and other things --

25          **THE COURT:**  I'm just trying to understand --

1        **MR. BLUMENFELD:**  Sure.

2        **THE COURT:**  -- because, you know, you're talking about

3   all the individual aspects of this; and as I listen to it, it

4   sounds like what you are saying is because people have

5   different interests, different goals, whatever, it could be a

6   breach as to one person, but not as to another person.  But you

7   are not saying that, correct?

8        **MR. BLUMENFELD:**  I am not.

9        **THE COURT:**  Okay.  And so given that -- I guess --

10       **MR. BLUMENFELD:**  What I'm saying, Your Honor, in that

11   aspect is that for them to advocate that something is a breach

12   of fiduciary duty when some participants find it a meaningful

13   benefit for them, that's a conflict.  It's not about our

14   conduct.  It's about the conflict in them advocating positions

15   that create conflicts among the different members of the class.

16       **THE COURT:**  Okay.  All right.  I might have

17   interrupted you.  I apologize.

18       **MR. BLUMENFELD:**  No, that's okay.  Two last things,

19   Your Honor.

20       First, what Plaintiffs are trying to characterize now in

21   this case is not that different from what the plaintiffs in the

22   *Dukes v. Wal-Mart* case were talking about.  They were alleging

23   that there was an overarching policy of discrimination and that

24   therefore that should suffice to certify a class.  And the

25   Supreme Court ultimately rejected that argument, and without

1  getting into what's dicta and what's a holding and what's a
2  statement by the United States Supreme Court, their argument
3  that there was an overarching policy of imprudence is the same
4  sort of analysis.

5      And what matters when it comes to the CREF Stock Account,
6  for example, or the Vanguard S&P 500 Index Fund is whether the
7  fiduciaries breached their fiduciary duty with respect to the
8  S&P 500 Vanguard Index Fund; and, frankly, the fact that they
9  breached or didn't breach their fiduciary duty with respect to
10 1 or 399 other investment options is not relevant to the
11 question of whether they breached their fiduciary duty with
12 respect to the Vanguard S&P 500.

13     **THE COURT:**  Well, that's inconsistent with what you've
14 been telling me about -- otherwise about how these plans work.
15 You have been saying to me you cannot look at one -- at the
16 inclusion of one plan in the abstract or by itself because --
17 you told me earlier it's very important to some plan
18 participants to include funds with loans even if their fees are
19 higher.

20     **MR. BLUMENFELD:**  That's certainly true, Your Honor.

21     **THE COURT:**  And so -- but that is not a decision you
22 examine all by itself.  You know, including -- whether you
23 include one thing or include another thing is a decision you
24 make in the context of managing the entire plan and offering
25 appropriate prudent funds with reasonable fees for people with

1  a variety of interests.

2     So -- I mean, I did not -- I understood you to be saying to

3  me earlier that when you -- you can't just look at one little

4  fund in the -- in isolation, whether the fees are excessive in

5  a fund that includes a loan feature, for example.  And so --

6  but now you're telling me you do look at it in isolation so...

7        **MR. BLUMENFELD:**  I think what I was at least trying to

8  communicate earlier, Your Honor, was that you can't just

9  consider the cost of an investment option or of a

10  record-keeper.  You have to consider the benefits that that

11  record-keeper offers in that context.

12        **THE COURT:**  Okay.

13        **MR. BLUMENFELD:**  But if Plaintiffs are going to

14  allege, for example, that a particular investment option, like

15  the Vanguard S&P 500 Index Fund, was a breach of fiduciary

16  duty, they have to prove that offering that investment option

17  was a breach of fiduciary duty, not that we engaged in other

18  fiduciary breaches with respect to the Plan.  Hopefully that's

19  a little more clear.

20        **THE COURT:**  Okay.

21        **MR. BLUMENFELD:**  The last thing that I --

22        **THE COURT:**  Well, I -- it still seems to me like

23  you're talking about something that they're not going to be

24  trying to do in exactly the way that you -- maybe I'm

25  misunderstanding the Plaintiffs' theory, but -- so that -- if

1  that's your view of what the law is when we get to summary

2  judgment, you're going to win, if you're right about the law.

3  I didn't mean to say you're going to win.

4         **MR. BLUMENFELD:**  I understand.

5         **THE COURT:**  I meant to say if you're right about the

6  law, then you're going to win on the whole thing, you know,

7  because that's not what they're trying to do.  But maybe I'm

8  misunderstanding what the Plaintiff is trying to do.

9         **MR. BLUMENFELD:**  I guess what I would say, Your Honor,

10 is I don't know exactly what they're going to try and do at

11 summary judgment.  I know at class certification they didn't

12 present any evidence and they presented the argument about --

13 and made clear at least that there are only two specific funds

14 whose performance they are challenging.

15        **THE COURT:**  Well, that's true, but that puts aside the

16 whole excessive fees.

17        **MR. BLUMENFELD:**  It does.

18        **THE COURT:**  You seem to be saying that as to those

19 excessive fees they still have -- they have to do it by

20 individual fund as well.  That's what I just understood you to

21 just be saying.  Is that not right?

22        **MR. BLUMENFELD:**  Well, it is, but that's because the

23 fees are being paid on a fund-by-fund basis.

24        **THE COURT:**  Okay.  So I understood you to be saying

25 that and I was correct.

1    **MR. BLUMENFELD:**  Yes.

2    **THE COURT:**  Okay.

3    **MR. BLUMENFELD:**  And the last thing I'll say, Your

4  Honor, is just I want to address counsel's comments about Rule

5  23(b)(1) and the example he used about if one Plaintiff were to

6  come in and say -- and prevail, that Plaintiff could prevail

7  and have the Plan be awarded -- in his example, I think he said

8  the first plaintiff could come in and say, "I got $10 million,"

9  or the Plan gets $10 million and injunctive relief to eliminate

10  a fund.  The second plaintiff comes in and loses, and it's not

11  found to be a fiduciary breach; and the third plaintiff comes

12  in and is awarded $5 million but no order ordering the removal

13  of that fund.

14    Putting aside we disagree with the premise of that, that

15  one plaintiff could come into court and get plan-wide damages

16  in that context, that is not a Rule 23(b)(1) certification for

17  two reasons.  One, the monetary relief that is ordered is never

18  an incompatible standard of conduct sufficient to justify Rule

19  23(b)(1) certification and the courts are very clear on that

20  point.

21    **THE COURT:**  But whether something is a breach of

22  fiduciary duty or not -- I mean, if one case says it is and

23  another case says it isn't...

24    **MR. BLUMENFELD:**  A declaration of that leading to

25  damages is not.  What could be, Your Honor, is an order

1  requiring the removal of a fund if the contrary order was not
2  you don't have to remove it, but you have to keep it in.  And
3  the courts and the treatises are very clear on that.
4  Incompatibility standards of conduct means that you're subject
5  to one court ordering you to do something and another court
6  ordering you affirmatively not to do that, as opposed to just
7  saying you don't have to do that if you don't want to.  And I
8  think Rule 23(b)(1) case law on that point is very clear and
9  Plaintiffs haven't demonstrated any chance of any incompatible
10  standards of conduct here that could justify a Rule 23(b)(1)
11  certification.

