IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DAVID CLARK *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DUKE UNIVERSITY *et al.*, <br><br> *Defendants*. | No. 16-1044-CCE-LPA |

**PLAINTIFFS' OUTLINE OF
THEIR CLAIMS AND CONTENTIONS**

As the Court requested at the April 30, 2018 planning and status conference, Plaintiffs submit their road map outlining the claims they are pursuing at trial and what they contend are the facts and law in support of each claim. Tr. of Planning & Status Conf. 21:20–23:7, 37:22–38:9 (Doc. 103). Plaintiffs submitted a draft of this Outline to Defendants on August 31.

**The Employee Retirement Income Security Act (ERISA).**

Plaintiffs' claims arise under ERISA, which allows any participant of a plan such as the Duke University 403(b) Plan to bring an action in federal court to obtain the relief for their Plan provided by the statute. 29 U.S.C. §1132(a)(2) ("A civil action may be brought... by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under §1109 of this title). The statute provides for this relief (29 U.S.C. §1109):

> Any person who is a fiduciary with respect to a plan who breaches any of
> the responsibilities, obligations, or duties imposed upon fiduciaries by this
> subchapter shall be personally liable to make good to such plan any losses
> to the plan resulting from each such breach, and to restore to such plan any
> profits of such fiduciary which have been made through use of assets of the

plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

ERISA imposes the following fiduciary duties (29 U.S.C. §1104(a)(1)):

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
   (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;
   (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ...and
   (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

ERISA also prohibits the following transactions between the Plan and a party-in-interest (which includes the Plan's recordkeepers and Duke University) (29 U.S.C. §1106(a)):

Except as provided in § 1108 of this title:
(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—...
   (C) furnishing of ... services ... between the plan and a party in interest; [and]
   (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

A fiduciary is liable not only for his own breach, but also for the breach of another fiduciary under the following circumstances (29 U.S.C. §1105(a)):

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

2

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> (2) if, by his failure to comply with § 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

A fiduciary is the person named as such in the document that establishes and maintains the Plan. 29 U.S.C. §1102(a). In addition, a person is a fiduciary to the extent (29 U.S.C. §1002(21)(A)):

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

A retirement plan is subject to ERISA if it is established or maintained by an employer to provide retirement income to its employees. 29 U.S.C. §1002(2)(A), (3). There is no dispute the Plan has been governed by ERISA at least since January 2009, and Plaintiffs contend it was governed by ERISA before then.

To establish a claim for liability under §1109(a), Plaintiffs must prove that a defendant was a fiduciary to the Plan, breached its fiduciary responsibilities to the Plan, and the Plan suffered a loss from that breach. *E.g.*, *Blair v. Young Phillips Corp.*, 235 F. Supp. 2d 465, 470 (M.D.N.C. 2002).

**Plaintiffs' claims**

Plaintiffs assert four broad claims in light of the Court's dismissal of certain claims

3

asserted in the Amended Complaint. See Doc. 96 at 2, 6–7 (Order on class certification); Second Amended Complaint (Doc. 48). Plaintiffs claim: (1) Defendants breached their duties under ERISA by causing the Duke University 403(b) Plan to incur unreasonable recordkeeping expenses; (2) Defendants committed prohibited transactions under ERISA by allowing four vendors to provide recordkeeping services to the Plan and receive Plan assets from which they retained unreasonable compensation; and (3) Defendants failed to prudently monitor Plan investment options resulting in the use of high-cost and low-performing funds compared to alternatives available to the Plan.[1]

## I. Excessive recordkeeping fees breach.

Generally, the largest expense of administering a retirement plan is for recordkeeping, which consists of keeping track of each participant's account in the Plan, including contributions made by the participant from salary deferrals, matching contributions from the employer, investments of the account among the Plan's investment options, tracking the daily value of each of those investments, processing and tracking distributions from those investments and transfers among investments, and distributions from the account to the participant. One of the fiduciary's duties is to ensure those administrative expenses are reasonable. 29 U.S.C. §1104(a)(1)(A). Minimizing costs is a fundamental element of the fiduciary's duty of prudence. *Tibble v. Edison Int'l*, 834 F.3d 1187, 1198 (9th Cir. 2016)(*en banc*).

