# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DAVID CLARK, *et al.*,<br>　　　　Plaintiffs,<br>　　v.<br>DUKE UNIVERSITY, *et al.*,<br>　　　　Defendants. | Case No. 1:16-CV-01044-CCE-LPA |
| KATHI LUCAS, *et al.*,<br>　　　　Plaintiffs,<br>　　v.<br>DUKE UNIVERSITY,<br>　　　　Defendant. | Case No. 1:18-CV-00722-CCE-LPA |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT ORDER REGARDING PENDING MOTION FOR PRELIMINARY APPROVAL**

On January 29, 2019, the Court requested additional information to assess the adequacy of the Proposed Settlement in the above-referenced matters before ruling on preliminary approval. Doc. 155 at 1.[1] In response to the Court's direction, Plaintiffs submit this supplemental brief addressing the adequacy of the proposed settlement and other issues raised by the Court. As further demonstrated herein, the Proposed Settlement is fundamentally fair and adequate based on the factors relevant to the Court's determination on whether to grant preliminary approval of the class action settlement.

---

[1] Citations to the record are to *Clark v. Duke Univ.*, No. 16-1044 (M.D. N.C.) unless otherwise indicated.

## I. The Proposed Settlement is adequate.

The Court identified factors that should be considered in evaluating the fairness and adequacy of the settlement. Doc. 155 at 2–3 (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158–59 (4th Cir. 1991)). These include: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, [and] (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment," among others. *Id.* Each of these factors weighs in favor of preliminary approval.

### 1. Relative strength of Plaintiffs' case

Plaintiffs maintain that they have strong underlying claims against Defendants related to their management and administration of the Duke University Faculty & Staff Retirement Plan ("the Plan").[2]

Plaintiffs allege that Defendants caused the Plan to pay unreasonable recordkeeping and administrative expenses. Doc. 72 ¶¶229–238 (Count III). One of the fiduciary's duties is to ensure those administrative expenses are reasonable. 29 U.S.C. §1104(a)(1)(A). And minimizing costs is a fundamental element of the fiduciary's duty of prudence. *Tibble v. Edison Int'l*, 834 F.3d 1187, 1198 (9th Cir. 2016)(*en banc*). There

---

[2] A summary of Plaintiffs' claims is set forth in their "Outline Of Their Claims And Contentions". Doc. 111.

are numerous facts to support Plaintiffs' claim that Defendants violated these duties in overseeing the Plan's recordkeeping expenses. Doc. 111 at 5–11.

Prior to the Plan's restructuring effective January 2019, and contrary to the advice of their consultant, Defendants allowed four separate companies to provide recordkeeping services and all of their investment options in the Plan (a fifth recordkeeper was removed as of January 2012). *Id.* at 5. Defendants maintained this structure even though they were repeatedly informed that reducing the number of recordkeepers and investment options would significantly reduce the amount of recordkeeping fees paid by the Plan. *Id.* at 7; Doc. 119-1 ¶¶98–105. Despite maintaining a multiple recordkeeper arrangement, Defendants failed to engage in any competitive bidding for the Plan's recordkeeping services (through a Request for Proposal or RFP) to determine the lowest price the Plan could obtained for the desired level of services. Doc. 111 at 5. This was so despite the fact that knowledgeable and diligent fiduciaries and consultants to plans of similar size knew that competitive bidding is the only reliable method to determine what a reasonable recordkeeping fee is for the Plan. *Id.*; *see also* Doc. 119-1 ¶¶59–79. Defendants also did not prudently determine or negotiate a reasonable recordkeeping fee for the Plan, even when presented with substantially lower pricing from the Plan's recordkeepers. They did not then monitor the recordkeeping compensation that the Plan's recordkeepers were

receiving to discover that they were being overcompensated nor return that excess for the benefit of the Plan. Doc. 111 at 6–9.³

Defendants' failure to obtain competitive bids for the Plan's recordkeeping services and their continued failure to monitor and control recordkeeping expenses, among other facts, have been shown to support a finding of fiduciary breach. *See, e.g.*, *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 788–89 (7th Cir. 2011)(if a plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)(failure to properly "monitor and control" administrative fees is a breach of fiduciary duties).