12          **THE COURT:**  So in the *Ortiz versus Fibreboard* case,
13  Supreme Court -- I didn't write the year down -- 527 U.S. 815,
14  the court says that classic examples of a case appropriate for
15  resolution under Rule 23(b)(1) include "actions charging 'a
16  breach of trust by...a fiduciary similarly affecting the
17  members of a large class' of beneficiaries, requiring an
18  accounting or similar procedure 'to restore the subject of the
19  trust.'"  And I -- that's what this is, I mean, using ERISA
20  language, but the courts -- that's what this is, isn't it?

21          **MR. BLUMENFELD:**  It certainly falls into some of that,
22  except that this is not a case in which everybody has an equal
23  interest in the trust that could be addressed through an
24  accounting.

25      And what I would say, Your Honor, is in the context of an

1   order where you've got a group of beneficiaries who don't know

2   what should happen to a pot of money, for example, and some of

3   them are claiming that that money should go to them and others

4   are claiming that that money should go to them instead, that's

5   a circumstance in which Rule 23(b)(1) as a certification might

6   be appropriate, because there you could end up with an order

7   saying, "You, defendant, give the money to those people and

8   you, defendant, give that money to those people."

9        But in the example that I think Plaintiffs are -- in the

10  circumstance of this case, Plaintiffs haven't identified any

11  incompatible standards of conduct that could justify a Rule

12  23(b)(1) certification.

13       And I agree with Your Honor that the Supreme Court's

14  comment in *Dukes,* again, putting aside what it is, was a strong

15  indicator that Rule 23(b)(3) is the appropriate vehicle, if

16  any, for certifying claims where there is monetary relief at

17  issue because you don't get to any incompatible standards of

18  conduct.  There is nobody who would be saying the exact

19  opposite of what Plaintiffs' counsel are saying; that is, for

20  example, an order that would compel the university to offer

21  four investment record-keepers.

22            **THE COURT:**  But you told me earlier that Plaintiffs'

23  counsel has a conflict because --

24            **MR. BLUMENFELD:**  They do.

25            **THE COURT:**  -- they are having to make choices about

1 what they say is a breach of fiduciary trust.

2        **MR. BLUMENFELD:** That's correct.

3        **THE COURT:** And so if that were to be so, wouldn't

4 you -- I'm not understanding -- that seems inconsistent with

5 what you just argued to me. You could have Plaintiffs' counsel

6 in this case coming in and saying one thing about a particular

7 fund and you could have plaintiffs' counsel in another case

8 saying another thing about the particular fund. That's what

9 you told me about the conflict of interest. So why does that

10 not result in the potential for different decisions by

11 different courts?

12        **MR. BLUMENFELD:** Well, there's no -- I guess to start

13 with, there's no other court in which anybody is asserting

14 anything similar to the claims that are alleged here and no

15 other court in which anybody is asserting that, for example,

16 the fiduciaries need to keep four record-keepers or that the

17 fiduciaries no matter what need to keep the CREF Stock Account.

18        **THE COURT:** No other lawsuit against your client,

19 against Duke University.

20        **MR. BLUMENFELD:** The fiduciaries, correct. Yes. So

21 that could lead to incompatible standards of conduct by the

22 fiduciaries.

23        **THE COURT:** So you're saying that you can't have class

24 certification unless there are two lawsuits where people are

25 asserting different interests?

 1          **MR. BLUMENFELD:**  No.  I'm saying Rule 23(b)(1)
 2    certification is supposed to come in where there's a real risk
 3    of incompatible standards of conduct and I don't see any real
 4    risk of incompatible standards of conduct here.  All we have is
 5    one set of Plaintiffs' lawyers asserting these claims.  Yes,
 6    they have conflicts in terms of the interests that they would
 7    advocate, I would say.  They've said they don't.  But whether
 8    they have a conflict of interest in asserting certain claims or
 9    not on behalf of a class says nothing about whether there is a
10    real risk of incompatible standards of conduct from an order
11    from this Court or some other court in terms of the prospective
12    relief.

13          **THE COURT:**  All right.  Anything else?

14          **MR. BLUMENFELD:**  That's it, Your Honor.

15          **THE COURT:**  Thank you.

16          **MR. BLUMENFELD:**  Thank you.

17          **THE COURT:**  I'll hear from the Plaintiff in rebuttal.
18    Of course, I'd like to hear from you on lots of different
19    things, but I would specifically ask you to address the
20    argument about the insufficiency of your evidentiary showing as
21    to named Plaintiffs investing in funds with excessive fees.

22          **MR. SOYARS:**  Okay.  Sure, Your Honor.  And I'll try to
23    be brief.

24          **THE COURT:**  That's okay.  Take -- well, not however
25    much time you want.  I have something to do this afternoon, but

1    you don't have to take -- you can take longer than five minutes

2    if you need to.

3            **MR. SOYARS:**  The first point I would like to make is

4    that they really are rebutting an argument that we're not

5    making, as you pointed out, Your Honor.  They talk a lot about

6    representational standing and the Fourth Circuit addressed that

7    in *David v. Alphin.*  In their opposition brief, this is what

8    they said about the Fourth Circuit decision -- this is page 9,

9    Footnote 4, ECF page 16.  "On appeal, the Fourth Circuit

10   affirmed the district court's decision but did not address

11   constitutional standing."  And the reason they said that is

12   because *David v. Alphin* does not address constitutional

13   standing in the context of a defined contribution plan.  It

14   addressed it in the context of a defined benefit plan where --

15           **THE COURT:**  Well, that's what I thought when I read it

16   over the lunch break, but perhaps I --

17           **MR. SOYARS:**  The plan was overfunded, the defined

18   benefit plan.

19           **THE COURT:**  I mean over the morning break.

20           **MR. SOYARS:**  The language we cite in paragraph 35 says

21   their -- the Plaintiffs' accounts were limited to their

22   investments less expenses.  That is simply the Supreme Court

23   quoting the statutory language of what a defined contribution

24   plan is.

25       In a defined benefit plan, you're promised a fixed -- a

1   monthly payment based on years of service and salary.  So when

2   the plan is overfunded, meaning it has enough assets to meet

3   its liabilities, there's no chance that person is going to

4   receive less than the amount they're promised.

5       That's completely different than a defined contribution

6   plan where, as the Supreme Court talked about in *LaRue,* the

7   solvency of the plan does not need to be threatened to reduce

8   the benefits below what they would have received under prudent

9   management.  And this is -- that is addressed in the *Mutual*

10  *Funds* opinion in the Fourth Circuit, this distinction between

11  defined benefit and defined contribution plans.

12      And to establish Article III standing in a defined

13  contribution plan, a plaintiff just has to allege a loss to an

14  account; that it would have been worth more without the breach

15  of fiduciary duty due to excessive fees, performance, whatever

16  it is.

17      So this argument that we're relying on representational

18  standing is just not an argument that we're making.  In our

19  reply brief, we point out that it's a two-step inquiry.  First

20  is the Article III standing piece.  That is established by the

21  allegations in paragraph 8 of the amended complaint where we

22  point out that -- the way each individual's account was harmed.

23          **THE COURT:**  So I hadn't really focused on this.  When

24  constitutional standing is challenged at motion to dismiss

25  stage, then you certainly -- the allegations of the complaint,

1  you know, you take them as true.  I don't know what the -- what

2  happens when they're challenged at the motion to certify the

3  class stage where, as the Supreme Court has told us, you know,

4  you do have -- let's see.  I just had this -- evidentiary --

5  I've forgotten the word.

6       **MR. SOYARS:**  The level of proof required at each stage

7  of the proceeding, something like that?