---

[1] Plaintiffs have decided not to pursue the claim asserted in Count VII of their Second Amended Complaint. The facts alleged in support of that claim support their other fiduciary breach claims described herein.

4

The administration of the Duke Plan was controlled by Duke University itself, through its Vice President of Administration (a.k.a. Vice President of Human Resources) Defendant Kyle Cavanaugh and the benefits office of its Human Resources department. (The other Defendants—the Investment Advisory Committee and its members (all Duke faculty and staff)—acted as fiduciaries only over the investment options that were included in the Plan.)

Duke caused the Plan to incur excessive recordkeeping expenses in three primary ways.

First, Duke allowed four separate companies to provide recordkeeping services to the Plan and include all of their investment options in the Plan (a fifth recordkeeper was removed as of January 2012). Duke did that despite being informed by its consultant and otherwise that prudently managed plans reduce their recordkeepers down to one or two and reduce plan investment options from multiple hundreds to less than a hundred, and despite being informed by its consultant that the Plan's recordkeeping fees would be reduced by consolidating recordkeepers and reducing investment options.

Second, even with its multiple recordkeeper arrangement, Duke failed to engage in any competitive bidding for the Plan's recordkeeping services (through a Request For Proposal or RFP) to find out in the market what was the lowest price Duke could get for the Plan for the level of recordkeeping services it desired. That was so even though its consultant specifically recommended conducting an RFP in 2009 and even offered to manage that project for Duke. Experienced and knowledgeable fiduciaries and

5

consultants to plans the size of Duke's knew even in 2010 that competitive bidding is the only sure way to determine what is a reasonable recordkeeping fee for a plan.

Third, Duke did not prudently determine what was a reasonable recordkeeping fee for the Plan and then monitor the recordkeeping compensation that the Plan's recordkeepers were receiving to discover that they were being overcompensated and to recover the excess compensation for the benefit of the Plan. Duke also did not negotiate reasonable recordkeeping compensation arrangements with the Plan's recordkeepers.

Instead of negotiating how much to pay each recordkeeper for the services rendered, Duke entered into contracts with each recordkeeper which on their face stated that the Plan did not pay anything for these recordkeeping services. However, those services were not free. Instead, those recordkeepers received their compensation from the investment options they included in the Plan. For many years before 2009, Duke allowed each recordkeeper to offer all of their annuities or mutual funds as investment options for Plan participants. The annuities and mutual funds were investment funds pooled from numerous investors, including but not limited to Duke Plan participants. The investment pools deduct a percentage of the total asset value of the pool in fees that are paid to the investment manager of the pool and various providers of services to the investment pool, including plan recordkeepers of plans such as the Duke Plan. (This sharing of the fee revenue from this process is called "revenue sharing.") Those percentage payments to the recordkeepers are the same percentages for all plans that invest in the pool, whether that plan has $100,000 or $100,000,000 invested in the pool. And that percentage payment

6

will increase as the assets in the pool increase (such as from additional participant contributions or gains from investments), even though the services provided by the recordkeeper have not changed. The Duke Plan had $2.6 billion in total assets at the end of 2009, which grew through 2016 to $5.2 billion. Each of the Plan's recordkeepers had between $487 million and $1 billion of Plan assets in their investment pools. The Plan thus amply paid asset-based revenue sharing compensation to its recordkeepers, which both overcompensated for the recordkeeping services that were provided and diminished the participants' returns on the investment of their retirement savings because excessive fees were being deducted from their accounts, usually daily.