Plaintiffs also claim that Defendants breached their fiduciary duties by selecting and retaining higher-cost retail share class mutual funds. *See* Doc. 72 ¶¶154–164, 249–252. During the Class period, Defendants maintained over 100 mutual funds in higher-cost share classes instead of lower-cost, but otherwise identical, institutional share classes for the exact same funds that were available to the Plan. Doc. 72 ¶161. Under fundamental trust law principles, a fiduciary "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble*, 843 F.3d at 1198. Given these principles, the facts supporting Plaintiffs' higher-

---

³ These same facts also support Plaintiffs' claims that Defendants committed prohibited by causing the Plan's recordkeepers to receive unreasonable compensation. Doc. 72 ¶¶239–244 (Count IV); 29 U.S.C. §1106(a)(1)(C) & (D).

4

cost share class claim have been found to support a finding of fiduciary breach. *Tibble v. Edison Int'l*, 135 S.Ct. 1823 (2015); *Tibble v. Edison Int'l*, No. 07-5359, 2017 WL 3523737, at 11–12 (C.D. Cal. Aug. 16, 2017); *Tussey v. ABB, Inc*., No. 06-4305, 2012 WL 1113291, at 26–28 (W.D. Mo. Mar. 31, 2012).

Relevant to Plaintiffs' other investment claims, in a case handled by undersigned Class Counsel, the Supreme Court unanimously held that plan fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829. And fiduciaries must exercise prudence in the selection and retention of investments. *DiFelice v. U.S. Airways Inc*., 497 F.3d 410, 418 (4th Cir. 2007). Despite these duties, Plaintiffs claim that Defendants failed to prudently monitor Plan investment options resulting in the use of high-cost and low-performing funds relative to available alternatives. *See* Doc. 72 ¶¶245–258 (Count V). There are numerous facts that support these allegations. Doc. 111 at 12–18 (summary of allegations).

Before Duke began exercising its fiduciary duties in administering the Plan in 2009, the Plan consisted of every investment option offered in the market by five different vendors with a total of over 400 investment options. *Id.* at 13. Rather than establishing a single "best-in-class" investment lineup, as prudent fiduciaries do, Defendants subsequently offered a tiered investment structure (Tiers 1–3) on each of the recordkeeper's platforms. *Id.* at 13–14. After selecting what they considered to be prudent investments for the group of core options in Tiers 1 and 2, Defendants did not remove hundreds of the remaining funds or review them to determine whether they were the best

5

funds in their respective asset classes. *Id.* at 14. Rather, Defendants placed hundreds of funds in the Tier 3 that were not monitored regularly, and Plaintiffs contend, did not meet the criteria for inclusion in the Plan under the terms of the Plan's Investment Policy Statement, and charged unduly high fees. *Id.* As a consequence of this, the Plan suffered performance losses based on a comparison between the investment returns of the Plan's investments and available prudent alternatives. Plan losses were determined for each Tier of the Plan's prior investment structure (Tier 1, 2 and 3), including the CREF Stock and TIAA Real Estate Accounts which were included in the unmonitored Tier 3. *Id.* at 12–19.