8       **THE COURT:**  Yes, you know, you do have to -- the

9  plaintiff does have to offer some evidence in support of all

10 the elements of Rule 23, which, at least arguably, would seem

11 to include constitutional standing.

12      **MR. SOYARS:**  Sure.

13      **THE COURT:**  So don't you have to go beyond what's in

14 your complaint?

15      **MR. SOYARS:**  This is the point.  This is a brand-new

16 argument that they're making.  We didn't read their opposition

17 as saying that Plaintiffs have not alleged any injury to the

18 extent they invested in these 25 particular funds, which are

19 the funds we point out in the complaint.  They're basically

20 conceding their standing as to those funds.  But now I hear

21 Mr. Blumenfeld saying, "Well, we disagree with that; that

22 Mr. Feather doesn't have standing as to the TIAA Real Estate

23 Account because he wasn't invested in it at the time the

24 complaint was filed."  That's nowhere in the opposition brief.

25      **THE COURT:**  All right.  And what about the excessive

1   fees?

2          **MR. SOYARS:**  The excessive fees, I mean, the same

3   point.  They -- I don't see in their opposition that there's a

4   lack of proof that the named Plaintiffs themselves had alleged

5   or had suffered or that they're challenging the accuracy of the

6   factual allegation that there was, in fact, an injury suffered,

7   but --

8          **THE COURT:**  So if I were to become concerned about

9   this and held the record open --

10         **MR. SOYARS:**  Yeah.  Well, I would just point out that

11  the assertion that there's no evidence in the record is

12  incorrect.  I think Mr. Blumenfeld said there's no evidence

13  that Mehen invested in a higher-cost share class of any of the

14  funds; and in paragraph 8d of the complaint, we point out he

15  invested in the higher-cost share class of Vanguard 500

16  Index --

17         **THE COURT:**  Slow down.

18         **MR. SOYARS:**  He invested in the higher-cost share

19  class of the Vanguard 500 Index Fund and that is one of the

20  funds identified in the chart on page -- paragraph 161 and it's

21  on -- on page 85.  So the Vanguard 500 Index Fund, he invested

22  in the fund that charged 17 basis points and there was an

23  available share class that charged 2 basis points.  So he's

24  paying an extra 15 basis points and that's going to the revenue

25  sharing.  If they had switched to the institutional share, he

1  would not have paid that 15 basis points.  Whether he paid more

2  than $30 or less than $30 doesn't matter.  He would have paid

3  less under our theory of the excessiveness of the unnecessary

4  fees in the share class.  And the chart that they attach to the

5  opposition, it includes the Vanguard 500 Index under Plaintiff

6  Mehen's investments.

7        **THE COURT:**  Under what?

8        **MR. SOYARS:**  Plaintiff Mehen, M-e-h-e-n.  That's

9  Doc. 74-10 at 3.  So that right there establishes that there is

10  an injury to his account from the 500 Index as related to both

11  the share class claim and the recordkeeping claim.

12        So to the extent that there are other -- you know, any

13  other evidentiary issues on that point, yes, we would like an

14  opportunity to present evidence, but we believe the record as

15  it stands is sufficient.

16        So the representational standing is not an argument that

17  we're relying on.  As the *Braden* case says and the *In Re Mutual*

18  *Funds* case says, Fourth Circuit case, these are -- they are

19  separate inquiries.  A loss to the account is sufficient for

20  Article III standing and then the statutory standing piece you

21  have -- you can pursue losses that sweep beyond your own

22  injury, in the words of the Eighth Circuit, based on the

23  language of 1132(a)(2).

24        **THE COURT:**  11 what?

25        **MR. SOYARS:**  '32(a)(2) and 1109(a).

1          **THE COURT:**  Those -- statutory.  Okay.  So what do you

2   say in response -- his -- the Defendant says that you equate

3   statutory standing with constitutional standing or at least

4   that's --

5          **MR. SOYARS:**  Well, yeah, my point is that we're not

6   making that argument at all.  We're saying that these

7   individuals have a loss in their account and we've alleged it,

8   okay; that their account would have been worth more had

9   Defendants monitored the recordkeeping fees, had they switched

10  to the lower-cost share classes.  Each individual has a loss

11  arising from those breaches of fiduciary duty and the funds

12  that are identified in the complaint are all corroborated by

13  this chart.

14         **THE COURT:**  And the chart is again where?  Did you say

15  74 point --

16         **MR. SOYARS:**  It's the Exhibit 6 to the Abbey Glenn

17  declaration, Doc. 74-10.  So that's -- you know, that's

18  evidentiary proof based on account statements and deposition

19  testimony.  We think that is a sufficient record.

20         **THE COURT:**  That was actually submitted by the

21  Defendants.

22         **MR. SOYARS:**  By the Defendants.  Exactly.

23         **THE COURT:**  So -- okay.  Go ahead.

24         **MR. SOYARS:**  All right.  So the representational

25  standing piece that we're equating I think is just wrong

1  because we have alleged an Article III injury to the individual

2  account.  We're not just saying, "The Plan suffered losses.  We

3  don't have to show individualized injury."  That was actually

4  argued in the initial motion to dismiss.  We amended the

5  complaint to include those allegations because the Defendants

6  had raised it.  When they filed their renewed motion to

7  dismiss, not a word about Article III standing, basically

8  conceding that those allegations were sufficient.

9      But I think Your Honor is right that the -- their essential

10  position is that there can never be class certification in the

11  DC -- the defined contribution plan case --

12          **THE COURT:**  In what?

13          **MR. SOYARS:**  -- defined contribution plan case -- even

14  though every court that has addressed the issue has found that

15  these cases can be certified, all the cases that we cite in our

16  briefs.

17      The five Plaintiffs that we have have invested in 25

18  investment options.  So under Defendants' theory that there

19  needs to be someone in every fund, 400 funds, you could have 80

20  participants to have that coverage and that's just -- that's

21  going to defeat the purpose of Rule 23 being a representational

22  case and would also provide a perverse incentive to the

23  fiduciary to just include a lot of funds, even if that's not in

24  the participants' interests; they can't be sued.

25      To the extent that they're challenging Article III standing

1   on the recordkeeping fees, again, the theory is the Plan paid

2   $10 million at a time when the market rate was a million

3   dollars.  Whether a particular individual paid more or less

4   than $30 is really beside the point because if the revenue

5   sharing had been monitored and capped and rebated to the Plan,

6   that would have reduced the amount that everyone was paying.

7        Now, they cite this 30 -- there are 82 funds.  According to

8   the declaration, this is as of 2016.  They carefully worded it,

9   paragraph 5 of the Hackney declaration.  Before that date,

10  presumably there were many more or else defense would have

11  pointed that out.  So it's possible, yes, as of 2016 someone

12  could have invested in funds that didn't pay any revenue

13  sharing, but it's completely speculative at this point.  They

14  have not -- they have access to account records of these

15  participants of the Plan.  If anyone in fact was invested in

16  those funds exclusively, they could have presented that type of

17  evidence.

18       In the *BB&T* case, Your Honor may remember that there was an

19  expert report pointing out that, you know, however many people,

20  a thousand people, supposedly had paid less than a benchmark.