Duke did not know how much each recordkeeper was receiving in revenue sharing compensation until late 2010. That was because Duke did not even begin the process of overseeing the Plan or monitoring Plan expenses until 2009. In October 2010, Duke's consultant (Buck) revealed to Duke that three of the recordkeepers admitted they were receiving revenue sharing payments from Plan investments of over $3.5 million more than they required on an annual basis. Duke was provided numerous options for reducing this excessive recordkeeping compensation, including reducing the number of investment options, reducing the number of recordkeepers, using index funds instead of higher-fee active funds, and using lower-fee share classes of Plan mutual funds. Repeatedly after October 2010, Duke was told that reducing the number of recordkeepers and investment options in the Plan would significantly reduce the amount of recordkeeping fees the Plan was paying. Duke, however, did not take any of those actions.

Even without being informed by plan consultants, a prudent fiduciary at that time under the applicable standards of prudence under §1104(a)(1)(B) would have known that the Plan's structure and the recordkeeping arrangements were imprudent and resulted in the payment of excessive recordkeeping fees. A prudent fiduciary operating under the standards prevailing in 2010 would have conducted an RFP for the Plan's recordkeeping services and negotiated recordkeeping compensation based on a fixed per-participant rate, and then monitored the compensation those recordkeepers received from plan investments and recovered any overpayments for the plan.

Duke and its Investment Advisory Committee (IAC) were informed in October 2010 that one of the Plan's recordkeepers needed only $62 per participant to provide its services while the others claimed to need $78, $173, and $175 per participant. One provider would have charged only $40 per participant for a plan the size of Duke's. One consultant believed the Plan could get $35 per participant in recordkeeping fees. Despite that information, neither Duke nor the IAC did anything to negotiate fixed, per-participant fees with any of the recordkeepers, much less a fee at the same or similar rate per participant.

Duke did not do anything about the overpayment of recordkeeping fees until November 2011, when it began to receive and accept offers from some Plan recordkeepers to pay other Plan expenses from their excess revenue sharing. Duke did not seek or obtain reimbursements to the Plan of even this admitted excess revenue sharing (which it could have done). Instead, it decided to use those funds to pay Plan expenses

8

that Duke had been paying up to that point. A significant portion of those expenses was the salaries and fringe benefits that Duke was paying to its own employees.

Duke did not negotiate the amount of recordkeeping compensation any of their recordkeepers would retain and how much of excess revenue sharing would be recovered. Instead, Duke uncritically accepted TIAA's offer of $630,000, even though Buck had informed Duke TIAA had been getting over $2 million in admitted excess revenue. Similarly, Duke uncritically accepted Fidelity's offer of $750,000, even though Buck had shown it was getting $930,000 in excess revenue. Duke also accepted without negotiation VALIC's offer of $80,000, even though Buck had shown VALIC was getting $517,000 in excess revenue. Duke also did nothing to recover the excess revenue sharing that these recordkeepers received before these programs were set up in 2011. These amounts were kept by the recordkeepers and just made available to pay such Plan expenses as Duke submitted, in a program called a Plan Expense Reimbursement Account. Duke could not find enough expenses to pay from these Accounts.

Although Duke was informed by Fidelity that at least as of 2012 it could have excess revenue sharing payments go directly to the Plan and the participants whose investments paid the excess revenue sharing, Duke did not take steps to set up such a Revenue Credit Program until 2014. Even then, Duke continued to pay itself employee salary and fringe benefit reimbursements and other Plan expenses and allowed the excess credits to accumulate. Duke did not transfer any of the money in the Credit Program to the Plan until September 2016, after Plaintiffs filed this lawsuit. At that point, Duke also stopped

using any credits from Plan recordkeepers to pay Plan expenses or to pay itself for employee salaries and fringe benefits. Until Plaintiffs filed their lawsuit, then, Duke continued to benefit itself at the expense of Plan participants from the Plan's excessive revenue sharing payments.