Plaintiffs also allege that Duke breached its fiduciary duties and committed prohibited transactions under ERISA by causing the Plan to pay Duke in the form of reimbursement of employee salaries and fringe benefits and other expenses for services performed by Duke employees. *Lucas*, Doc. 1 ¶¶48–59. Duke did not cease seeking reimbursement from the Plan until August 2016, after it discovered that Class Counsel was investigating fiduciary breaches in the Plan. *Id.* ¶36. Plaintiffs have detailed that the payments that Duke caused to be made to itself as a fiduciary to the Plan constitute prohibited transactions under 29. U.S.C. §1106(b) (as well as under §1106(a)). *Id.* ¶¶49–52. They also allege that Duke cannot satisfy the exemption under 29 C.F.R. §2550.408b-2(e) to avoid §1106(a) violations because: the services for which Duke was reimbursed were not provided under any reasonable contract or arrangement between the Plan and the individuals or Duke, or a written contract that specifies the services to be provided and the amounts to be paid; the amounts paid to Duke were not reasonable; and Duke never

6

engaged an independent fiduciary to determine that the reimbursement of expenses to Duke for services by employees was permissible and lawful. *Id.* ¶¶56–59. Duke's motion to dismiss these claims was pending at the time the parties reached a settlement in this matter. *Lucas,* Doc. 9.

   2.  **Existence of any difficulties of proof or strong defenses**

Although Class Counsel continues to believe in the underlying merits of these claims, there are significant legal obstacles and defenses that render recovery in this case uncertain. Defendants continue to "deny all allegations of wrongdoing and deny all liability for the allegations and claims" made in this litigation, and continue to maintain "that the Plan has been managed, operated and administered at all relevant times in compliance with ERISA and applicable regulations, including the fiduciary and prohibited transaction provisions of ERISA." Doc. 149-2 at 1–2 (¶1.5). To support their defenses, Defendants retained two expert witnesses to justify the actions taken by the Plan's fiduciaries. *See* Docs. 121-3 and 121-5.

This action is among the first class actions brought under ERISA against a private institution of higher education alleging that the plan fiduciaries caused their 403(b) plan to incur unreasonable investment and administrative expenses and to suffer from other losses caused by underperforming and high-cost investments.[4] Although the Court found

---

[4] Tara Siegel Bernard, *Employees Sue Four More Universities Over Retirement Plan Fees,* N.Y. TIMES (Aug. 11, 2016), https://www.nytimes.com/2016/08/12/business/employees-sue-four-more-universities-over-retirement-plan-fees.html.

7

that Plaintiffs sufficiently alleged claims for fiduciary breach and prohibited transactions, Doc. 48, at least two cases involving similar allegations were dismissed in their entirety and are now on appeal. *See Divane v. Northwestern Univ.*, No. 16-8157, 2018 WL 2388118 (N.D. Ill. May 25, 2018); *Sweda v. Univ. of Pa.*, No. 16-4329, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017).

It is uncertain whether Plaintiffs would prevail on these claims at trial. Only one 403(b) case has gone to trial in history. *Sacerdote v. New York Univ.*, 328 F.Supp.3d 273 (S.D.N.Y. 2018). That trial, handled by Plaintiffs' undersigned Class Counsel, occurred in April 2018, and a bench judgment was issued on July 31, 2018, finding in favor of New York University and against the plaintiffs. In particular, the district court in *Sacerdote* found that the 403(b) plan fiduciaries did not breach their duty of prudence despite failing to consolidate recordkeepers, failing to conduct more frequent RFPs, and maintaining the CREF Stock Account and TIAA Real Estate Account, among other findings. *Id.* at 297–99, 312–15; *see also* Doc. 109 (notice of decision). Similar allegations of imprudence are also alleged in this case. *See supra.* Class Counsel anticipates that Defendants would rely on this decision and those dismissing similar claims in moving for summary judgment since both the CREF Stock Account and TIAA Real Estate Account are at issue in this litigation and Defendants maintained a multiple recordkeeper structure until January 2019. *See* Doc. 111 at 17; Doc. 72 ¶¶185–214.

Class Counsel also anticipates that Defendants may argue that Plaintiffs' investment claims are limited to the CREF Stock Account and TIAA Real Estate Account. *See* Doc.