21  There's no similar evidence here and even that in the *Sims* case

22  wasn't sufficient to defeat class certification.

23       Mr. Blumenfeld stated that the *Alphin* and *Fuller* district

24  court cases were similar plan-wide challenges.  Well, that's

25  incorrect.  In *David,* there was a Count Five specifically

1  challenging a single fund, the Columbia Quality Bond Fund.
2  That's a distinctly different challenge than the claim that
3  we're making about 138 different mutual funds where each one
4  was flawed for the same reason, for being a higher-cost share
5  class.  *Fuller* was the same situation, Count Three about the
6  STI Classic Equity Fund, that fund only, and none of the named
7  plaintiffs invested in those.

8      Now, the Defendants have said they would not challenge
9  Kathi Lucas if she had divested her fund in the -- her
10 investment in the CREF Stock Account.  However, it seems that
11 they would not -- or they're not challenging -- they wouldn't
12 have challenged her standing to seek damages; but as far as
13 injunctive relief, if there was no plaintiff invested in that
14 fund, they surely would have said there's no standing to seek
15 that type of relief.

16     The issue of the loans, I don't know how that's relevant to
17 any of our claims.  You know, if a record-keeper offered loans
18 or doesn't offer loans, I don't know how it -- how it affects
19 what we're alleging as far as the excessive payments.  The
20 Hackney declaration claims that Vanguard and Fidelity did not
21 offer a loan program.  Well, these are -- these are some of the
22 largest record-keepers in the country for -- to get the sole
23 business of a $5 billion plan, I think that that could be
24 negotiated if it was somehow relevant to the claim.  Even if
25 they would refuse to do that, that still doesn't rule out the

 1 | possibility of going with TIAA or VALIC as the sole

 2 | record-keeper.

 3 |      **THE COURT:** Or some other provider who has lower fees

 4 | and does offer a loan. I mean, I don't know if there is

 5 | another one. I don't know --

 6 |      **MR. SOYARS:** I think the expert testimony will show

 7 | that there is.

 8 |      **THE COURT:** I mean, which sort of goes to my concern

 9 | about, well, aren't we getting into the merits here. I mean, I

10 | do want -- you know, I want you to address the conflict issue.

11 | I just -- I'm not sure I really completely understand the

12 | Defendants' position on this, but, you know -- is it the case

13 | that, as class counsel here, if I certify class, you would have

14 | to make decisions about what arguments to pursue and what

15 | arguments not to pursue that could affect class members

16 | differently down the road and is that a conflict?

17 |      **MR. SOYARS:** Well, I think, you know, in theory if

18 | there was a substantial -- a substantial interest that would be

19 | harmed by something that goes to the heart of the claim that

20 | certainly we would have to take that into account, but we're

21 | talking about paying lower recordkeeping fees. No one is going

22 | to complain about that.

23 |    There was a similar argument in the *Tibble* case in the

24 | Supreme Court that switching to a lower-cost share class might

25 | confuse participants because they don't want change. Justice

1  Kagan from the bench during argument found that to be basically
2  laughable because it would be a red-letter day to get a letter
3  saying you're going to be paying lower fees.  That's the
4  situation here.

5       **THE COURT:**  Okay.  So you're -- you do not intend at
6  some point to say that the Defendants violated their fiduciary
7  duty by including funds that had no fees.

8       **MR. SOYARS:**  That they breached their fiduciary duty
9  for --

10      **THE COURT:**  I mean, because they have some funds that
11 have no recordkeeping fees, right?

12      **MR. SOYARS:**  Oh, yeah.  In fact, the letter that they
13 attached to the opposition shows that they changed 50 of those
14 funds after we filed the lawsuit.  So they're basically doing
15 what we said they should have been doing all along.  They're
16 moving from the high revenue sharing funds to the low revenue
17 sharing funds and moving to lower share classes.  So saying
18 that they shouldn't be doing that is the exact opposite of what
19 we're saying.  We said that they should have done this back in
20 2010.

21    So I don't know how -- I guess some people in theory are
22 being subsidized by people who are in the higher-cost funds;
23 and that if there was a request to reform the method of payment
24 of revenue -- the recordkeeping fees, they would pay more.  I
25 don't know that anyone has a legal interest in -- or a

1    reasonable expectation of being subsidized by their fellow

2    employees in perpetuity, and, you know, the prayer for relief

3    is just that the fees should be reasonable going forward.

4    Whether that's a flat fee, a percentage fee, that's really

5    beside the point.  The Plan should not be paying 10 times what

6    the market rate is.  I mean, that's really what we're looking

7    for.

8         **THE COURT:**  All right.  So -- I mean, this kind of

9    goes back to my question that I was discussing with

10   Mr. Blumenfeld about looking at the Plan offerings as a whole

11   as opposed to looking at individual special -- individual

12   specific ones.  You're not going to come in here and say, "Plan

13   1, here's all the evidence.  Plan" -- excessive fees, one; and

14   different evidence for two and three all the way up to 138.

15   You're going to be coming in and saying, "138, same argument."

16        **MR. SOYARS:**  Right.  We're going to say, "Here's

17   Quarterly Meeting No. 1.  These 138 funds were in the Plan.

18   There was no discussion for any of them about whether we should

19   look at a lower-cost share class."  And that's going to prove

20   the claim across the board.  You know, if the evidence is,

21   "Well, we looked at these," then maybe the relief or the remedy

22   is, okay, we don't get damages for those because -- a loss of

23   the Plan because they were actually investigating; but for the

24   others, that's a breach for 127 funds.

25        **THE COURT:**  Can you -- pardon me.  Excuse me.  Can you

1  remind me where we are -- where you are in discovery in this
2  case and what the cutoff and -- on the merits, how that -- I
3  did not look back at the scheduling order.

4          **MR. SOYARS:**  The fact discovery cutoff I believe is
5  April 30th and then the fact -- or the -- yeah, the expert --
6  the ultimate discovery cutoff is September 30th.

7          **THE COURT:**  So you have not yet disclosed experts on
8  loss?

9          **MR. SOYARS:**  We have not.  We have gotten a large
10  number of documents from Duke and from third parties and
11  believe we'll be looking to schedule depositions relatively
12  soon.

13          **THE COURT:**  All right.  So you have not done fact
14  depositions yet?  The individual Plaintiffs have been deposed.

15          **MR. SOYARS:**  The individual Plaintiffs have, but the
16  committee members have not.

17          **THE COURT:**  All right.  Thank you.  Go ahead.

18          **MR. SOYARS:**  Right.  So it's -- in the *Tibble* case,
19  the trial there was, you know, 6 -- 6 funds in the first trial
20  and 17 in the second trial; and it really was -- it was an
21  across-the-board practice.  And we envision the same thing here
22  as far as the share class reviews not being done at all.

23          **THE COURT:**  That's the *ABB* case?

24          **MR. SOYARS:**  *Tibble, Tibble versus Edison.*

25          **THE COURT:**  *Edison.*

1     **MR. SOYARS:**  The one that went to the Supreme Court.

2     **THE COURT:**  Okay.

3     **MR. SOYARS:**  And by the way, *Tibble* and the *Tussey v.*

4  *ABB* case were both certified classes with almost identical

5  definition with what we proposed here.  In *Tibble,* the

6  defendants appealed the class certification.  The Ninth Circuit

7  rejected that.  And in *Tussey,* the class certification was not

8  appealed at all.