As of 2019, Duke will completely restructure the Plan. There will be only one recordkeeper (Fidelity) who apparently will be paid a fixed per-participant fee of $25 for accounts under $5,000 and $54 for accounts with $5,000 or more. (This is what Duke disclosed to participants in 2018. Duke has refused to provide Plaintiffs the recordkeeping contract it has been negotiating with Fidelity for Plaintiffs to determine the terms of the new recordkeeping arrangement.) TIAA will continue to be a recordkeeper of a single investment option, its Traditional Annuity, and will be paid no per participant fee. Fidelity will receive no more revenue sharing payments.

By failing to reduce Plan recordkeepers down to one, by failing to reduce the number of Plan investment options and remove revenue sharing investment options, by failing to conduct any RFPs, by failing to negotiate a specific recordkeeping fee based on a specific dollar per participant, by failing to negotiate the appropriate amount of credits from revenue sharing, and failing to deliver all excess revenue sharing to the Plan, Duke and the IAC breached their duties of prudence and having the Plan defray only reasonable administrative expenses. Maintaining the Plan with its revenue share generating investments so that Duke could pay expenses it had been paying previously (including its employees) itself, and accumulating surpluses for that purpose, were not the acts of

fiduciaries acting exclusively in the interest of participants. Had Duke and the IAC discharged their duties, they could have reduced Plan recordkeeping fees to at least $54 per participant, and far lower, resulting in millions of dollars of additional retirement savings for participants. Those savings would have been invested, so the Plan's total losses includes not just the amount of excessive recordkeeping fees paid, but also the lost investment opportunity of those fees, which Plaintiffs contend can be approximated by the rate of return of the stock market as represented by an S&P 500 index fund.

## II. Excessive recordkeeping fees prohibited transactions.

The same facts also establish that Duke committed prohibited transactions by allowing TIAA, Fidelity, VALIC, and Vanguard to continue providing recordkeeping services, provide their investment options, and continue to receive Plan contributions for investment in the revenue sharing generating annuities and mutual funds. 29 U.S.C. §1106(a)(1)(C) & (D). While that is a broad prohibition (no one can provide a service to or receive payment from a plan), ERISA provides a number of exemptions in 29 U.S.C. §1108. One such exemption allows for contracting or making reasonable arrangements with a recordkeeper for services necessary for the operation of the plan, if no more than reasonable compensation is paid therefor. 29 U.S.C. §1108(b)(2); 29 C.F.R. §2550.408b-2. The burden of proving the application of any such exemption is on the Defendants. *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir. 1994); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676–77 (7th Cir. 2016).

Plaintiffs assert as a separate prohibited transaction under 29 U.S.C. §1106(b) Duke's

paying itself for the compensation and fringe benefits of its employees from the excess revenue sharing that was returned by the recordkeepers. That claim is being asserted in a separate lawsuit (*Lucas v. Duke University*, No. 1:18-cv-722) because the Court denied Plaintiffs leave to include that claim in this lawsuit. Doc. 107.

**III.  Imprudent investment options breach.**

Duke and the IAC failed to properly monitor Plan investment options and provided participants with high-fee and low performing investment options in several respects. Before Duke began exercising its fiduciary duties in administering the Plan in 2009, the Plan consisted of every investment option offered in the market by five different vendors in what amounted to little more than five separate 403(b) programs (each separately recordkept by each vendor) with a total of over 400 investment options. Duke did not begin administering these programs as a single plan until 2010. It established the IAC in 2010 as a committee of Duke University executives and some faculty. The IAC was responsible for selecting, monitoring, and removing Plan investment options, but could only recommend to Duke the removal of any Plan vendor/recordkeeper. Despite all the problems in the Duke Plan as of 2010, the IAC met only once in 2010, twice in 2011, one in 2012, once in 2013, and twice in each year of 2014–2016.

A prudent fiduciary, particularly with a focus exclusively on providing benefits to participants and defraying only reasonable expenses of administration, would not administer a plan with over 400 duplicative and overpriced investment options. Duke, in fact, was informed that it had to select prudent investment options for the Plan.