86 at 8. Class Counsel submits there is no merit to such argument because Plaintiffs actively pursued their investment claims throughout this litigation. *See also* Doc. 111 at 13–17 (outlining claims related to Tier 1, Tier 2 and Tier 3 investments). Regardless, there is risk that Plaintiffs' performance claims could be limited, thereby reducing potential damages.

Defendants would presumably have argued that during the lawsuit they dramatically reformed the Plan along the lines of what Plaintiffs contend should have been done. This reduced the damages from what they would otherwise have been and benefitted participants. They would also presumably have argued that this shows they were monitoring the Plan and acting prudently.

As this Court is aware, at the time the parties reached a settlement, Defendants' motion to exclude two of Plaintiffs' rebuttal experts was pending. Doc. 115. Based on a preliminary review of the parties' briefing, the Court indicated that it "should strike at least some" of those experts' reports. Doc. 135 at 4. If the Court adopted Defendants' arguments after additional briefing, which were strongly opposed by Plaintiffs, Doc. 121, that decision could adversely impact Plaintiffs' claims. This is because expert testimony is crucial for plaintiffs to prove fiduciary breach claims in ERISA retirement plan litigation. *Tussey*, 2012 WL 1113291 at 36–37 (relying on expert testimony in finding breach); *Tibble,* 2017 WL 3523737 at 13 (same).

### 3. The anticipated duration and expenses of additional litigation

9

As with other ERISA fiduciary breach actions, these lawsuits are complex. They are hard fought at each stage of the case, as demonstrated here. The parties would incur very substantial expense in continuing this litigation. Very substantial resources would be expended in completing briefing on summary judgment and preparing the *Clark* case for trial, not to mention the significant costs that would be incurred if the *Lucas* case proceeded to discovery and through judgment. Plaintiffs anticipate that the *Clark* trial would last approximately four weeks. Doc. 54 at 5 (estimating 20 days for trial). The length of the trial would be consistent with Class Counsel's experience in similar litigation. *Tussey v. ABB,* No. 06-4305 (W.D. Mo.), the first full trial of a 401(k) excessive fee case, which was handled by undersigned Class Counsel, lasted four weeks.

In Class Counsel's experience, substantial litigation expenses also would be incurred to reach final judgment and for the inevitable appeal. Both parties would incur significant expenses for trial alone, including costs associated with preparing voluminous exhibits, expert witnesses, travel and other litigation expenses. As an example of the scope of resources defendants were willing to devote to litigate a similar action through trial, the defendants' legal fees in *Tussey* exceeded $42 million—through the trial in 2010 alone. *Tussey v. ABB Inc.*, No. 06-4305, 2015 WL 8485265, at 6 (W.D. Mo. Dec. 9, 2015).[5] That does not include fees paid for experts or other expenses, which were very

---

[5] This case involved two sets of defendants, not one, as the case herein. The law firm representing Duke also represented the employer in that case (ABB).

substantial.[6] The plaintiffs alone in that case have incurred out-of-pocket expenses of $2.2 million. *Id.* at 8. These expenses were more than double Class Counsel's estimated out-of-pocket expenses of $825,000, most of which was for experts, in this matter. Should this litigation continue through judgment, those expenses would substantially increase.

Even after a successful trial on the merits, further delay in recovery and additional expenses would be incurred through years of appeal. This has been the experience of other plaintiffs who have succeeded at trial on similar claims. In *Tussey,* a case filed in 2006, the court entered judgment in March 2012. 2012 WL 1113291. After two separate appeals to the Eighth Circuit Court of Appeals and remands to the district court, more than twelve years after filing, the case is still pending before the district court on issues related to the proper damages methodology. And in *Tibble*, a case filed in 2007, the court recently entered judgment in 2017 after ten years of litigation. 2017 WL 3523737. A successful judgment was only obtained after the plaintiffs, represented by undersigned Class Counsel, appealed the district court's summary judgment order to the Ninth Circuit, successfully petitioned the Supreme Court to take the case, the first 401(k) excessive fee case taken by the Court, and obtained a unanimous decision reversing the Ninth Circuit's affirmance of that decision. Thereafter, the plaintiffs successfully obtained *en banc* review from the Ninth Circuit, which vacated the summary judgment order, and then

---

[6] In fact, the cost for just one of the defendants' joint experts, Glenn Hubbard, and his research was $3.2 million. *Tussey v. ABB, Inc.*, No. 06-4305, Doc. 650 at 20 (W.D. Mo.); *see also Tussey,* Doc. 567 at 172–175 (Tr. 2108–11).