9      Mr. Blumenfeld, he compared this case to *LaRue* because, you

10  know, apparently -- in *LaRue,* it's really different because

11  there there was one individual who suffered losses in his

12  account, and it was based on an individual interaction between

13  the defendant and plaintiff.  He requested that his fund be

14  transferred to a different option of the plan and the

15  administrator did not do that.  So he was the only person

16  injured by the breach.

17      Here we have, again, across-the-board decisions how to pay

18  for recordkeeping fees, monitoring share classes, monitoring

19  particular options in the menu that's available to everyone.

20  This is not individual interaction.

21      So while the Supreme Court held that that individual could

22  pursue an 1132(b)(2) claim for the losses in his individual

23  count, the court did not suggest that thousands of people hurt

24  by the same breach could each file their own action, which

25  would be -- would cause the very problems that Rule 23(b)(1) is

1  designed to address.

2      The Defendant disputes that (b)(1)(A) certification is

3  proper, but it really has not addressed (b)(1)(B) where the

4  classic example is the trust and beneficiary action, as pointed

5  out by the Supreme Court in *Ortiz.*

6      Mr. Blumenfeld mentioned the limited fund context.  That's

7  another example of a (b)(1)(B) class, but it's not the only

8  example because the trust and beneficiary is a distinct example

9  that the Supreme Court cited in *Ortiz.*

10      And this case is also not similar to *Dukes* whatsoever,

11  which was an employment discrimination case nationwide, all

12  female managers at Walmart who each had an individual –– had

13  their own manager who was making hiring decisions.  So you have

14  thousands of different managers making different decisions.

15  That's why there's no common issue there and no company-wide

16  policy of discrimination.  Here the same decision-maker is

17  making the Plan-level decisions that affect everyone.  That's a

18  key distinction.

19      So on the question of what is a proper measure of damages

20  for an imprudent investment claim, that's not an individualized

21  analysis.  So for the CREF Stock investors, Plaintiff 1 can't

22  say, "Well, you should use the S&P 500," while Plaintiff 2

23  says, "You should use, you know, some other large cap fund."

24  The question is how to measure the losses of the Plan.  If

25  Defendants had monitored the CREF Stock Account and removed it,

1   what would have happened to those assets?  They would have

2   replaced it with a different fund and that's -- that's a

3   dispute for the experts, what would that fund have been.

4      *Tatum* -- the Fourth Circuit opinion in *Tatum* says it's on

5   the defendant to prove that a prudent fiduciary would have made

6   the same decision.  In other words, in the -- if they had

7   used -- a fiduciary who had used a prudent process would have

8   selected the fund.  That's for the Defendant to prove.

9        **THE COURT:**  Say again.  Burden of proof -- the burden

10   of proof is usually on the plaintiff.

11        **MR. SOYARS:**  Right.  The plaintiff -- the plaintiff

12   has the duty to prove that there was a flawed process.

13        **THE COURT:**  Oh.  Okay.

14        **MR. SOYARS:**  In other words, like Duke was not paying

15   attention to this fund and a prudent person would have -- if

16   they were paying attention to it, would have removed it.  The

17   burden then shifts to the defendant to say, "We didn't use a

18   prudent process, but a prudent person would have made the same

19   exact decision we did and therefore our breach did not cause

20   the losses to the Plan."

21        **THE COURT:**  All right.  I understand that better.  And

22   you're relying on the *Tatum* case for that?

23        **MR. SOYARS:**  Yeah, the *Tatum* Fourth Circuit decision.

24        **THE COURT:**  Okay.

25        **MR. SOYARS:**  And as far as damages, the *Donovan v.*

1  *Bierwirth,* which relies on --

2         **THE COURT:**  Say again.

3         **MR. SOYARS:**  *Donovan v. Bierwirth,* I referenced it

4  earlier.  It's a Second Circuit case.

5         **THE COURT:**  Yes.

6         **MR. SOYARS:**  It says that, you know, any uncertainties

7  as to measure of damages are resolved against the defendant as

8  well, the breach of fiduciary as opposed to the -- as opposed

9  to the beneficiaries.  I think there are cases like that in

10 many areas of the law.  So to -- you know, the notion that we

11 have to prove who was harmed before even certifying the class

12 really seems to be pushing merits issues on damages ahead of

13 class certification.

14     And I think the last point is the statute of limitations

15 argument.  The point that I made about it's the named plaintiff

16 is the party whose knowledge is relevant, that's not based on

17 Rule 23.  That's based on cases that are addressing the ERISA

18 provisions.

19     One that comes to mind is the Secretary of Labor brought an

20 action.  This was a Third Circuit case decided in 2017.  I

21 believe the defendant's name was Stastny, S-t-a-s-t-n-y.  So

22 the Secretary of Labor brings a suit to recover losses.  The

23 defendants argue that the beneficiaries had knowledge of this

24 breach more than three years before suit and their knowledge

25 should be imputed to the Secretary for purpose of the statute

1  of limitations; and the Third Circuit rejected that and said

2  no, the relevant person for the inquiry of the statute of

3  limitations is the actual plaintiff who brings the suit.

4  There's a Ninth Circuit case that cites to the same effect.  So

5  it's not a Rule 23 issue that you should just look at the named

6  plaintiff.  That's really an ERISA issue.

7      That's all I have.  Thank you.

8          **THE COURT:**  Okay.  Anything on matters raised in

9  rebuttal?

10         **MR. BLUMENFELD:**  If I could have just five minutes or

11  less, Your Honor.

12         **THE COURT:**  Uh-huh.

13         **MR. BLUMENFELD:**  Thank you.

14     I guess I want to start by the "no revenue sharing" funds

15  because I think maybe counsel's argument made some of the

16  points that I was trying to make almost better than I did.  His

17  argument is that all of the funds in the Plan should have been

18  put into "no revenue sharing" funds, not just the 82 that were

19  offered, but the whole kit and caboodle, all 400 of them.  If

20  that were true, that would mean there was no revenue sharing

21  money going to any of the record-keepers; and if that was true,

22  that would mean recordkeeping would have to be paid for through

23  some other mechanism.

24     He's articulated at least so far two possible alternatives.

25  The first was a fixed per-participant fee and the second was an

1  asset-based charge.  In both of those circumstances, the people
2  who invested in those 82 funds that didn't pay any revenue
3  sharing at all would have to pay more for recordkeeping.
4  That's one example of the very conflict that I was just talking
5  about that came up in the context of his argument right now.
6  And when we get to the merits, they're going to have to make
7  similar judgment calls and arguments along the way that are
8  going to put various class -- groups of class members and pit
9  them against each other on these very kinds of issues.
10      And I would say on a related point you heard counsel talk
11  about the fact that they're going to rely on uniform evidence
12  and used the example of meeting minutes from Meeting No. 1.
13  First of all, this is class certification now; and so to the
14  extent they're going to say they're relying on common evidence,
15  they should have put forth those meeting minutes.  They should
16  have taken some discovery to prove, for example, what he just
17  said to you, which is that the process for looking at all of
18  those investment options was the same, it was uniform from
19  among them.
20      But you heard him caveat that, or at least I heard him
21  caveat that, at the end and say, "If it turns out they were
22  monitoring some of the funds and not monitoring other of the
23  funds, then maybe we just prevail as to some and not others."
24  Well, again, that's the constitutional standing problem and
25  that's what I was talking about when I said this is not just an

1  overarching challenge to the Plan as a whole.  This is a

2  challenge to each of the investment decisions made by the Plan

3  fiduciaries and that's why they don't have standing to

4  challenge those investment decisions that they weren't subject

5  to and they didn't --

6       **THE COURT:**  Let me ask you about that constitutional

7  standing.  I asked Plaintiffs' counsel about this too and I'm

8  still not completely sure about how this works.  I know that at

9  the motion to dismiss stage when constitutional standing is

10 raised you look at the allegations of the complaint; and if

11 they're sufficient, they're sufficient.  But, of course, I

12 don't know that that precludes raising constitutional standing

13 later.  So -- I mean, I'm trying to figure out exactly how this

14 works.  You know, you didn't raise it in the motion to dismiss.