12

The IAC determined that the Plan should have as its basic tier (tier 1) a group of investments that each were so diversified that a participant could prudently invest all of her retirement savings in a single investment. Primarily, this tier consisted of target date retirement funds, which adjusted the investment allocations of its pool to become less risky as the designated retirement date approached. However, instead of providing all Plan participants a single prudent group of target date funds (with different target retirement years), the IAC and Duke allowed each vendor to provide its own target date funds. That was so even though the IAC had determined that Vanguard's target date funds were the prudent choice and set them as the default investment for participants who had not designated where to invest their retirement contributions. A prudent fiduciary would have provided only one target date fund group, as many other universities had. Duke and the IAC did ultimately decide to move to Vanguard as the sole target date fund series, but that was not until the end of 2016. They have provided no good reason for that delay. Had Duke and the IAC acted prudently and provided the Vanguard funds as the Plan's sole target date fund option in 2010, the Plan would have gained millions in additional retirement savings because the other target date funds were more expensive and underperformed.

In the next tier (tier 2) the IAC determined that the Plan should have a group of core investment options that were supposed to be the "best-in-class" for each of the investment categories a participant would need to construct her own prudent retirement portfolio. These categories included large U.S. stocks, medium U.S. stocks, small U.S.

13

stocks, foreign stocks, a low-risk short-term fixed income investment, and a U.S. bond fund. Again, as with tier 1, the IAC did not select and provide to participants a single "best-in-class" core fund lineup. Instead, it allowed each of the four recordkeepers to initially designate what they considered to be their own "best-in-class" funds. The IAC and its consultant reviewed those designations and made the final selections, but established and maintained a different tier 2 for each recordkeeper. That was despite the fact that some of the designated funds were the same on different vendor platforms but charged higher fees, and clearly were not best in class. And while Duke and the IAC ultimately changed tier 1 to be only Vanguard target date funds, they never consolidated the tier 2 core funds to a single group of actual best-in-class investments in each category.

After selecting what they considered to be the prudent investments from the pre-existing pool of hundreds of investment options that had been included in the Plan without any fiduciary oversight, Duke and the IAC did not remove the remaining funds or review them to determine whether they were the best funds in their respective classes. Instead, they left them in the Plan and just called them "tier 3" funds. Neither Duke nor the IAC monitored the tier 3 funds regularly, although occasionally Duke's plan advisor did review the funds and determined that most of them were duplicative of tier 1 and tier 2 investments, did not meet the IAC's own standards for inclusion in the Plan, were bad investments, charged unduly high fees, or were not in core asset classes. It is an elemental duty of prudence and loyalty to participants that plan fiduciaries screen the prudence of all plan investment options and not just leave a mass of options in a plan for participants

14

to try and figure out which are the prudent ones (if any). *DiFelice v. U.S. Airways Inc.*, 497 F.3d 410, 418 (4th Cir. 2007); *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Duke and the IAC were even informed they had a duty to monitor the prudence of all plan investments. In addition to being imprudent, Duke employees also noted that having so many funds in the Plan increased their workloads (and thus administrative expenses charged to the Plan) and made Plan administration more difficult and complicated. Duke repeatedly recognized tier 3 was a problem that it had to deal with, but repeatedly delayed dealing with it without any good reason.

One consequence of the undifferentiated mass of funds in tier 3 was clearly imprudent results, such as having 14 money market mutual funds in the Plan, when the fiduciaries had already determined that the funds they selected for this category in tier 2 (low-risk short-term) were the prudent funds to provide participants. Duke ultimately fixed this problem by removing all but the Vanguard money market fund, but did not do so until 2016. It has no good reason for that delay. Another consequence was that numerous funds in tier 3 were in more expensive share classes than were available to the Plan. In fact, a number of tier 3 funds were more expensive versions of investments that already were included in tier 2.