11

successfully tried the case again before the district court following remand. This case has still not concluded because it is on appeal.

In short, the alternative path through trial and appeal is very protracted, expensive, and would result in delayed compensation and substantially greater expense for the Class.

### 4. The solvency of the Defendants and likelihood of recovery on litigated judgment

Duke University is a non-profit institution of higher education and one of North Carolina's largest employers. There is no evidence that Duke would be unable to satisfy any judgment if ordered by the Court.

## II. Other information demonstrates the adequacy of the Proposed Settlement.

The Court also provided other examples of information to supplement the record. Doc. 155 at 3. This information is provided below.

### 1. Basic information concerning the Plaintiffs' damages evidence, including range of potential damages for class as a whole and individually

Plaintiffs' experts estimated damages for unreasonable recordkeeping and investment fees and maintaining underperforming investments in the Plan.[7] Plaintiffs' expert Michael Geist estimated that the Plan paid $44.8 million in unreasonable recordkeeping fees without accounting for any lost investment opportunity. Doc. 119-1 at 10 (¶18).[8]

---

[7] For *Lucas,* Plaintiffs have determined that Duke was paid approximately $1.6 million as reimbursement for salaries and fringe benefits. *Lucas,* Doc. 1 at 12–13 (¶38).

[8] Plaintiffs estimated potential damages caused by the use of higher-cost share classes for the Plan's mutual funds of $6.1 million. Doc. 121-5 ¶147. Defendants' expert contended that those damages would be largely subsumed within the recordkeeping fee damages because those share classes contributed to greater amounts of revenue sharing to cover recordkeeping expenses. *Id.*

12

Both of Defendants' experts attacked Plaintiffs' expert's damage estimates, including his claimed lack of 403(b) recordkeeping experience and his methodology used in determining Plan losses. Doc. 121-3 ¶¶253–274; Doc. 121-5 ¶¶150–156. Apart from their experts' challenges, Class Counsel expects that Defendants would ask the Court to reject Mr. Geist's opinions based on the *Sacerdote* court's criticisms of his testimony on similar issues in that 403(b) case. 328 F.Supp.3d at 283 n. 19. Thus, obtaining a judgment for these damages was uncertain.

Plaintiffs also sought investment performance damages for each Tier in the Plan's investment structure. Based on Plaintiffs' claim that Defendants failed to provide a single "best-in-class" investment lineup, Plaintiffs' expert estimated the following damages: (1) Tier 1, approximately $6 million; (2) Tier 2, approximately $34 million; and Tier 3, over $200 million, approximately half of which was attributed to the CREF Stock Account and TIAA Real Estate Account. Defendants' expert not only disputed these numbers but strongly asserted there were no damages at all. *See* Doc. 121-5. Similar claims also were rejected by the court in *Sacerdote*. All of these factors made recovering these losses uncertain.

The settlement amount for the Proposed Settlement is $10.65 million. Doc. 149-2 at 4 (¶2.26). In light of the procedural and substantive risks that Plaintiffs would face if litigation were to continue, including the risk of zero recovery, Class Counsel believes that the Proposed Settlement is not only "within the range of reasonableness", but is also fair, reasonable, adequate and in the best interests of Plan participants. Doc. 150-1 ¶2.