15 I assume that's right.

16      **MR. BLUMENFELD:**  I believe that's correct in response

17 to the first amended complaint, yes.

18      **THE COURT:**  And so I'm wondering just -- I mean, I

19 haven't -- I've got to go back and look at all of this again in

20 light of you-all's arguments, but it -- when I go and look at

21 the evidence, you know, he's pointed out one Plaintiff that

22 your evidence shows invested in a plan with excessive fees,

23 your charge, and so --

24      **MR. BLUMENFELD:**  I --

25      **THE COURT:**  Let me --

1     **MR. BLUMENFELD:**  Sorry.  Yes.

2          **THE COURT:**  But is constitutional standing -- let me

3   ask my more general question after I, you know, think out loud,

4   which is what I've been doing.  Is constitutional standing

5   something that you raise -- you can raise at any point?  I

6   mean, can you raise it at summary judgment?  Can you raise

7   it -- is it like jurisdiction -- subject matter jurisdiction?

8          **MR. BLUMENFELD:**  It is, in fact, subject matter

9   jurisdiction.  Constitutional standing is an element of subject

10  matter jurisdiction and can never be waived and can be raised

11  even as late as trial or after trial.

12       And I would caveat what you said, Your Honor, with one

13  thing.  You're right that you can make a challenge -- a facial

14  challenge to subject matter jurisdiction in response to a

15  complaint, in which case you can take the complaint allegations

16  as true; but a defendant can also make an evidentiary challenge

17  to say the plaintiff has to prove that they have constitutional

18  standing because anybody can put into a complaint that

19  plaintiffs have been damaged.

20         **THE COURT:**  Okay.

21         **MR. BLUMENFELD:**  That's essentially what the complaint

22  here does and so --

23         **THE COURT:**  All right.  And now do you want to address

24  the specifics about -- I've forgotten the named Plaintiff's

25  name.

1        **MR. BLUMENFELD:**  Mr. Mehen.  Yes.  So I can tell you

2   what the evidence is.  The evidence is that Mr. Mehen was

3   invested in a Vanguard S&P 500 Index Fund.  That's the evidence

4   that is in the record.  The allegation from Plaintiffs, which

5   is not supported by any evidence, is that there was a

6   lower-cost share class of that specific fund available through

7   the record-keeper that Mr. Mehen was looking to use because,

8   again, he needed to use VALIC as the record-keeper because of

9   the loan program that was available through that.

10       **THE COURT:**  But you don't have to prove your case at

11  class certification.  I mean, that's what I'm trying to figure

12  out here because -- that's true what I just said, right?  You

13  do not have to prove your case at class certification and you

14  do not even have to prove that you can survive summary judgment

15  at class certification, even the named Plaintiff, right?

16       **MR. BLUMENFELD:**  That's true.

17       **THE COURT:**  So why do -- I mean, exactly what do they

18  have to present evidence of in order to show constitutional

19  standing at this point?

20       **MR. BLUMENFELD:**  Well, to the extent that what they're

21  alleging is that they invested in one of the 138 funds that

22  they say had revenue sharing or there was a lower-cost share

23  class, they have to prove that they were invested in one of

24  those funds that did that.

25       **THE COURT:**  Well, that -- I mean, that's what I'm

1  asking you.  They allege that this fund did that and then they

2  offer proof -- or at least I hear you conceding that they have

3  offered -- that there's evidence in the record that at least

4  one Plaintiff invested in one of these funds that they allege

5  did that.

6          **MR. BLUMENFELD:**  They certainly -- there is evidence

7  that Mr. Mehen invested in the Vanguard S&P 500 Index Fund

8  through VALIC and through Vanguard, period.  That's the only

9  evidence in the record.  There's not evidence that that is one

10 of the 138 funds that would give him the constitutional

11 standing to be able to assert a challenge.

12         **THE COURT:**  But they allege that.

13         **MR. BLUMENFELD:**  That's -- yes, they allege that, but

14 I don't think allegations in the context of a Rule 23 analysis

15 are sufficient.

16         **THE COURT:**  But you just agreed with me that you don't

17 have to prove your case at the class certification stage.

18         **MR. BLUMENFELD:**  That's true, Your Honor.

19         **THE COURT:**  And so if you don't have to prove your

20 case, then why do they have to offer evidence?  I mean, that --

21         **MR. BLUMENFELD:**  You have to offer evidence that is

22 relevant to the Rule 23 elements for sure.  It's those elements

23 that don't bear on the Rule 23 analysis, that is, for example,

24 Mr. Mehen's ability to represent a class of participants who

25 fall into that category, that you need evidence of at class

1 certification.  What they don't need evidence of is the merits,

2 and when it comes to the merits, for example --

3         **THE COURT:**  I don't -- okay.  I'm not really -- you

4 seem to be talking in circles to me about this.  I'm not really

5 getting it because you -- what you are saying is that the

6 Plaintiff has to prove his case at class certification in order

7 to show constitutional standing.

8         **MR. BLUMENFELD:**  No.  He has to prove that he's a

9 member of a class that he's trying to represent; that is,

10 individuals who invested in one of these 138 funds that had a

11 lower-cost share class available to them.

12         **THE COURT:**  But you already told me that there is

13 evidence that he invested in one of these 138 funds.

14         **MR. BLUMENFELD:**  He invested in one of the funds, Your

15 Honor, one of the 400 funds that was in the Plan.  That was a

16 Vanguard S&P 500 Index Fund.  There's no evidence in the record

17 that that's one of the funds, that is, the 138, such that he

18 would have constitutional standing to assert a claim involving

19 the excessive recordkeeping fees.

20         **THE COURT:**  And your contention is that the -- that is

21 alleged in the complaint, though, right?

22         **MR. BLUMENFELD:**  It is alleged in the complaint.

23         **THE COURT:**  Okay.  And your contention is then that

24 they have to offer proof of that at the class certification

25 stage.

1        **MR. BLUMENFELD:** And I would distinguish that from the

2   merits; and what I would say about that, Your Honor, is at the

3   merits of the case there are good and abundant reasons for

4   plans to offer retail share classes of funds or share classes

5   that offer revenue sharing payments, for example. That's a

6   merits issue, but that's a merits issue that the Court doesn't

7   need to address now in the context of Rule 23 because this is

8   the class certification context. But certainly the Plaintiffs

9   have to come forward with evidence that they are members of the

10  class that they're trying to represent; and if Mr. Mehen didn't

11  invest in one of the 138 funds that pay revenue sharing, he's

12  not a member of the class and he shouldn't be allowed to assert

13  that claim and he would lack constitutional standing to assert

14  that.