Duke and the IAC believed that tier 3 should be used only by participants who were financially sophisticated enough to be able to determine themselves whether an investment was prudent, both on its own and for their retirement savings. Duke and the IAC, however, did nothing to ensure that only such financially sophisticated investors

invested in tier 3 funds (and, especially, to prevent participants who erroneously believed they were sophisticated from going into tier 3). That was despite the fact of being repeatedly informed that 50% (often times more) of Plan assets were invested in tier 3 funds. In plans that offer brokerage windows (which give participants the opportunity to invest in any mutual fund available in the market), only 3–5% of plan assets get invested in such windows. Duke and the IAC (as well as their advisors) recognized that having so much Plan money in tier 3 was a problem, but Duke and the IAC never did anything effective about it. As of 2019, the new Plan will have only one target date fund series, only one core fund lineup, and no tier 3.

Part of the reason so much Plan money was invested in tier 3 was that those investments were legacies from the days before 2010 when no one was monitoring the Plan as a fiduciary on behalf of the participants. For instance, VALIC previously provided only its annuities as Plan investment options. VALIC itself admitted that these annuities were more expensive than its mutual fund options and that the Plan should use the mutual funds instead. While Duke and the IAC did switch to VALIC's mutual funds in 2011 and prevented participants from investing any more money in the annuities, they did not engage in an effective campaign to inform participants who had invested in those annuities of the better investments in the Plan and the need to execute the paperwork VALIC required to transfer their investments. Instead, Duke left it to VALIC to inform participants of the need to move out of VALIC's profitable annuities to its less profitable mutual funds. Prudent fiduciaries know that unconflicted advisors who engage in

16

effective information campaigns are successful in getting participants to move out of obsolete and bad annuity investments into newer and better mutual fund options in the Plan. Prudent fiduciaries know that plan participants tend to be inattentive and inactive about their retirement investments.

Two of the larger investments in tier 3 were TIAA's CREF Stock Account and Real Estate Account. As of the end of 2015 (the first time Duke or the IAC obtained this information), those annuities had $288.5 million and $51 million in Plan money, respectively. Again, these were primarily legacy investments that were around for decades and part of TIAA's annuity program since before Duke applied any fiduciary oversight to the Plan. TIAA had proposed those funds for inclusion in the Plan as its tier 2 funds, but the IAC and its consultant determined they were not appropriate investments. Had a prudent fiduciary examined the investment histories and fees of these funds in 2010, that fiduciary would have determined those were not prudent investments to include in the Plan for any reason. Neither of those funds will be included in the 2019 restructured Plan.

Because tier 3 was imprudent from its inception and included so many imprudent investments, a prudent fiduciary would have removed those funds altogether and put the Plan money that was in those investments in the tier 2 core line up (or convinced participants in individually controlled annuities to transfer their balances to the new and better Plan investments). Had Duke and the IAC done that, the Plan would have gained millions of dollars in additional retirement savings. The CREF Stock Account alone

17

accounts for over $90 million of those losses.

September 18, 2018  Respectfully submitted,

/s/ Michael A. Wolff
SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter, MO No. 32225*
Michael A. Wolff, MO No. 38207*
Kurt C. Struckhoff, MO No. 61873*
Ethan D. Hatch, MO No. 68126*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
(314) 621-6115, (314) 621-7151 (fax)
jschlichter@uselaws.com
mwolff@uselaws.com
kstruckhoff@uselaws.com
ehatch@uselaws.com
*appearing by *special appearance*

*Lead Counsel for all Plaintiffs*

/s/ David B. Puryear, Jr.
David B. Puryear, Jr.
North Carolina State Bar No. 11063
PURYEAR & LINGLE, PLLC
5501-E Adams Farm Lane
Greensboro, NC 27407
(336) 218-0227
puryear@puryearandlingle.com

*Local Counsel for all Plaintiffs*