13

Case 1:16-cv-01044-CCE-LPA   Document 156   Filed 02/01/19   Page 13 of 19

This settlement also represents the largest settlement amount to date in any ERISA 403(b) plan excessive fee suit. The only other settlement was reached with the University of Chicago for $6.5 million in May 2018. *See Daugherty v. Univ. of Chi.*, No. 17-3736, Doc. 57-1, 77 (N.D. Ill.).

Based on the early stage of this settlement process, Class Counsel is unable to estimate potential recoveries for individual class members at this time. Unlike other class actions, this case is brought on behalf of the Plan as a whole under ERISA with allocation of the damages to be made to individual participants' accounts. This is the reason the Settlement's Plan of Allocation is dependent on the total number of Class members. Current participants need not submit any documentation to participate in the settlement but former participants must do so, and that number is uncertain because it is unknown how many former participants can be reached. The amount held by each class member in the Plan during the Class period must be determined, which also will affect the amount per participant. This information is not yet known because notices and claim forms have not been distributed, all recordkeeping data has not be compiled, and calculations by the Settlement Administrator to determine individual recoveries will not be conducted until after the Settlement Effective Date. *E.g.*, Doc. 149-2 at 16 (¶6.5).[9]

As indicated in the Settlement Agreement, the amount distributed to Class members (or the Net Settlement Amount) will be determined after subtracting from the Gross

---

[9] Should the Court require this information, Class Counsel can work with the Settlement Administrator to provide an estimate of potential individual recoveries and present that information during the fairness hearing.

14

Settlement Amount: (a) attorneys' fees and costs ordered to be paid to Class Counsel; (b) any compensation awarded to the Class Representatives; (c) Administrative Expenses incurred in facilitating the Settlement; and (d) a contingency reserve for Administrative Expenses incurred before or after the Settlement Effective Date, and for adjustments of data or calculation errors. *Id.* at 5 (¶2.39).

Based on the amount of the proposed attorneys' fees and costs that Class Counsel intends to petition the Court for approval ($3,550,000 and $825,000), the proposed amount to be paid to the Class Representatives ($25,000 – $30,000 per individual for five Class Representatives), and the *current* estimate of Administrative Expenses ($162,729, of which $132,729 is the cost of the Settlement Administrator, and $30,000 for the cost of the Independent Fiduciary who will separately review and approve the Settlement),[10] Class Counsel estimates the net settlement amount is approximately $5,972,271 (or $103 per participant on average based on the current estimated size of the Class of 58,110).[11] Some Class members will receive more than this and some will receive less. This is apart from the value of the non-monetary terms, which is very substantial and materially increases the amount of the monetary recovery.

### 2. Comparison between non-monetary relief and injunctive relief sought

---

[10] Class Counsel received a reduced bid for sending electronic notice to Class members who have a known e-mail address and print notices to those that do not of approximately $132,729.

[11] This is only an estimate based on information presently known and assumes no contingency reserve. Additional administrative expenses may be incurred to facilitate the settlement, such as for compiling the recordkeeping data.

Plaintiffs sought various forms of injunctive relief in their complaints. In *Clark,* apart from relief related to the recovery of Plan losses and removal of the Plan fiduciaries, Plaintiffs requested that the Plan include only prudent investments, the Plan obtain competitive bids for recordkeeping services, the Plan pay only reasonable recordkeeping expenses, and the fiduciaries be required to select investments and service providers based solely on merit. *See* Doc. 72 at 144–45. Based on the claims asserted in *Lucas* related to the unlawful payment of Plan assets to Duke as reimbursement of employee salaries and fringe benefits, Plaintiffs also requested that Duke be prohibited from receiving Plan assets, unless an independent fiduciary acting solely in the interest of the Plan determines that such a payment complies with ERISA. *Lucas*, Doc. 1 at 27.