15       **THE COURT:** But you agree that he invested in one of

16  the plans alleged in -- one of the funds alleged in the

17  complaint to charge these excessive fees. Yes or no?

18       **MR. BLUMENFELD:** Yes, he invested in one of the funds

19  that Plaintiffs identify in the complaint as having paid

20  excessive recordkeeping fees.

21       **THE COURT:** Okay. So you are arguing that at class

22  certification the Plaintiff has to prove -- offer evidence --

23  doesn't have to prove, but they have to offer evidence that

24  that fund is -- charged excessive fees because otherwise you're

25  saying he's not a sufficient class representative.

1          **MR. BLUMENFELD:**   No.   I appreciate what you're saying,

2    Your Honor, and I guess the problem that I have with the

3    terminology is you -- your question embedded into it paying

4    excessive recordkeeping fees and I don't think that's something

5    that Plaintiffs would need to prove at class certification.

6          **THE COURT:**   Okay.

7          **MR. BLUMENFELD:**   But what they would need to prove is

8    that he invested in a fund where there was a lower-cost share

9    class available for that fund because that's the nature of the

10   claim and that's the nature of what a class representative

11   needs to be able to prove in order to show that he's a member

12   of the class that he's trying to represent and that he has

13   Article III standing to assert a claim challenging those

14   investments.

15         **THE COURT:**   That's just another way of saying they

16   have to offer evidence sufficient to support the claim on the

17   merits.   That's what you're saying, because how could you do

18   that -- I mean, what would be the difference between those two

19   things?

20         **MR. BLUMENFELD:**   Well, like I said, Your Honor, there

21   are lots of reasons why a fund could offer a more expensive

22   share class.

23         **THE COURT:**   Okay.   You're talking about a -- what you

24   would offer at summary judgment.

25         **MR. BLUMENFELD:**   And what they would offer.   They

1  would –– presumably they're going to present evidence that

2  there is no benefit to the Plan and Plan participants for

3  offering the higher-cost share class that would be available.

4  This is just the simple fact of there being a higher-cost and

5  lower-cost share class available such that this Plaintiff could

6  assert the claim that Plaintiffs are trying to assert.

7         **THE COURT:**  Okay.  So do you have a case, if you can

8  help me understand, a case that says –– supports what you are

9  saying at the class certification stage; that the plaintiff ––

10  in an ERISA context, that the Plaintiff has to offer evidence

11  to show what you say they have to show since I don't completely

12  understand that?  I'll just say it that way.

13         **MR. BLUMENFELD:**  I guess I would say it's a

14  combination of –– there is no case that I can think of right

15  now that is directly on all fours where there were multiple

16  record-keepers and allegations of revenue sharing payments.

17  And I don't know, frankly, if plaintiffs –– or excuse me –– or

18  if defendants have challenged those issues in other cases or

19  maybe it has been claimed that an investor in a particular

20  investment option can only challenge that investment option.  I

21  know in the *Oracle* case there was one investment option where

22  class certification was denied because none of the named

23  plaintiffs invested in that investment option.  The same thing

24  is true in the *SunTrust* case, in the *Delta Air Lines* case

25  and –– so in the context of the investment claims, that's

1  certainly out there.

2      This is just the same analysis applied to revenue sharing.

3  The Plaintiffs are alleging that the revenue sharing,

4  presumably on this Vanguard fund, was unreasonable and should

5  not have been paid; and the Plaintiffs are alleging that there

6  were 137 other funds like that; and yet they didn't present

7  evidence that this named Plaintiff is a member of the class

8  that they're seeking to represent because they haven't

9  presented evidence that his fund falls within that bucket.

10 They have an allegation, but that's it.

11     And I would say in the context of Rule 23, just like you

12 have to prove constitutional standing with respect to the

13 investment claims and it's not sufficient just to allege "I

14 suffered an injury as a result of this," it's not sufficient to

15 say, "I invested in this fund," and allege but not prove that

16 there was even a lower-cost share class available.  Or not

17 prove.  That's the wrong word.  But present evidence that there

18 was a lower-cost share class.

19          **THE COURT:**  So I guess the question -- and I'll just

20 have to take a look at this -- is whether class certification

21 is more like a motion to dismiss or more like summary judgment.

22 But, I mean, even at summary judgment -- I mean, yes, the

23 Plaintiff ultimately has to prove constitutional standing.

24 That's obviously true.  But, you know, ordinarily at this point

25 the Defendant is the one who challenges it; and as you've

1  pointed out about motions to dismiss, if the Defendant offers

2  evidence to the contrary, then the burden is on the Plaintiff.

3  And, you know, that's how it normally comes up.  I'm thinking

4  out loud.  I'm not challenging you on this.

5          **MR. BLUMENFELD:**  Sure.

6          **THE COURT:**  I'm thinking out loud about how it works

7  at this particular stage because you've deposed all of these

8  people.  You know what the funds are that are at issue in the

9  complaint that they're making these allegations about.  You

10 have the records.  So if these people didn't invest in any of

11 these funds, you could come forward with that kind of evidence,

12 right?

13         **MR. BLUMENFELD:**  Well, so --

14         **THE COURT:**  I'm not saying the burden is on you at

15 this point.  Ultimately -- I agree with you.  Ultimately, the

16 burden for constitutional standing is on the Plaintiff.  I

17 think -- he can rebut that if that's not so.  But I think I

18 agree with you at this point.  Ultimately, that's the burden.

19 But at this particular stage, I'm just trying to figure --

20 figure it out because it seems like it goes -- what you're

21 saying is they have to offer proof in support of the merits of

22 the claim.

23         **MR. BLUMENFELD:**  I would say, Your Honor, I don't

24 think even in the Rule 12 context a defendant necessarily has

25 to offer evidence in order to make a substantive challenge to

1  constitutional standing and subject matter jurisdiction.  They

2  can just move without evidence --

3          **THE COURT:**  Right.

4          **MR. BLUMENFELD:**  -- and it's the plaintiff's burden to

5  present evidence.  There is a difference -- you could certainly

6  make just a facial challenge and say on the face of the

7  complaint this plaintiff lacks constitutional standing, but you

8  can also say, as a matter of evidence, plaintiff needs to come

9  forward and come forward now with evidence to demonstrate

10 constitutional standing.

11     I can tell you as a practical matter why defendants don't

12 often do that, because it leads into discovery that you're

13 trying to avoid.  So you sometimes just move right off the bat

14 as a facial challenge.  Or if you have very simple, narrow

15 evidence, you can present that very simple, narrow evidence.

16     I'll tell you we had a very difficult time understanding

17 when we deposed the named Plaintiffs what they were actually

18 invested in and we don't have the same sort of access to all of

19 the Plan participant records that you might expect,

20 particularly in the context of litigation.

21         **THE COURT:**  Okay.  All right.  Go ahead.

22         **MR. BLUMENFELD:**  I took way more than the five minutes

23 I told you I was going to take.

24         **THE COURT:**  Well, I asked you all those questions, so

25 that's okay.

1    **MR. BLUMENFELD:**  I don't have anything further, unless

2  Your Honor has questions for me.

3    **THE COURT:**  No.  Thank you.