As this Court is aware, after the lawsuit was filed, effective January 2019, Defendants dramatically restructured the Plan. The changes they made were very similar to what Plaintiffs have claimed should be done. Thus, the Class has already benefitted from these changes and this lawsuit. In particular, Duke consolidated the Plan's investment options and recordkeepers, selected Fidelity as the primary recordkeeper after receiving bids from providers, and now offers a new investment lineup to Plan participants. *See, e.g.,* Doc. 111 at 10; Doc. 119-1 ¶115. [12] Given these changes that Defendants have implemented after the filing of the lawsuit, certain requested injunctive relief was no longer needed. As a result, the non-monetary relief negotiated was tailored to provide additional benefit to Plan participants under the unique circumstances of this case.

---

[12] *See also* https://hr.duke.edu/benefits/retirement/retirement-plan-redesign.

Duke will do more under the Proposed Settlement. (1) Duke agreed to a three-year Settlement Period to comply with the non-monetary terms. Doc. 149-2 at 21 (¶10.1). (2) To ensure Plan participants are provided with prudent investment options, Duke has agreed to provide Class Counsel during the three-year Settlement Period with a list of the Plan's investment options and fees and the Plan's Investment Policy Statement (if any). *Id.* (¶10.2). (3) Duke has agreed to take into account the cost of different share classes in providing investment options. *Id.* at 22 (¶10.8). (4) Duke also agreed to retain an independent consultant during the last year of the Settlement Period to recommend to the Plan's fiduciaries whether they should issue RFPs for recordkeeping and administrative services provided to the Plan. *Id.* at 21 (¶10.4). (5) Duke has agreed to communicate in writing to current Plan participants to fully inform them of the investment options available in the new lineup and provide them with information on the performance and fees of the new investment options and frozen annuity accounts on a dedicated webpage, which was not previously done in this manner. *Id.* (¶10.3). This will enable participants to fully understand these aspects of the Plan much more completely. Should participants determine they want to transfer their investments in the frozen annuities, they will be provided contact information for the individual or entity to facilitate that transfer. *Id.* (6) Duke has agreed not to allow Plan assets to be used to pay salaries and fringe benefits and other expenses incurred by Duke for services performed by Duke employees during the three-year Settlement Period. *Id.* at 22 (¶10.9).

In addition to the changes to the Plan already made after this lawsuit was filed, these terms provide significant value to Class members in addition to the monetary component of the Proposed Settlement. Moreover, the value will occur far earlier than would be the case if there were a trial and appeal.

### 3. Overview of the nature and extent of any obstacles

Class Counsel believes that the risks and uncertainties inherent in continuing this litigation have been adequately addressed above.

### 4. Publishing supplemental briefing on the settlement website

Class Counsel has no objection to providing this supplemental brief or any other supplemental briefing by the parties on the settlement website. Defendants have no objection to posting this supplemental briefing on the settlement website, and will not be filing a supplemental brief in addition to this filing.

Should the Court require any additional information related to the adequacy or fairness of the Proposed Settlement, Class Counsel will promptly provide that information.

## CONCLUSION

Plaintiffs request that this Court grant preliminary approval to the Proposed Settlement.

February 1, 2019                              Respectfully submitted:

/s/ Jerome J. Schlichter
SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter, MO No. 32225
Michael A. Wolff, MO No. 38207
Kurt C. Struckhoff, MO No. 61873
100 South Fourth Street, Ste. 1200
St. Louis, Missouri 63102
(314) 621-6115, (314) 621-5934 (fax)
jschlichter@uselaws.com
mwolff@uselaws.com
kstruckhoff@uselaws.com

*Counsel for all Plaintiffs*

/s/ David B. Puryear, Jr.
David B. Puryear, Jr.
North Carolina State Bar No. 11063
PURYEAR & LINGLE, PLLC
5501-E Adams Farm Lane
Greensboro, NC 27407
(336) 218-0227
puryear@puryearandlingle.com

*Local Counsel for all Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on February 1, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of filing to all counsel of record.

/s/ Jerome J. Schlichter

19