4    Mr. Soyars, is there anything you want to say in response?

5    **MR. SOYARS:**  Yeah, I just want to point out again that

6  this argument was not raised in their opposition at all, the

7  argument that these individual Plaintiffs were not themselves

8  injured.  The only argument that was made was they don't have

9  standing to represent people in other funds.  This is a

10  completely different issue and I think it's really improper to

11  raise it for the first time at a hearing.  If there's anything

12  to this, then I think they should have to file a separate

13  motion where we can respond and --

14    **THE COURT:**  Yeah, I think you made that point earlier

15  and I, you know, understand that argument.  All right.

16    **MR. SOYARS:**  That's all.  Thank you.

17    **THE COURT:**  Okay.  Thank you.

18    So I just want to raise with you-all sort of a

19  down-the-road question and this assumes that I will grant class

20  certification.  I am not saying that I am going to.  But one of

21  the things that I find helpful in cases that are not always

22  simple is for people to think about the factual issues that the

23  fact finder is called upon to decide before the summary

24  judgment briefing is done.

25    You know, in jury trials, when a jury is going to be the

1   fact finder, I sometimes have people, as soon as notice is
2   given that anybody is going to make a dispositive motion, talk
3   to each other about what the verdict sheet looks like because
4   one of the things that sometimes happens in summary judgment
5   motions is the defendants spend a whole lot of time addressing
6   arguments that it turns out the plaintiff isn't even going to
7   make; and then you get it all clarified in the reply brief
8   and –– you know, so I don't like to read stuff that doesn't
9   matter –– that ends up not mattering and I don't like to
10  require people to brief stuff that, you know, ends up not
11  mattering.
12      So I just want to raise this as a thinking point for
13  you-all if I certify the class, which I have not decided to do,
14  though I will say I walked in the door inclined to certify the
15  class.  But I'm going to think about it in light of you-all's
16  arguments and go back and look much more specifically at
17  everything and read the cases and such in light of you-all's
18  arguments.
19      But if I do certify it –– and this is obviously down the
20  road because I guess we would be talking about this fall for
21  summary judgment motions and briefings.  You know, I would
22  really like you-all to think about ways to talk to each other
23  before the summary judgment briefing is filed about exactly
24  what the Plaintiff is going to do at trial so that the summary
25  judgment motions can be directed towards that; and if there are

1  things that were alleged in the complaint that the Plaintiff

2  says, "You know, I'm not going to pursue that at trial," that

3  that can get worked out, you know, maybe before the briefing.

4  And if there are ways -- if there are ways that things are

5  narrowed, you know, by you-all, not me, it just seems like it

6  might be productive and it is always helpful to me.

7      You know, I was a state court judge for a long time.

8  Everybody -- I know Mr. Puryear knows it.  When we instruct a

9  jury in state court, we say whatever the case is, in a civil

10 case, "The burden of proof is on the Plaintiff to prove the

11 following three things:  One, fact one; two, fact two; three,

12 fact" -- whatever they are.  Elements, just like in criminal

13 court.  You-all don't go to criminal court, I assume, but

14 there's elements of crimes; and that's how I think about civil

15 cases too, which is, I believe, consistent with how I'm

16 supposed to think about it.

17     So it would just be helpful to me to -- maybe before the

18 summary judgment briefing gets done for you-all to think about,

19 you know, exactly what are the disputed questions.  Well, I

20 know you're going to be thinking what are the disputed

21 questions of material fact, but, you know, to have some thought

22 about -- I mean, I assume there's going to be a lot you're

23 going to agree on and then that helps me narrow what you're not

24 agreeing on.  You know, what exactly would the Plaintiff have

25 to prove on Count III, breach per 1104(a)(1) by failing to

1   monitor and control administrative and recordkeeping fees?

2   What are the elements of that, for example?  So I just want --

3   you know, you-all are still in discovery mode, but if the case

4   goes forward, you know, how are we going to make it easier for

5   everybody to brief what really matters.  So I just kind of

6   raise that with you-all as a general topic.

7        And when are you -- when is somebody going to be asking me

8   to decide about the jury trial issue?  How are you-all

9   intending to raise that with me?

10        **MR. BLUMENFELD:**  Your Honor, I believe we've raised it

11   with Plaintiffs as something perhaps the parties could agree on

12   and we're hoping to avoid briefing on that issue.

13        **THE COURT:**  Okay.  You-all are talking about it then.

14        **MR. BLUMENFELD:**  We're talking about it.

15        **THE COURT:**  All right.  Well, I assume somebody will

16   raise it at some point.  I'd rather have a jury to decide it,

17   if it were a matter of personal opinion, but that's not always

18   what it is.

19        All right.  I will try to get you-all a decision as quickly

20   as I can.  It's possible I may tell you the decision before I

21   get the order out just because, you know, orders take a while,

22   especially if I'm going to certify the class, just so you-all

23   will know.  Well, actually, I guess it would be true either

24   way.  You would want to know either way.  So I'll try to let

25   you know as soon as I'm sure of the answer even if that's

1 | before I actually get an opinion out and that can help you-all
2 | go forward.
3 | And I may bring you back in -- if I do certify the class, I
4 | may bring you back in at some point for a status conference for
5 | us to talk about logistical briefing and other issues at some
6 | point. And you-all are free to ask for a hearing or a status
7 | conference like that. We can do -- you know, to some extent,
8 | we can do it by phone. I don't always insist that people --
9 | especially if it's more of a brainstorming kind of discussion
10 | than really an argument between the parties. So anytime
11 | you-all talk to each other and think that would be productive,
12 | you can let Ms. Sanders know.
13 | Part of what I would like to do is to help you-all keep
14 | your cost -- everybody keep your costs down, keep your
15 | litigation expenses down, make this as efficient as we can. So
16 | I'm open to whatever you -- especially if you-all agree, you
17 | know, to things; but even if -- even if you don't agree, if
18 | there are things that are allowed and somebody wants to talk
19 | about that in an informal way, you're welcome to do that with
20 | me.
21 | The magistrate judges in this district tend to deal with
22 | the discovery, so you need to talk to them if it's about
23 | discovery.
24 | Otherwise, I'm open to helping you-all do that because I
25 | think we all have an interest in making things more affordable

```
 1  and efficient while still getting to where we need to be at the

 2  end of the day.  So feel free.

 3      Anything else you-all want to talk about today?

 4          MR. SOYARS:  No, Your Honor.

 5          MR. BLUMENFELD:  We're all set.  Thank you very much,

 6  Your Honor.

 7          THE COURT:  All right.  Thank you.

 8      Court's adjourned.

 9      (Proceedings concluded at 12:44 p.m.)

10

11

12                      C E R T I F I C A T E

13      I, LORI RUSSELL, RMR, CRR, United States District Court
    Reporter for the Middle District of North Carolina, DO HEREBY
14  CERTIFY:

15      That the foregoing is a true and correct transcript of the
    proceedings had in the within-entitled action; that I reported
16  the same in stenotype to the best of my ability and thereafter
    reduced same to typewriting through the use of Computer-Aided
17  Transcription.

18

19  ⁣𝐿𝑜𝑟𝑖 𝑅𝑢𝑠𝑠𝑒𝑙𝑙

20  Lori Russell, RMR, CRR          Date:  3/12/18
    Official Court Reporter
21

22

23

24

25
```